# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

JOHN DOE, )
)
      Plaintiff, )
)
v. )     Civil No. 5:15-cv-00035-EKD
)
JONATHAN R. ALGER, President of )
James Madison University, sued in his )
official capacity, and )
)
MARK J. WARNER, Ph.D., Senior )
Vice President of Student Affairs and )
University Planning for James Madison )
University, sued in his official capacity, )
)
      Defendants. )
)

## AMENDED COMPLAINT

### INTRODUCTION

John Doe,[1] by and through counsel, files this Amended Complaint, pursuant to this Court's Oral Order entered June 26, 2015 (Dkt. No. 27). This action is one for declaratory, injunctive and other appropriate relief and is brought to vindicate Plaintiff's rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. This case arises out of a constitutionally flawed disciplinary process that resulted in James Madison University ("JMU") suspending Plaintiff for more than five years based on an unjustified and erroneous determination that he was "responsible" for an act of "sexual misconduct."

### PARTIES

1. Plaintiff John Doe is, and at all times relevant to this Complaint has been, a resident of the Commonwealth of Virginia.

2. Defendant Jonathan R. Alger is the President of JMU and served in this role at all times relevant to this action. As President, Defendant Alger is charged with the general

---

[1] "John Doe" is not Plaintiff's real name. Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under a pseudonym to protect his privacy and that of his accuser, who is identified as "Jane Roe." Defendant will not be prejudiced by permitting Plaintiff to proceed anonymously because JMU has knowledge of the actual identities of both John Doe and Jane Roe. A separate motion (Dkt. No. 2) is pending before the Court on this issue.

responsibility for the administration of the University, and is ultimately responsible for the actions taken by JMU described herein. Mr. Alger was acting under color of state law at all times, and is sued in his official capacity only.

3.     Defendant Mark J. Warner, Ph.D., is the Senior Vice President of Student Affairs and University Planning at JMU and served in this role at all times relevant to this action. He is in charge of various departments at JMU, including the Office of Student Accountability and Restorative Practices ("OSARP"). Dr. Warner was the person who authorized the disciplinary action taken against Plaintiff. Dr. Warner was acting under color of state law at all times, and is sued in his official capacity only.

## JURISDICTION AND VENUE

4.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 2201, 2202, 1331 and 1343.

5.     James Madison University (hereafter "JMU" or "University") is an institution of higher education located in Harrisonburg, Virginia, and is part of the statewide system of public higher education operated by the Commonwealth of Virginia. All of the actions of its officials described herein took place under color of state authority.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as all of the acts, errors and omissions giving rise to Plaintiff's claims took place in this district.

## JMU CREATES A PROTECTED PROPERTY INTEREST IN
## CONTINUED ENROLLMENT IN THIS CASE

7.     In the fall of 2013, Plaintiff applied to JMU and several other Virginia universities for admission as a freshman undergraduate for the school year that was to begin in August 2014.

8.     In the spring of 2014, Plaintiff was notified by JMU and two other state universities that he had been accepted for admission as a freshman in August 2014.

9.     JMU's offer of admission to Plaintiff was an offer to enroll as an undergraduate student and obtain an education subject to policies governing student conduct. In an effort to induce accepted students to enroll there, JMU substantially limited its ability to suspend, expel or dismiss students by adopting policies, by engaging in practices and a consistent course of conduct for many years, and by fostering understandings that it would not suspend or dismiss students without proving cause.

10.     In return for Plaintiff paying the required tuition and fees in a timely manner, JMU agreed to provide an undergraduate educational program which required the earning of a minimum of 120 credit hours to be earned over several years in order to be eligible for a degree. During this period of enrollment, JMU placed substantive limits on its ability to suspend or dismiss Plaintiff by adopting policies and by continuing to follow a longstanding and consistent practice of requiring a finding of cause, as determined by a fair and impartial process which

included notice of the charge, a meaningful opportunity to appear, and confront the evidence to be considered.

11.    Based on these policies, courses of conduct, practices and understandings which JMU created and published to all students, JMU has never dismissed, suspended, expelled or separated an undergraduate student for alleged misconduct without proving cause through the use of a fair and impartial process where the accused student had a meaningful opportunity to appear before the fact-finder and confront all the evidence considered.

12.    If JMU had stated it could or would dismiss students arbitrarily without cause, then many students, including Plaintiff, would have declined JMU's offer of admission and enrolled elsewhere.

13.    JMU's Policy on Student Rights,[2] in part, provided as follows:

**James Madison University considers individuals as students upon receipt of deposit for admission until their official graduation date.** (emphasis in original) …

All students have the right to fair and equitable procedures, which shall determine the validity of charges that they have violated university regulations….

Each student has the right to know in advance the range of sanctions. The definition of adequate cause for separation from the university should be clearly formulated and made public.

**Accused Student Rights (Sexual Misconduct)** (emphasis added)

**An accused student has…**

   **1.  The right to a fair and impartial case review.**

   **2.  The right to a presumption of being not responsible for a violation until proven responsible as determined by a preponderance of the evidence…**

   **4.  The right to be present during the entire case review…**

   **6.  The right not to have his or her past sexual history discussed during the case review, except as it relates to the specific incident in question.**

14.    In promulgating the Student Rights Policy, JMU created a clear understanding that students accused of sexual misconduct have the right to a presumption that he or she will not be suspended, expelled or separated from enrollment until he or she has been proven responsible

---

[2] **Exhibit A** is a copy of a policy published on JMU's website as of January 12, 2015. Plaintiff submitted a FOIA request to JMU on June 29, 2015, asking JMU to provide the policies in effect in August 2014, when Plaintiff matriculated, but to date JMU has not provided the requested documents.

for committing the specific misconduct alleged. This express policy substantially limits JMU's ability to sanction a student for sexual misconduct. JMU created a clear understanding that it encouraged and expected students, including Plaintiff, to rely upon.

15.     JMU's Student Rights Policy specifically provides a student accused of sexual misconduct with the right to a fair and impartial case review, which includes among other elements, the right to be present during the entire case review.

16.     JMU, as a recipient of federal funding, has entered into a contract with the federal government that requires JMU to adopt fair and impartial processes and procedures to protect the due process rights of students accused of having committed an act of sexual misconduct.

17.     On or about April 6, 2014, in reliance on these policies, practices and understandings regarding Student Rights, Plaintiff accepted JMU's offer and paid the required deposit. By doing so, Plaintiff entered into a relationship with JMU that entitled him to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course work needed to earn a degree, otherwise met the requirements for graduation, and complied with JMU's conduct rules.

18.     In addition to the initial deposit, consistent with their agreement, Plaintiff also timely paid JMU the sum of $9,270 in tuition and fees for the fall semester 2014. The tuition paid was based on the entitlement Plaintiff had as a Virginia resident to receive state support for his college education.

19.     JMU's agreement with Plaintiff did not permit JMU to suspend or dismiss him without proving good cause existed.

20.     Plaintiff had a constitutionally protected property interest in his continued enrollment at JMU and to be free from arbitrary dismissal as a result of the policies, courses of conduct, practices and understandings established by JMU which substantially limited JMU's discretion to sanction students for misconduct, including for allegations of sexual misconduct. JMU's Student Rights Policy (**Exhibit A**) specifically provides that JMU would not suspend, expel or separate a student for misconduct, including sexual misconduct, until after both a fair and impartial case review where the student could be present throughout, and after the student has been "proven responsible" for the specific charge of misconduct.

21.     Plaintiff's contractually protected property interest arises under state law by virtue of JMU's policies, courses of conduct, practices and understandings as described herein and is protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

22.     Plaintiff's constitutionally protected property interest also arises by virtue of the express and implied contractual relationship that existed between Plaintiff and JMU.

## BACKGROUND GIVING RISE TO CLAIMS

23.     On or about June 4, 2014, the Office of Civil Rights of U.S. Department of Education ("OCR") commenced a Title IX investigation in response to a complaint made by

Sarah Butters, a former female student, who challenged JMU's response to her allegation of sexual assault by students while on spring break.[3] She has alleged that it took JMU 372 days to determine that three male students were "responsible" for a sexual assault, and then only punished them by expelling them after they were allowed to graduate.

24.     As national, regional and local media reported on the allegations prompting this OCR investigation, a series of harsh and critical news articles appeared in mid-June, 2014.

25.     In response, on June 19, 2014, JMU issued a public response in an effort to offset this very negative publicity. The statement included a pledge to review all of its policies and procedures "to ensure that it is doing all it can to prevent and address issues of sexual harassment and assault."

26.     Then, on June 28, 2014, Defendant Alger issued a statement on "Student Safety" in an effort to provide reassurance to the new students and their families who were coming for freshmen orientation that JMU was doing "everything in its power to help keep our students safe."

27.     In the summer of 2014, JMU began to make changes to the policies and procedures used to investigate and respond to allegations of sexual assault, including changes in the judicial hearing panels and the appeals process.

28.     In August 2014, Defendant Alger appointed a 14-member Title IX Task Force to take a comprehensive look at JMU's efforts to combat sexual assault. Defendant Warner is a key member of this Task Force.

29.     On August 27, 2014, in a further attempt to make headway against the harsh criticism leveled against JMU for its "post-graduation" punishment approach, Defendant Alger posted an article on the new weblog created by the White House, www.NoMore.org, in which he cautioned others to avoid a "rush to judgment and finger-pointing [against JMU] based on incomplete or inaccurate information."

30.     During the fall semester of 2014, there were numerous meetings held on campus involving students, faculty and administrators to address what many claimed was a system that provided insufficient protection for those who were victims of sexual assault. On August 24, 2014, the campus newspaper, *The Breeze*, published an editorial, "*We cannot tolerate a culture of sexual assault at our school*," related to the perceived problem that JMU's system provided an inadequate response to claims of sexual assault. Virtually every week thereafter, the newspaper carried an article addressing some aspect of this issue.

31.     On December 4, 2014, *The Breeze* repeated its call to action in what it saw as the "stark" difference in how the University of Virginia had responded to the "gang rape" (as reported by *Rolling Stone*) and JMU's ineffective response to Sarah Butters in an op-ed piece

---

[3] Ms. Butters is now the plaintiff in a Title IX case pending in this Court, *Sarah Elizabeth Butters v James Madison University*, Civ. Action 5:15-cv-00015-MFU. On May 4, 2015, JMU filed a motion to dismiss for failing to state a claim under Title IX.

entitled, "*JMU shouldn't need a controversy to 'be the change.'*"

32.     Over JMU's winter break, December 12, 2014 to January 9, 2015, President Alger sent an email informing all students that he had appointed the Title IX Task Force, and indicating that progress had been made.

33.     On information and belief, the OCR investigation prompted by Sarah Butters' complaint is ongoing.

34.     Given the continued pendency of the OCR's investigation and unrelenting public criticism of JMU's handling of the Butters matter since June 17, 2014, JMU's senior officers, especially Defendants Alger and Warner, have been and continue to be under significant public pressure to respond quickly and decisively when a female JMU student makes a complaint alleging sexual assault.

## RELATIONSHIP BETWEEN PLAINTIFF AND JANE ROE

35.     In August 2014, Plaintiff and Jane Roe enrolled as freshmen at JMU as full time students.

36.     Plaintiff and Jane Roe were assigned to live in the same dorm, but on different floors.

37.     Plaintiff and two of his friends met Jane Roe and two of her friends in their dorm on the evening of Friday, August 22, 2014. This was the first time Plaintiff and Jane Roe had met, and after the group talked, Jane Roe's smartphone was used to take a photograph of the entire group at 10:36 p.m., just before Plaintiff and his friends left the dorm and went out separately from Jane Roe and her friends.

38.     After exchanging text messages, Plaintiff and Jane Roe arranged to meet back at the dorm during the early morning hours of Saturday, August 23, 2014. The two went out briefly, and then returned to Plaintiff's dorm room, where they had consensual sex.

39.     Thereafter, Plaintiff and Jane Roe exchanged numerous friendly communications over several days, and on Sunday evening, August 24, 2014, Plaintiff visited Jane Roe in her dorm room at her request.

40.     The following week, Jane Roe came to Plaintiff's room, and the two had consensual sex for the second time.

41.     Several days later, Jane Roe came back to Plaintiff's room a third time, this time with a pillow and blanket. When the door opened and Jane Roe saw another female sitting on Plaintiff's bed, she promptly left.

42.     Thereafter, the two had only two interactions and both were initiated by Jane Roe.

## JANE ROE'S CHARGE OF SEXUAL ASSAULT

43.     On November 6, 2014, Plaintiff received an email from OSARP notifying him that documentation had been received which had resulted in a charge of "Sexual Misconduct" being brought against him.

44.     JMU classifies a broad range of conduct as "Sexual Misconduct."

45.     The OSARP email did not provide Plaintiff with any details of the allegation or identify the accuser, but Plaintiff was directed that he was to have no further contact with Jane Roe, and warned that *any* contact, directly or indirectly, with her would result in another charge. Plaintiff was advised to attend a meeting on November 13, 2014 at 2:00 p.m. where the charge would be discussed and the procedures explained, and if he failed to attend, he would also be charged with another violation of JMU policies.

46.     On November 9, 2014, over Plaintiff's objection, JMU required him to move out of his residence hall to another dorm across campus.

47.     As directed, on November 13, 2014, Plaintiff met with R. J. Ohgren, Assistant Director of JMU's OSARP, who explained the procedures to be used and his rights as an accused student.  He informed Plaintiff that two dates, December 3 and/or 5, 2014, were under consideration for the hearing.

48.     At this meeting, Plaintiff was provided a copy of his "Rights" as an "Accused Student" facing a sexual misconduct charge.[4]

49.     In terms of the details of the Sexual Misconduct charge, Mr. Ohgren simply advised Plaintiff to review materials in the OSARP file on which the charge was based.  Mr. Ohgren told Plaintiff that he was prohibited from making or receiving copies of any of the materials supporting the charge, but advised Plaintiff that he could take personal notes about the documents.

50.     The OSARP file provided to Plaintiff contained only two items: (i) a typed report dated October 24, 2014, prepared by JMU employees/students who served as the Resident Advisor and Hall Director for Plaintiff's dorm, and (ii) a typed report dated October 29, 2014, submitted by JMU's then Title IX Officer for Students.  Each statement described interviews of Jane Roe who alleged that her first sexual encounter with Plaintiff was not consensual, and she told the Title IX Officer she was drunk (the "Charge"). There was no typed or written statement signed by Jane Roe or by any other person who claimed to support her Charge against Plaintiff.

51.     Jane Roe's Charge against Plaintiff accused him of rape on August 22, 2014, but not the second occasion when the two had sexual intercourse the following week.

52.     On November 19, 2014, Plaintiff received notice from Wendy Lushbaugh, Associate Director of JMU's OSARP, that the hearing on this Charge would occur on December

---

[4] **Exhibit B** is a redacted copy of the document signed by Plaintiff on November 13, 2014.

5, 2014 at 3:30 p.m.

53.     On December 4, 2014, Ms. Lushbaugh sent an email reminding Plaintiff of the hearing the next day at 3:30 p.m. She advised him that five witnesses would be called to present evidence "*for the University*" on the Charge, including Jane Roe, her roommate, her suitemate, the Resident Advisor and the Hall Director. The email concluded with a stern caution, "discussing this case before the case review with any of the witnesses for the university may lead to an additional charge of interference with the Accountability Process."

54.     Later that day, Plaintiff visited the OSARP office and reviewed the file of materials to be used to support the Charge to see if new information had been submitted in support of the Charge. Other than the October 24 and 29 typed reports mentioned above, Plaintiff found only a short handwritten statement by a female student dated December 3, 2014, who claimed to have seen Jane Roe drinking earlier in the night of August 22, 2014.

## DECEMBER 5 HEARING EXONERATES PLAINTIFF

55.     A hearing on the Charge was held on Friday, December 5, 2014, beginning at 3:30 p.m. This hearing occurred more than 40 days after Jane Roe first complained on October 24, 2014.

56.     Joshua Bacon, the Director of OSARP ("Dr. Bacon"), chaired a three person panel which heard and considered the testimony, information and materials presented ("Hearing Panel"). The Hearing Panel was asked to decide whether Plaintiff was "responsible" for the Charge by using only a "preponderance of the evidence" standard.

57.     The testimony offered in support of the Charge was provided by Jane Roe, as well as live testimony from two University witnesses: Jane Roe's Resident Advisor and her supervisor, the Hall Director, each of whom provided testimony about their interactions with Jane Roe on October 24. In addition, the documents from the OSARP file mentioned above were submitted, which included the October 29, 2014 typed report submitted by JMU's Title IX Officer for Students regarding her conversation with Jane Roe on October 28. Jane Roe also gave a "victim impact statement" orally to the Hearing Panel as part of her presentation on the Charge which included very sensitive information about her past.

58.     The Hearing Panel also heard live testimony from two other University witnesses, Jane Roe's roommate and suitemate. The roommate testified she did not believe Jane Roe was drunk or incapacitated when she saw Jane Roe in Plaintiff's dorm room shortly after the first sexual encounter.

59.     The testimony by Jane Roe's roommate to the Hearing Panel that Jane Roe was not drunk or incapacitated in the early hours of August 23 was important testimony. The Hearing Panel heard this testimony live and was able to observe the demeanor of this witness as she described the events of August 22 and 23.

60.     The suitemate also testified before the Hearing Panel. She testified that she had no personal knowledge of what happened on the night in question as she was not involved.

61.     Plaintiff then testified about the events of the night and early morning in question. He testified that Jane Roe had consented to sex and denied she had been drunk or incapacitated. Plaintiff also testified about his subsequent interactions with Jane Roe, including the fact they had consensual sex a second time the following week.  Plaintiff's roommate, although not present at the time of the sexual encounters, testified about what he knew about the night in question, and other interactions between Plaintiff and Jane Roe thereafter.  Plaintiff called a female student who testified as to his good character.  Plaintiff also presented a one page document that showed the group photograph taken with Jane Roe's smartphone on August 22, which she sent to Plaintiff, and a few screen shots of text messages between Plaintiff and Jane Roe.

62.     Witness credibility was very important in resolving Jane Roe's allegations against Plaintiff because no one else was in the dorm room during the early morning hours of August 23, 2014 when the sexual encounter occurred.

63.     In this regard, the members of the Hearing Panel were fully engaged during the hearing asking questions of Plaintiff and Jane Roe, as well as most of the witnesses who testified.

64.     Once all the evidence was submitted, the Hearing Panel excused the witnesses and parties, and deliberated on the information provided.  At approximately 8:30 p.m., Dr. Bacon reported to both parties that the Hearing Panel had determined that Plaintiff was "not responsible," meaning he had not raped Jane Roe.  The Hearing Panel reached this decision on the Charge even though the University only had to prove Plaintiff "responsible" by a mere preponderance of the evidence.

65.     The exam period for JMU's fall semester 2014 began on Monday, December 8, 2014.  The semester ended on December 12, 2014.

66.     The Hearing Panel's decision was not a mere recommendation, but a final decision exonerating Plaintiff of any actions constituting Sexual Misconduct, and Jane Roe's accusation could not have been raised against Plaintiff again at JMU in the future unless JMU allowed an appeal by Jane Roe.

67.     In all cases, other than those involving allegations of Sexual Misconduct, if a JMU student is accused of misconduct (even accusations of serious criminal misconduct where others are badly injured) and is found "not responsible" at a disciplinary hearing, the matter is final for JMU purposes in all respects.  The accusing student or others in these other cases have no right to file an appeal.[5]

68.     Despite the protections provided to students accused of serious criminal misconduct, in order to comply with OCR Guidance on Title IX, JMU adopted different policies

---

[5] **Exhibit A.**  JMU's policies in this regard comport with traditional notions of due process.  If an accused is found "responsible" after a case review hearing, then JMU affords a right of appeal only to the accused student to challenge the decision and/or sanction.  If an accused student is exonerated of wrongdoing at the hearing, then there is no appeal by the accusing student.

regarding appeal when the accusation involves Sexual Misconduct.[6] The Title IX rules did not and do not require JMU to take the actions described below.

69.     In developing this new and novel right of appeal for an accuser who has brought a Sexual Misconduct charge, JMU set in place an unfair and constitutionally deficient appeal process more fully set forth below.  Moreover, JMU compounded its error by denying the accused any recourse whatsoever from an adverse decision by the Appeal Board even though he had prevailed on the merits during the only hearing where actual testimony was taken and credibility could be judged.

70.     Unknown to Plaintiff at the time, JMU employees, who report to or who are under the supervisory authority of the Defendant Warner, were making changes to the process and procedures to be used to adjudicate the Charge against Plaintiff and on which the Appeal was decided during the period November 1, 2014 to January 9, 2015.[7]

71.     Plaintiff passed all of the classes that he took during the fall semester 2014, and was in good standing academically when the semester ended on December 12, 2014.  Consistent with JMU's policies, practices and understandings, as well as Plaintiff's contractual arrangement with JMU, Plaintiff had pre-registered for five new classes that were set to begin on January 12, 2015, when the spring 2015 semester began, and planned to return the day before to continue his studies.

## JANE ROE'S "APPEAL"

72.     On December 10, 2014, Jane Roe filed an appeal asserting three possible grounds for an appeal: (i) alleged "new evidence," (ii) "leniency" of the sentence," and (iii) denial of "due process" (the "Appeal").[8]  This Appeal was filed on the very last day permitted by JMU's new appeal system.  JMU employees encouraged Jane Roe to file this Appeal.

73.     In support of her Appeal, Jane Roe submitted only her own short handwritten statement and a typed statement dated December 10, 2014, from the student who had served as Jane Roe's "support person" during the original hearing.

74.     JMU permits both the accuser and the accused in a Sexual Misconduct case to have a "support person" assist at the Hearing.  Under JMU's policies, a person who serves as a "support person" cannot also provide testimony or evidence as a witness as part of the case review.

75.     Despite JMU's policies prohibiting it, Jane Roe submitted a typed statement from her "support person" as so-called "new evidence."  The typed statement indicated that the

---

[6] **Exhibit C** is a copy of JMU's Sexual Misconduct Accountability Process published on JMU's website as of January 12, 2015.  As noted above in ftn. 2, Plaintiff is waiting for a response to a FOIA request to determine if this policy is the correct policy for this case.

[7] As indicated in ftn 2 above, Plaintiff's FOIA request with JMU is pending, and he has requested this information. Plaintiff is aware of an email dated December 8, 2014 to Defendant Warner discussing changes to the appeals process which had been in circulation since November 21, 2014.

[8] **Exhibit D** is a redacted copy of Jane Roe's Appeal filed on December 10, 2014.

"support person" had been with Jane Roe earlier in the evening of August 22 when the group photograph had been taken with Plaintiff, and that afterwards Jane Roe, Jane Roe's roommate and the "support person" had been out drinking. The "support person" then stated that when she and Jane Roe's roommate left Jane Roe alone at an off-campus party, the "support person" thought Jane Roe was intoxicated. The "support person" acknowledged that Plaintiff had not been present when Jane Roe had been drinking, and stated that she did not know what occurred after she left Jane Roe alone at the party. She offered no information about Plaintiff or the sexual encounter.

76.     This information from Jane Roe's "support person" was "new evidence" in the sense that it was not offered to the Hearing Panel, but it was not "new" in the sense that the information had been unavailable to Jane Roe before the December 5 hearing. By not testifying before the Hearing Panel, the "support person" was not subject to questioning by Plaintiff or the Hearing Panel.

77.     On Thursday, December 11, 2014, the next to last day of the fall semester, Plaintiff received a call from Mr. Ohgren advising him that Jane Roe had filed an appeal that would be heard on December 18. He also advised Plaintiff that OSARP was closing early the next day since Friday was the end of the semester. As a result, Plaintiff went to the OSARP office that afternoon to view the Appeal file.

78.     Upon review, Plaintiff saw the Appeal file consisted of only the official JMU appeal form signed by Jane Roe, Jane Roe's short handwritten statement, and the typed statement (described above) by the "support person." As before, Plaintiff was not allowed to make or receive copies of any of these documents.

79.     Plaintiff advised Mr. Ohgren that he had two exams the next day and was leaving shortly thereafter on a trip out of state and would have little or no access to a computer for an extended period of time.

80.     During this meeting on December 11, 2014, Mr. Ohgren informed Plaintiff that he would not be allowed to appear before or attend the meeting of the Appeal Board.

81.     On Friday, December 12, 2014, OSARP solicited and then appointed three "volunteers" to serve as the Appeal Board for Jane Roe's Appeal, and initially scheduled a hearing of the Appeal Board for December 18, 2014 at 1:30 p.m.

82.     Also on December 12, 2014, Mr. Ohgren called Plaintiff to inform him that Jane Roe had been given extra time (until Saturday December 13, 2014 at 5:00 p.m.) to submit additional evidence and the Appeal Board hearing had been postponed. Mr. Ohgren also said, while no precise date was set for the Appeal Board to meet, it would occur before classes commenced for the spring semester.

83.     On December 12, 2014, JMU closed all dorms for undergraduate students, and the dorms remained closed until Sunday, January 11, 2015. During this time period, Plaintiff was out of state for a substantial period and also on holiday with his family.

Case 5:15-cv-00035-EKD-JCH   Document 30   Filed 07/17/15   Page 11 of 24   Pageid#: 321

84.     OSARP then gave Jane Roe additional extra time to submit information in support of her Appeal based on "new evidence" by extending the deadline from December 13 to December 15, 2014.

85.     On or about December 15, 2014, Jane Roe presented two additional types of "new evidence" to OSARP.

86.     The first part of Jane Roe's "new evidence" consisted of two documents from her suitemate who had previously testified as a University witness at the December 5 hearing. The first document was a typed statement dated December 5, 2014 by the suitemate where she admits again that she did not know anything about what occurred on August 22, other than what she learned "later in the semester." She asserted that she got involved to help Jane Roe because she believed Plaintiff had been engaged in a similar experience with another girl, who was not named.

87.     This typed statement by the suitemate contained "new evidence" that she had not testified to at the December 5 Hearing, and as a result, neither Plaintiff nor the Hearing Panel had the ability to question her or judge her credibility about these issues.

88.     The other document was an undated email from the suitemate to OSARP which accused Jane Roe's roommate of intentionally providing false information to the Hearing Panel, and concluded by falsely calling Plaintiff a "rapist." This email was "new evidence" that was not part of the proceedings before the Hearing Panel.

89.     JMU prohibited Plaintiff from contacting both Jane Roe's roommate, whose credibility was now being attacked, and the suitemate who raised allegations of another alleged incident unrelated to Jane Roe. As a result, Plaintiff was prohibited from responding in any meaningful way to these attacks and this so-called "new evidence."

90.     The second type of so-called "new evidence" submitted for the first time by Jane Roe on December 15, 2014 was a statement and materials from a friend who attended another college. The friend provided a voice message recording left by Jane Roe and her roommate, a short statement and a screenshot from her smartphone which showed the voice message was left at 11:39 p.m. on Thursday, August 21, 2014. Jane Roe provided no contact information for her friend, and under JMU's policies, Plaintiff was prohibited from contacting her.

91.     Jane Roe provided no explanation for why this so-called "new evidence" from her friend had not been presented at the December 5, 2014, hearing, or how it related to the Charge she had made against Plaintiff.

92.     Then, at 12:03 a.m. on December 17, 2014, more than a day after the already twice extended deadline for the Appeal had expired, Jane Roe submitted a further email to the OSARP Office to provide a new statement of her Appeal, including new information and renewing her argument that her "story is true." She too alleged that her roommate lied at the hearing, and for the first time, Jane Roe tried to connect the new voicemail to her ability to consent. Though this voicemail left by Jane Roe occurred more than 24 hours before Jane Roe and Plaintiff had sex for the first time, Jane Roe now claimed in her "new" Appeal statement that

the voicemail was evidence *"that I was drunk and unable to give consent to sex"* with Plaintiff. The statement then concluded with the statement, *"It is very important to me that I feel safe and the other victim feels safe on this campus."*

93.     This new Appeal statement from Jane Roe came 12 calendar days after the December 5, 2014 hearing, and was not immediately provided to Plaintiff. As discussed below, Plaintiff did not even receive this new statement of Appeal for another five days.

94.     On Thursday, December 18, 2014, at 4:42 p.m., JMU sent Plaintiff some of the "new evidence" submitted by Jane Roe, but not all of the information and documents provided to the Appeal Board, as explained below. Plaintiff was only given until Monday, December 22, 2014, a mere three days, to submit a response. Jane Roe's new Appeal statement was not sent with this email even though JMU had possession of it for more than 36 hours.

95.     Unaware of Jane Roe's new more complete statement of her Appeal and Jane Roe's attempt to connect the voice message to the Charge, Plaintiff sent his response to Jane Roe's original Appeal statement on December 22, 2014. His response, like Plaintiff's original Appeal, was short and reiterated his innocence. He also submitted a short statement from another JMU student who described a subsequent encounter set forth in paragraph 41 above where Jane Roe left Plaintiff's room upset when she found Plaintiff with another female in his room.

96.     Since JMU prohibited Plaintiff from contacting Jane Roe's roommate, suitemate, or her friend, and since he had very limited time and no in-person access to any other student witnesses since the University was closed for the winter break, he was given no other meaningful way to respond to the original Appeal.

97.     In response to Plaintiff's reply to the original Appeal, Ms. Lushbaugh then sent Plaintiff an email which "cut and pasted" information from Jane Roe's new Appeal and gave him a mere 24 hours to respond. Nowhere in this email did JMU advise Plaintiff that he had the right to request more time to respond.

98.     Plaintiff did not see this email from Ms. Lushbaugh until after the mandatory 24 hour deadline had expired.

99.     The statements in Jane Roe's "new" Appeal statement joined in the attack on her roommate's truthfulness at the December 5 hearing, asserted for the first time that the August 21 voicemail proved her intoxication to the point that she could not have consented to sex with the Plaintiff on the first encounter (even though it was the wrong day), and accused Plaintiff of victimizing another unnamed female student who did not feel safe on campus.

100.    JMU permitted Jane Roe and her suitemate to present unfounded and generalized statements suggesting that Plaintiff had sexually assaulted another JMU student in direct violation of the Student Rights Policy. JMU gave Plaintiff no notice of any specifics of this alleged "other victim," and thus he had no meaningful way to defend himself.

101.    As Plaintiff was unaware of this "new" statement of Appeal, Jane Roe's new

accusations and "new evidence" were left without any response.

102.     In addition to these documents which were not in the OSARP file on December 11, 2014, at some point on or after December 4, 2014 and before January 8, 2015, Jane Roe submitted to OSARP a copy of her typed written "Impact Statement" dated December 5, 2014, a three page statement from a licensed clinical social worker dated December 3, 2014, that describes the impact of alcohol use when also using a specific prescribed medication, and a one page prescription report from CVS. These additional documents also were "new evidence" on the Appeal.

103.     While Jane Roe did mention some of the information contained in the "Impact Statement" when she testified at the December 5 hearing, at no time relevant to this action did JMU provide Plaintiff notice or a copy of any of this "new evidence," even though these documents were part of the "file" forwarded to the Appeal Board to be considered in connection with its deliberations.

104.     JMU made multiple accommodations to Jane Roe by allowing late evidence that it did not make for Plaintiff, allowing her to submit information prohibited by JMU's policies, and allowing her to submit a new Appeal statement a week after the deadline for filing an appeal.

105.     JMU gave Plaintiff inadequate time and no meaningful opportunity to respond to the various forms of "new evidence" and "new arguments" presented by Jane Roe on her new Appeal statement.

106.     Unlike its treatment of Jane Roe, JMU gave Plaintiff no advance notice of exactly what charges would be considered by, or the information provided to, the Appeal Board, and gave him no meaningful opportunity to respond to the "new evidence" and "new appeal" being presented by Jane Roe.

## JMU DENIES PLAINTIFF ANY OPPORTUNITY TO APPEAR BEFORE APPEAL BOARD

107.     At no relevant time was Plaintiff informed of the identity of the three persons appointed to serve on the Appeal Board, and he never received notice of the date or time for the Appeal Board's hearing.

108.     JMU clearly and unequivocally advised Plaintiff that he had no right to appear before the Appeal Board. This notice was provided to him even though JMU's policy clearly would have allowed for Plaintiff to be present in appropriate circumstances.

109.     The decision to deny Plaintiff the right to appear before the Appeal Board was made by or with the approval of Defendant Warner.

110.     The Appeal Board was not informed that Plaintiff had been given a mere three days to respond to Jane Roe's Appeal, nor were they told that Plaintiff did not have Jane Roe's December 17, 2014 email when he submitted his reply to the Appeal.

111. Since JMU denied Plaintiff any right to appear before the Appeal Board and failed to notify Plaintiff who would be serving on the Appeal Board, Plaintiff had no way to assess its members, or challenge their participation for bias.

112. JMU made the decision to proceed with deciding Jane Roe's Appeal in Plaintiff's absence during the period December 12, 2014 to January 9, 2015, rather than wait for the spring semester to resume on January 12, 2015. This decision had the effect of further limiting Plaintiff's ability to develop information from other students to respond to the Appeal.

113. The Appeal Board for Jane Roe's Appeal was granted full authority to decide the merits of her Appeal on a *de novo* basis, even though Plaintiff, as the accused, was not allowed to be present or to confront his accuser and the "new evidence" being considered for the first time.

114. While JMU informed Plaintiff that both Jane Roe and he would have the right to file an appeal from the Hearing Panel's decision, JMU never informed Plaintiff of the following: (i) if only Jane Roe appealed, the Appeal Board would have the ability to re-decide the Charge on a *de novo* basis as if the "appeal" was a new trial, and (ii) if the Appeal Board overturned the Hearing Panel's ruling in his favor and found him to be "responsible" for the very first time, that he would have absolutely no right of appeal of any kind.

115. On January 8, 2015, without notice to Plaintiff, the anonymous Appeal Board met in secret. It heard no live testimony, but had before it the so-called "new evidence" submitted by Jane Roe.

116. Despite the absence of Plaintiff, any live testimony, cross examination of witnesses or any presentation on behalf of Plaintiff, the Appeal Board considered Jane Roe's allegations regarding the Charge, all of her "new evidence" and subjected Plaintiff to a second trial on the Charge in his absence.

117. Defendants denied Plaintiff any opportunity to appear before the Appeal Board (which was acting as a fact-finding body), to examine or challenge the so-called "new evidence," to challenge any of the additional information provided in the case file, or to offer additional information to refute Jane Roe's claims set forth in her "new" Appeal.

118. Despite the fact that the Appeal Board knew that JMU had prohibited Plaintiff from contacting Jane Roe's roommate, the Appeal Board made no effort whatsoever to secure any information or a response from Jane Roe's roommate who had been accused of intentionally lying to the Hearing Panel. In fact, had a reasonable effort been made to contact her, the Appeal Board would have learned that the roommate would have refuted this accusation by the suitemate and Jane Roe, and reaffirmed her original testimony that Jane Roe was not drunk.

119. Accordingly, despite the importance of witness credibility in resolving Jane Roe's allegations, the Appeal Board had no ability to assess witnesses' credibility through the observation of live testimony, but was left to consider Jane Roe's "new evidence" without rebuttal or challenge by Plaintiff.

120.    At the end of its January 8, 2015 meeting, without providing any reasoning and without even making or recording a finding that Plaintiff was "responsible," the Appeal Board completed the official JMU Appeal Board form and marked it as a case where the sanction was being "Increased."[9]

121.    The Appeal Board recommended to Defendant Warner that Plaintiff be suspended immediately through the end of the spring semester 2020 in order "to allow [Jane Roe] the opportunity to complete her chosen program of study, including any post-graduate certificate or advanced degree in a safe environment." The Appeal Board's sanction also requires Plaintiff to complete sexual assault counseling prior to readmission and bans him from participating in the Greek system.

122.    The Appeal Board's recommended sanction was forwarded to Defendant Warner for review and approval.

## DEFENDANTS APPROVE AND RATIFY ACTION TAKEN AGAINST PLAINTIFF AND DENY HIM ANY APPEAL OF THE ADVERSE DECISION

123.    Plaintiff was provided no notice of the Appeal Board's decision on January 8, 2015, and no right to contest this new decision before Defendant Warner acted on the Appeal and imposed the new sanction.

124.    On Friday January 9, 2015, Defendant Warner summarily affirmed the decision of the Appeal Board without any notice to or input from Plaintiff and approved the immediate suspension of Plaintiff for 5½ years to run through June 2020. The sanction requires Plaintiff to reapply for admission at the end of the suspension period.

125.    This sanction is tantamount to an expulsion from JMU.

126.    Despite the importance of witness credibility in resolving Jane Roe's allegations against Plaintiff, JMU gave more weight to the Appeal Board that considered new evidence in Plaintiff's absence and did *not* observe *any* live testimony than it did to the Hearing Panel that met and questioned both Plaintiff and Jane Roe, and heard and observed several hours of live testimony by multiple witnesses, including Jane Roe's roommate.

127.    Later on the afternoon of January 9, 2015, Ms. Lushbaugh (JMU's OSARP official) called Plaintiff to inform him that JMU had changed its mind on the Charge and he was suspended immediately until June 2020. He was advised that he was not permitted on JMU's campus for any reason effective immediately, and advised that he would need a police escort when he came to remove his personal belongings. Ms. Lushbaugh followed her call with an email that was sent at 5:10 p.m.

128.    JMU disclosed and published to Jane Roe the outcome of the Appeal and that Plaintiff had been suspended for 5½ years.

---

[9] **Exhibit E** is a redacted copy of the Appeal Board decision as produced to Plaintiff by virtue of a FERPA request.

129.	On January 9 and 10, 2015, Plaintiff and his parents contacted several JMU employees, including Dr. Bacon, to determine what recourse was available to overturn this unjust decision, and they were informed Dr. Warner's decision was final and there was no further appeal available on this matter.

130.	On January 15, 2015, JMU sent Plaintiff an email containing the "official" decision of the Appeal Board decision on January 8, 2015 and copied 24 different college departments including (among others), the campus police, director of public safety, parking, financial aid, bookstore, residence life, dining services, human resources, as well as the "Dispatchers for Public Safety" and Registrar. The email informed all recipients that Plaintiff had been suspended as of January 9, 2015 through the end of the spring, 2020 semester for "Sexual Misconduct."

131.	Despite the lack of an appeal, Dr. Warner and Dr. Bacon agreed to meet with Plaintiff and his parents on January 21, 2015. At this meeting, Plaintiff demonstrated that the Appeal Board decision was based on false and misleading information and that his due process rights had been violated. Plaintiff asked that the decision be set aside and that he be permitted to return to JMU.

132.	JMU considered the request for approximately 10 days, and then advised Plaintiff's counsel that there would be no change in JMU's decision and that JMU's system provided no further process of any kind; the suspension decision handed down on January 9, 2015, was final. Defendant Alger participated in this decision.

## CONSEQUENCES OF FALSE FINDING AND UNJUST SANCTION

133.	As a result, Plaintiff was not allowed to enroll in the five classes he was preregistered to take at JMU during the spring 2015 semester, or to participate in other educational and training opportunities, and was publicly banned from JMU's campus, except for permission granted so he could return for 2-3 hours on February 7, 2015, to retrieve his personal effects from his dorm room.

134.	The decision by the Defendants to impose a 5½ year suspension based on a finding Plaintiff had engaged in sexual misconduct is now part of Plaintiff's permanent student record, even though the information is false and carries with it a stigma that substantially limits, and in some instances will foreclose, his ability to transfer to another undergraduate institution. This information shall also substantially limit, and in some cases foreclose, future employment opportunities.

135.	JMU has an established practice of providing other universities with information about final disciplinary action taken against its students when a former or suspended student seeks to transfer to a new college or university and JMU receives a request from the other university.

136.	In addition to this established practice, JMU is now required by state law to place a prominent notation on the academic transcript of any student who has been suspended for, permanently dismissed, or has withdrawn while under investigation for an offense involving

sexual violence. Va. Code § 23-9.2:18.

137.    The registrar of JMU will comply with this state statute when providing transcripts and educational records of Plaintiff in the future, and when it does, it will include information regarding the Charge and the final decision taken.

138.    In connection with any request to transfer from one state-funded university in Virginia to another in order to continue his academic studies, Plaintiff must in all cases authorize the new university to obtain a copy of his academic transcript from JMU if he seeks admission as a transfer student.

139.    Further, when applying for admission at another college or university, Plaintiff will be asked to disclose this unjust decision, approved and ratified by these Defendants.

140.    Accordingly, despite its falsity, Plaintiff will be required to disclose as part of any application to transfer to a new university or college the existence of this disciplinary action and this highly stigmatizing finding of responsibility for sexual misconduct.

141.    Unless this Court grants the relief sought in this action, this highly stigmatizing information regarding a 5½ year suspension (equivalent to expulsion) for sexual misconduct will remain part of Plaintiff's permanent educational record at JMU, and it is inevitable that JMU will release these records to other higher educational institutions and potential employers. This disclosure will substantially limit and/or foreclose Plaintiff's ability to secure his undergraduate and graduate education at another university and other training programs and will substantially limit his future employment opportunities.

### COUNT I—VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 FOR DEPRIVATION OF PLAINTIFF'S PROPERTY INTEREST

142.    Plaintiff incorporates by reference all of the allegations in the preceding paragraphs of this Complaint.

143.    As set forth above, Plaintiff has a constitutionally protected property interest in his continued education at JMU, including the various educational and training programs it supports, of which he cannot be deprived arbitrarily without due process of law.

144.    Plaintiff 's constitutionally protected property interest in his continued enrollment at JMU and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by JMU which substantially limited JMU's discretion to sanction students for misconduct, including for allegations of sexual misconduct. JMU's Student Rights Policy (**Exhibit A**) specifically provides that JMU would not suspend, expel or separate a student for misconduct, including sexual misconduct, until after both a fair and impartial case review where the student could be present, and "proven responsible" for the specific charge of misconduct.

145.     Plaintiff's constitutionally protected property interest further arises from the express and implied contract relationship between JMU and Plaintiff.

146.     Plaintiff's constitutionally protected property interest also arises from the policies, courses of conduct, practices and understandings that have been regularly and routinely followed by JMU over many years and continuing to today which make it clear that there is an entitlement to continued enrollment at JMU unless one of three situations exist: (i) the required tuition and fees for attendance are not paid in a timely manner, (ii) the student does not remain in good standing academically, or (iii) the student is "proven responsible" for having committed a violation of student conduct rules or other legal requirements.

147.     As a result, if Plaintiff as a JMU student faced disciplinary action that included the possibility of a suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process JMU used.

148.     Plaintiff was entitled to process commensurate with the seriousness of the Charge and the potential discipline and sanctions he faced.  The rape allegation made in the Charge was very serious and resulted in very harsh sanctions, as well as the prospect of a lifelong stigma that will substantially limit or foreclose both future educational and employment opportunities.  As described above in detail, JMU failed to provide adequate due process.

149.     Furthermore, JMU violated its own policies by providing accommodations to Jane Roe that it did not provide to Plaintiff, by forcing the Appeal to be decided during a period of time when JMU was not in session, dorms were closed and students were not allowed on campus, and by not allowing Plaintiff to be present for and make a direct presentation to the Appeal Board when that body was conducting a *de novo* retrial on the merits and considering new witnesses and evidence not heard by the Hearing Panel.

150.     Defendants Alger and Warner, and other employees and agents of JMU, were acting under color of state law, and under significant public pressure to avoid a new controversy regarding JMU's processes for responding to allegations of sexual assault when they violated Plaintiff's constitutional rights, and denied him any meaningful right to participate in the Appeal.

151.     Further, the Defendants, while they authorized the creation of a new right of appeal for Jane Roe which heretofore had not existed and does not exist when adjudicating any other form of serious criminal misconduct charge at JMU, completely denied Plaintiff any right to appeal after the flawed decision was made by the Appeal Board and Defendant Warner.

152.     As a result of the due process violations described herein, Plaintiff has been wrongly disciplined and suspended, been deprived of his constitutionally protected property interest without due process and is suffering ongoing harm to his educational progress and his good name and reputation.  Plaintiff was effectively expelled from JMU, is unable to enroll in classes at JMU or its sponsored training programs, is unable to transfer to a comparable university, was injured by the broadcast email sent to 24 campus departments, and continues to be injured by University records labeling him as having committed sexual misconduct.

## COUNT II — VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 FOR DEPRIVATION OF PLAINTIFF'S LIBERTY INTERESTS

153.    Plaintiff incorporates by reference all of the allegations in the preceding paragraphs of this Complaint.

154.    Plaintiff has a protected liberty interest in his good name, reputation, honor and integrity, of which he cannot be deprived without due process.

155.    The State Council of Higher Education of Virginia, of which JMU is a part, has recognized the critical importance of obtaining a college degree and the substantial value both in terms of improved earning capacity and the opportunities for a higher quality of life that comes from a higher education and earning a undergraduate degree.[10]

156.    As such, Plaintiff also has a protected liberty interest in pursuing his higher education, as well as future educational and employment opportunities, and these educational and occupational interests cannot be deprived without due process of law.

157.    As set forth above, the determination made and approved by these Defendants that Plaintiff had committed an act of sexual misconduct with Jane Roe is false and was arrived at by means of a constitutionally deficient and fundamentally unfair process that subjected him to a trial *de novo* in his absence under the guise of providing his accuser, Jane Roe, an appeal from the decision where he was found not responsible.

158.    Under Defendants' authority and supervision, this false determination and his long-term suspension has been made part of Plaintiff's permanent educational record and it has placed a permanent stigma on his good name, reputation, honor and integrity. The recording of this determination, coupled with a long-term suspension, is tantamount to having been labeled a "rapist."

159.    As set forth above, JMU has published this false and highly stigmatizing determination to Jane Roe, and to 24 different departments of the University. It is highly likely that this information has been disclosed and/or will be disclosed in the future.

160.    Equally important, as alleged above in more detail above, JMU will disclose this false and stigmatizing information about Plaintiff to other colleges or universities where Plaintiff seeks admission as a transfer student, including other state-supported colleges and universities in Virginia. Such disclosure shall substantially limit Plaintiff's ability to transfer to another college or university. Further, by making such disclosure, JMU will be denying Plaintiff of his statutorily granted entitlement as a Virginia resident to receive financial support for his college education along with his liberty interest in being able to pursue a college degree.

---

[10] See **Exhibit F**, a publication by the State Council on Why a College Education is Important first published in 2011, and still available on its website, http://www.schev.edu/students/espanol/englishpdfs/preparingforcollegespanish.pdf.

161. In addition to these disclosures, for the reasons alleged above in more detail, it is also reasonably likely that JMU will make available this highly stigmatizing information to prospective employers through disclosures of this transcript. Such disclosures shall either foreclose employment opportunities or substantially limit those opportunities for him for the rest of his adult life.

162. Since Plaintiff, as a JMU student, faced potential disciplinary action that included the possibility of a significant denial of his liberty interests if found responsible for alleged sexual misconduct, the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process JMU used.

163. Plaintiff was entitled to fundamentally fair procedures and processes commensurate with the seriousness of the Charge and the potential discipline and sanctions he faced. The allegation of sexual misconduct made in the Charge was very serious and resulted in very harsh sanctions, as well as a lifelong stigma that will substantially limit or foreclose both future educational and employment opportunities. As described above, JMU failed to provide adequate due process.

164. Furthermore, JMU violated its own policies by providing accommodations to Jane Roe that it did not provide to Plaintiff, by forcing the Appeal to be decided during a period of time when JMU was not in session, dorms were closed and students were not allowed on campus, and by not allowing Plaintiff to be present for and make a direct presentation to the Appeal Board.

165. Defendants Alger and Warner, and other employees and agents of JMU, were acting under color of state law, and under significant public pressure to avoid a new controversy regarding JMU's processes for responding to allegations of sexual assault, when they violated Plaintiff's constitutional rights, and denied him any meaningful right to participate in the Appeal.

166. Further, the Defendants, while they authorized the creation of a new right of appeal for Jane Roe which heretofore had not existed and does not exist when adjudicating any other form of serious criminal misconduct charge at JMU, completely denied Plaintiff any right to appeal after the flawed decision was made by the Appeals Board and Defendant Warner.

167. As a result of the due process violations described herein, Plaintiff has been wrongly disciplined and suspended and is suffering ongoing harm to his reputation and educational progress. Plaintiff was forced to leave JMU, is unable to enroll in classes at JMU or its sponsored training programs, is unable to transfer to a comparable university, was injured by the broadcast email sent to 24 campus departments, and continues to be injured by University records labeling him as having committed sexual misconduct.

# DEMAND FOR JUDGMENT

WHEREFORE Plaintiff requests this Court enter judgment in his favor and against Defendants as follows:

A.      A declaratory judgment that the Defendants have violated and are continuing to violate Plaintiff's rights to due process;

B.      A permanent injunction requiring the Defendants, all other officers, employees or agents of JMU, and all other persons in active concert or participation with them, to: (i) reinstate Plaintiff and permit him to re-enroll at JMU as a full-time student beginning with the start of the fall semester, 2015, and (ii) expunge Plaintiff's records at JMU of any indication of a finding that he committed an act constituting Sexual Misconduct or was the subject of a disciplinary suspension, and (iii) protect Plaintiff from acts of retaliation by Jane Roe, her friends or others on the JMU campus;

C.      A permanent injunction enjoining the Defendants, all other officers, employees or agents of JMU, and all other persons in active concert or participation with them, from (i) continuing to enforce any sanction against Plaintiff for alleged Sexual Misconduct arising out of the incidents described in this Complaint; (ii) making any notation on Plaintiff's educational or disciplinary records related to the incidents described in this Complaint, and (iii) making any disclosure to a third party that any adverse disciplinary action was taken against Plaintiff arising out of the incidents described in this Complaint;

D.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and any other appropriate authority; and

E.      Any other further relief as the Court deems just and appropriate.

Respectfully submitted,


/s/ W. David Paxton
W. David Paxton (VSB No. 19798)
Justin M. Lugar (VSB No. 77007)
Bradley C. Tobias (VSB No. 88046)
GENTRY LOCKE
P.O. Box 40013
Roanoke, VA 24022-0013
(540) 983-9900
paxton@gentrylocke.com
lugar@gentrylocke.com
tobias@gentrylocke.com

Michael E. Rosman
Michelle A. Scott

CENTER FOR INDIVIDUAL RIGHTS
1233 20th Street, N.W., Suite 300
Washington, D.C.  20036
(202) 833-8400
rosman@cir-usa.org
scott@cir-usa.org

21499/1/7183455v6

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed a copy of the foregoing on July 17, 2015, using the Court's ECF/CM filing system, which will send an electronic notification of the same to counsel of record for defendants, John Gilbody of the Office of the Virginia Attorney General.

*/s/ W. David Paxton*
W. David Paxton (VSB No. 19798)
GENTRY LOCKE
P.O. Box 40018
Roanoke, VA 24022-0013
(540) 983-9300
paxton@gentrylokce.com