<pre>
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
 2                      Harrisonburg Division

 3   JOHN DOE,                        Civil No. 5:15cv00035

 4              Plaintiff,

 5         vs.                        Harrisonburg, Virginia

 6   JONATHAN R. ALGER, et al.,

 7              Defendants.           September 30, 2015

 8
                      TRANSCRIPT OF MOTIONS HEARING
 9            BEFORE THE HONORABLE ELIZABETH K. DILLON
                    UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Plaintiff:          W. DAVID PAXTON
12                               MICHAEL E. ROSMAN
                                 GENTRY LOCKE
13                               P.O. Box 40013
                                 Roanoke, VA 24022
14
     For the Defendants:         JOHN D. GILBODY
15                               NERISSA N. ROUZER
                                 Assistant Atty General
16                               900 E. Main St.
                                 Richmond VA 23219
17
     Court Reporter:             Sonia Ferris, RPR, OCR
18                               U.S. Court Reporter
                                 116 N. Main St.  Room 314
19                               Harrisonburg, VA 22802
                                 540.434.3181.  Ext. 7
20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
</pre>

1          THE COURT:  Good afternoon, counsel.

2          Ask the clerk to call the case.

3          THE CLERK:  Yes, Your Honor.

4          This is Civil Action No. 5:15cv000035, John Doe

5     versus Jonathan R. Alger, et al.

6          THE COURT:  Ms. Rouzer, welcome to the case.

7          MS. ROUZER:  Thank you, Your Honor.

8          THE COURT:  I understand that was a recent event.

9          The rest of us have gathered here earlier for the

10    prior motion to dismiss and this is the defendant's motion to

11    dismiss the amended complaint.

12          Mr. Gilbody, you may proceed.

13          MR. GILBODY: Thank you, Your Honor.

14          Now, Your Honor, when last we came before you, you've

15    indicated that the primary issues the Court was worried about

16    was focusing on whether or not there's a property interest or

17    a liberty interest.

18          THE COURT:  Correct.

19          MR. GILBODY:  The property interest has been

20    well-briefed twice now for the Court.  I'm not going to spend

21    a whole lot of time on that.  I just want to point out a few

22    things that I think are worth noting.

23          There are no cases out there in Virginia which I'm

24    aware where the holding was there's a property interest in a

25    continued enrollment in a public university.  The plaintiffs

```
 1    haven't been able to point to any state law.  The plaintiffs
 2    have alleged a contract of some sort -- not clear, not
 3    discrete, as required under Virginia law.  I've cited the
 4    Randolph Macon case to Your Honor where the Supreme Court of
 5    Virginia spoke to this issue of Virginia law very clearly and
 6    said that it has to be clear and discrete for there to be a
 7    contract.  And in that case, it was just like this.  It was
 8    an alleged contract between a student and a university.  The
 9    Supreme Court of Virginia was very clear that you have to be
10    able to define what the terms of that agreement are.  The
11    plaintiff hasn't shown that in their complaint.  They haven't
12    properly alleged any clear, discrete contract between the
13    parties.
14           They've also indicated that they think there's an
15    implied contract.  As we've indicated in our brief, you
16    cannot have an implied contract with the Commonwealth of
17    Virginia and that's not a viable claim against the defendants
18    in this matter because the cases have been brought, as Your
19    Honor is aware, in their official capacity.
20           Finally, and I think perhaps most interestingly, the
21    plaintiffs are alleging that the "dear colleague" letter
22    creates a contract between the Commonwealth and the federal
23    government to which he is a third party beneficiary.  Now, I
24    think it's a novel claim, but I -- just looking at it very
25    basically, going back to law school, a contract claim
```

1  requires a signing by the party to be charged.  They don't

2  have that here.  What they've got is a letter from a federal

3  bureaucrat to a university musing on, making statements about

4  what they expect to be done, pursuant to Title IX.  It

5  doesn't have exactly the force and effect of law.  However,

6  it does, quite clearly, lay out what the federal agency

7  believes the law to be.  But it's not a contract.  There's no

8  discrete contract between OCR, the Office of Civil Rights for

9  the Department of Education and the federal government, and

10 JMU, to which the plaintiff in this action is a third party

11 beneficiary.  So, for all those reasons and all the reasons

12 that have been briefed extensively, we think simply no

13 property interest has been shown here, Your Honor.

14        Really, I think the liberty interest question is

15 really the one that's going to be the focus of this

16 afternoon's hearing, I suspect, and I'm going to move on to

17 that, unless Your Honor has anything else.

18        THE COURT:  You may proceed.

19        MR. GILBODY:  Thank you, Your Honor.

20        I'll just start off by saying that, quite obviously,

21 the 800-pound gorilla or the elephant in the room, so to

22 speak, was the recent opinion handed down by Judge Ellis in

23 Alexandria, on September 16th.

24        THE COURT:  There is a motion to supplement with

25 regard to that opinion. I already found that opinion.  I

1    already read that opinion.  So to the extent that motion is

2    outstanding, it's granted.  I'm assuming everybody is going

3    to talk about that case anyway.  So go ahead.

4            MR. GILBODY:  It is, Your Honor.  While I appreciate

5    that, I would also -- I want to just be clear that going

6    forward, if there are questions regarding that, we may be in

7    a position -- I don't know, based on what happens today and

8    how Your Honor rules or doesn't rule or what Your Honor says

9    or doesn't say, I want to be sure that we would request, if

10   the Court thinks it's helpful, that the Commonwealth be

11   afforded an opportunity to brief the issues that have been

12   raised as a result of Judge Ellis' opinion because,

13   obviously, that came after all the briefing had been done.

14           THE COURT:  At the end of this argument, I'll let

15   counsel know if I think I need anything else in that regard.

16           MR. GILBODY:  Thank you, Your Honor.

17           Now, I'm not going to stand before Your Honor today

18   and try to distinguish this case from the case before Judge

19   Ellis.  I'm going to say, with all due respect to Judge

20   Ellis, who is a very well-respected jurist, and I can say

21   I've never had the privilege of appearing before, but I think

22   he's just got it wrong.  So I'm not distinguishing our case

23   from that.  I'm saying very clearly that we think,

24   unfortunately, he made a mistake in his decision.  I will

25   tell you why.

1    First of all, he was making new law.  He makes that
2  quite clear in his opinion when he discusses qualified
3  immunity.  He says there's no way -- or he says it's not
4  necessarily clear that a party would know that a Court would
5  analogize stigma-plus analysis that had previously been used
6  only and solely in the employment context into the
7  educational setting and he's doing that because he's noting
8  he's making new law.  He is transferring a whole body of law,
9  the stigma-plus analysis, that had exclusively been used in
10  the employment context into the educational context and
11  that's simply not been done before, at least not in the
12  Fourth Circuit.  In that respect, he was making brand new
13  law.  In doing so, it's our position that he made a number of
14  mistakes and probably the easiest to understand is in the
15  context of FERPA, tied with Iqbal and Twombly. What I mean by
16  that, Your Honor, the analysis for educational records are
17  all protected by FERPA.  Universities spend millions of
18  dollars every year making sure that they comply with this
19  extensive set of federal regulations relating to those
20  records.  Now, they can't simply hand over their records to
21  anybody who wants them.  They would be in violation of
22  federal law if they did. Now, there's no similar federal
23  regulatory scheme relating to employment records.  So, the
24  analysis in terms of saying that these employment records are
25  likely to be made public or likely to be seen by third

 1    parties should be completely different in an educational

 2    context.  And Judge Ellis doesn't do any analysis whatsoever

 3    under FERPA to understand what are the -- how are they

 4    different.  And what's important about that is because on

 5    brief, or rather, on their complaint, the plaintiffs have

 6    alleged that third parties -- that JMU regularly allows third

 7    parties to just look at records.  Okay, let's break that down

 8    under Iqbal and Twombly.  That's a very vague, nonspecific

 9    allegation, okay?  That's just a generalized allegation of

10    fact that's not a specific fact.  Let's be clear what they

11    are really saying.  They are saying that JMU, as a matter of

12    course, violates federal law, just all the time, for no

13    reason, whatever.  That's what they are alleging.  Now,

14    that's just not plausible and it's not plausible because it's

15    not true.  I don't think plaintiff's counsel can stand before

16    this Court and say we are aware of specific instances where,

17    repeatedly, JMU has violated FERPA and regularly violates

18    FERPA. They can't say that.  It sounds nicer, but that is, in

19    essence, what they're alleging.

20         Now, that doesn't make sense and it's not plausible.

21    So if it's not plausible that we would regularly allow a

22    third party to look at these records, how does the analysis

23    that Judge Ellis uses when he looks at the -- and I'm going

24    to butcher the name of the case -- it's Sciolino.

25         THE COURT:  I say it "Sciolino," but I don't know if

1    that's correct.

2         MR. GILBODY:  I'll take your --

3         THE COURT:  I think you can pronounce it however

4    you'd like.  I can't correct you on that.

5         COURT REPORTER:  Can you spell it?

6         MR. GILBODY:  S-C-I-O-L-I-N-O; sorry.

7         Now the analysis in that case doesn't look at all to

8    -- they never consider any protections for the documents in

9    question because as I've said, there's no federal body of law

10   protecting those documents from disclosure.

11        THE COURT:  What about this scenario?  What if John

12   Doe goes to apply to another university and they ask him on

13   the application form, "have you ever been disciplined" or

14   "have you ever been suspended or expelled from a university?"

15   And so, he either must lie or self-disclose.  Suppose he

16   self-discloses.  He discloses that he has been suspended from

17   JMU and they ask for him to grant permission -- they say

18   "we'll consider your application, but you're going to have to

19   give us access to your records because we can't get them

20   under FERPA."  What about that scenario?

21        MR. GILBODY:  In that scenario and -- in that

22   scenario, I guess to the extent the records are releasable,

23   the school could release them at the request of John Doe.

24   But let's be clear.  That would be at his request.  In the

25   similar matter, which require the sort of self-disclosure,

```
 1   would be of his own making and of his own doing.  The
 2   analysis there is different necessarily than the analysis of
 3   an employer saying "here are some employment records."  It's
 4   just a different set of rules that relate to that.  There's
 5   simply no analysis that Judge Ellis did.
 6        Your point is well taken in the sense that, is it
 7   possible? Yes. But that's not the standard under that case I
 8   just spelled for the Court Reporter -- Sciolino, we'll say.
 9   It was something about very likely or the standard there is
10   it's not one of, "is it possible?" It's "is it very likely?"
11   I can't say -- I mean -- that it is or is not.  Well, I can't
12   speak to the actions of what John Doe may or may not do, but
13   it's not on his transcript.  There's no allegation that it's
14   in his transcript and that's been briefed for Your Honor and
15   there's a new law.  That's an area that's in flux, but for
16   purposes of John Doe, that is not on his transcript.  It is
17   my understanding, and I think it's common knowledge, that's
18   typically the information that flows from one university to
19   another university when discussing a student.
20        THE COURT:  I appreciate the difference between
21   educational records and employment records.
22        MR. GILBODY:  And there is -- okay.  So another point
23   here, in terms of the motion to dismiss, that when we're
24   talking about the liberty interests that I think it's
25   important for the Court to understand, because in terms of
```

1    the motion to dismiss, we're trying to put some level, to the

2    extent the case moves forward, want to understand what is it

3    that the plaintiff is asking for and is entitled to? Now,

4    under liberty interest analysis and under stigma-plus

5    analysis, what's very important, Your Honor, is if you read

6    -- the stigma-plus cases all talk about how the plaintiff in

7    those cases is entitled to a "name-clearing hearing."  Now,

8    that's very important for a couple of reasons.  First of all,

9    the first reason is that in this case, he had an opportunity

10   for a name-clearing hearing.  He's been afforded that.  Now,

11   the question for Your Honor then, and one that I haven't seen

12   briefed is, does that name-clearing hearing, are the

13   requirements for that hearing coterminous with due process or

14   not? Now, I don't know the answer to that question, but I can

15   say that it would seem an odd thing that if it were, because

16   then, in a sense, the thing proves itself.  That is a

17   problematic analysis from my perspective.  But what's more

18   important or not more important, but more easy to get our

19   head around as it relates to this case is that to the extent

20   the plaintiff has asked, the relief specifically sought by

21   the plaintiff is for this Court to order JMU to allow him

22   back as a full-time student. Period.  That's what he's asked

23   for.  That's not what one gets in a stigma-plus case. In a

24   stigma-plus case, what the plaintiff, at best, at most, is

25   entitled to is an opportunity for a name-clearing hearing.  I

1    want to be clear.  To the extent that Your Honor is inclined

2    to accept Judge Ellis' liberty interest analysis, then

3    necessarily, the relief that can be afforded to the plaintiff

4    is circumscribed by that stigma-plus analysis and the only

5    thing the plaintiff would be entitled to going forward would

6    be a name-clearing hearing.  And that would be, in our view,

7    at least in part, granting the motion to dismiss because it's

8    limiting the amount of relief and the parameters of the

9    relief that the plaintiff can get, and the Court is

10   recognizing what it is we're really arguing about because

11   that's very important if we're going to move forward in this

12   case because I'm not sure the case would move forward on that

13   basis. So it's very important that we understand that.  I

14   think that is -- if that is the theory upon which they can

15   move forward, that is the only relief that I think a

16   stigma-plus analysis or a liberty interest, as described by

17   Judge Ellis in his opinion, would afford.

18          But taking a step back for just a moment, because

19   Judge Ellis, he analogized this whole area and created what

20   was new law and the one thing that I didn't see in that

21   opinion was why.  I don't understand, why are we taking all

22   of this employment analysis and just plopping it down into

23   the educational arena?  I'm still at a loss.  Having read the

24   opinion, it's not clear to me what the motivation for that

25   was.  As Your Honor is well aware, Judge Ellis' decision,

```
 1  while certainly having persuasive authority, is not binding
 2  upon this Court.  Having failed to provide any reason why
 3  this one method of analysis should be superimposed on a whole
 4  different body and a whole different set of law, having
 5  failed to make that argument, I'm at a loss to understand why
 6  the Court would want to do that, and it's our position that
 7  it doesn't make any sense. They're very different things.
 8  Employment has to do with how one feeds oneself and one's
 9  family in the very immediate sense of the word.  Education
10  temporally is connected very differently and you get an
11  education so down the road, years later, you can get a job.
12  They're very different things.  The problem that I have with
13  Judge Ellis' opinion is that all of the things in between are
14  necessarily going to be dragged along with his analysis,
15  which is to say, if someone is receiving any type of benefit
16  from the federal government, is it the case that if you
17  receive any type of benefit from the federal government that
18  you rely upon, which is really a much better analogy to an
19  employment situation than an educational situation, in every
20  single one of those cases, if they make a statement, if
21  there's a document put in a file that says something that
22  suggests you're not a good person and then you lose a
23  benefit, do you have a liberty interest? Because that is the
24  clear import of Judge Ellis' opinion.  The scope, the
25  potential scope of what we're -- the body of benefits and
```

```
 1    different types of payments that the government might make to
 2    an individual that are included within that are really
 3    unspecified and unclear to me.  But I believe it's pretty
 4    straightforward and I think we all know that there are a lot
 5    of payments that the federal government makes to people and
 6    they're quite often administrated through the state.  In
 7    every single one of those, it would necessarily be a liberty
 8    interest if there's any finding that the person did anything
 9    wrong that was in any way stigmatizing; in any way.  That, to
10    me, you're opening up a Pandora's Box of problems, whereas
11    before you had the stigma-plus analysis, was boxed in and
12    related only to employment law.
13         THE COURT:  Would you concede, Mr. Gilbody, that
14    sexual misconduct is different than "did anything wrong"?
15         MR. GILBODY:  I would.
16         What is stigmatizing and what is not would be for a
17    Court to decide ultimately.  I'm not sure -- look.  I'm not
18    going to argue that certainly an allegation of sexual
19    misconduct is stigmatizing.  We wouldn't argue otherwise.
20         THE COURT:  So we're really talking about the plus
21    part, for the stigma-plus analysis? Aren't we talking about
22    the plus part? Does the plus part have to be termination from
23    a job or, as you're saying, denial of some benefit you
24    receive from the government? Is that enough? Where do we come
25    down as to what is the plus?
```

1      MR. GILBODY:  That's a problem that Judge Ellis in

2   his opinion faced and he said, well, it can't be a property

3   interest because then liberty interest doesn't mean anything.

4   I can understand what he's saying.

5      THE COURT:  If we analogize to employment, clearly

6   you can have a liberty interest with regard to -- and get a

7   name-clearing hearing in employment, even if you didn't have

8   a property right.

9      MR. GILBODY:  Correct, because that is this change in

10  legal status sufficient to trigger the liberty interest

11  because it's something -- the plus is amorphous.  It's not

12  quite a property interest.  We don't know what to call it, so

13  we're calling it plus. But that plus could be a denial of

14  Section 8 waiver, Section 8 benefits.  I've done work with

15  people.  I know the rules on that are very strict and if

16  someone is found to be in any way involved in drugs, for

17  instance, that would certainly potentially be stigmatizing.

18  Moreover, they could lose their benefits.  That could

19  potentially involve and raise the specter of whether or not

20  that person has a right to a due process hearing before

21  they're denied that benefit, which kind of leads to, what's

22  really going on here, in my view, is that we are turning the

23  -- we're doing exactly that which the high Court has said

24  should not be done; namely, the due process clause was not

25  supposed to be a font of tort law.  What this, in many ways,

bears a great similarity to is a defamation action.  The only

difference between the allegation the plaintiffs have made

and the analysis under a liberty interest would be -- the

only difference between a defamation case and the case they

propose going forward is the relief sought, because they're

going to have to prove -- as I understand it, they're going

to have to prove in this case that JMU does regularly allow

third parties to look at records, as they've alleged in their

complaint. They're going to have to prove that the statements

made regarding the plaintiff were false.  That's one of the

elements of the stigma-plus case.  And they're going to have

to show injury.  That's the stigma.

      In every way, this is a defamation case.  The only

difference is instead of seeking monetary damages as they

would in a state court proceeding, they're seeking equitable

relief from a federal court.  But what they're in effect of

doing is making a federal tort out of defamation.  That's

from our perspective.

      The state court remedy has defamation.  Tort law is

designed to modify behavior.  You're supposed to have --

defamation lawsuits are designed to not only rectify the

defamation that occurred in the case before it, but also to

keep defamation from occurring in the future.  Now, what this

is doing is just allowing them a different avenue to pursue

that exact same relief.  It's becoming a font of tort law, as

1    the Court has repeatedly said the due process clause should

2    not be.

3          So, with that, I'm not sure there's anything else on

4    the liberty interest front that I need to go into and I

5    certainly am doing so with no disrespect to Judge Ellis in

6    his opinion.

7          THE COURT:  I understand.

8          MR. GILBODY:  Another issue that's before the Court

9    in terms of the motion to dismiss is the question of whether

10   or not President Alger will remain a defendant.  We briefed

11   that extensively for Your Honor.  There's nothing in the

12   complaint about President Alger that relates to due process

13   other than a single allegation that he did not -- that he was

14   somehow vaguely involved, was the language used, in a

15   decision not to reconsider the decision that was made

16   pursuant to the procedure set up at JMU.  That's the only

17   factual allegation that in any way touches upon President

18   Alger.  As we've indicated in our brief, we think the sole

19   reason for his inclusion going forward, and the pretty, I

20   would say, manifest desire of the plaintiff to move forward

21   against President Alger is solely to try to keep the profile

22   of this case higher than it necessarily -- I mean, it doesn't

23   affect the proof.  It doesn't affect the remedy.  It affects

24   nothing.  So, why he should be included in this case escapes

25   me.  The primary case upon which they've relied where the

Ninth Circuit said the buck stops with the president, I've indicated that case has never been cited with approval anywhere. The Ninth Circuit didn't provide any citation for their statement. They just made that up. I don't think a random statement by the Ninth Circuit that no other circuit has ever attributed any precedential value has any precedential value in this court. It's just simply a statement they made, as far as I can tell, for convenience, because they needed to find a defendant.

But in this case, that's not the case. They have a clear defendant in Mr. Warner, who is plainly, and according to the allegations in the plaintiff's own complaint, the party who was responsible for the process at issue. There's just no reason to continue with the case against President, and Doctor, Alger.

With that, I think those are all the issues for now. I'll ask for a chance to rebut. Thank you.

THE COURT: Thank you.

Mr. Paxton?

MR. PAXTON: Yes. Good afternoon, Your Honor.

There's much I can say, but the Court is obviously focused on this issue and is well aware of the cases that have been cited. I'm happy to address -- I want to do whatever is most beneficial to the Court and I don't want to waste a lot of time. I think the analysis that Judge Ellis

1   gave both to the property interests, as well as the liberty

2   interests in his decision, was very thoughtful, and I think

3   he got it right on both counts.

4          THE COURT:  With regard to property interest, he

5   allowed an amendment.  He granted leave to amend.

6          MR. PAXTON: The one thing that was really interesting

7   in his opinion, Your Honor, was he noted the plaintiff had

8   not alleged a contract by the payment of tuition for the

9   right to go -- I think it's 3 or 4.  I don't have the case

10  right in front of me.  But he specifically seemed to be

11  suggesting that if the plaintiff had actually alleged the

12  existence of a contract where they had paid tuition -- one

13  moment.  I'll get the case and I'll point you to it.

14         THE COURT:  Footnote six.

15         MR. PAXTON: As I read that, Your Honor, basically,

16  what he is recognizing is that the lower courts that have

17  wrestled with this have struggled with the recognition of a

18  property interest.  But he clearly says that isn't

19  controlling and that there really is not as much law as any

20  of us would like on this issue.

21         We clearly have alleged in our complaint the payment

22  of tuition, the response to an offer, the successful

23  completion of the first semester of academic course work, the

24  pre-registration for five classes that would have started in

25  January, all of which are consistent with the contract that

1  we allege was entered into where they agreed that if you made

2  satisfactory academic performance, he could continue to be

3  enrolled and would not be dismissed without good cause.

4  That's very clearly alleged.

5       THE COURT:  Let me ask you this, Mr. Paxton.  Should

6  we encourage universities not to have fair and impartial

7  processes with regard to discipline so they don't create

8  property rights?

9       MR. PAXTON: No, I don't think that's the issue, Your

10 Honor. The struggle I think the Courts face, and it was clear

11 from the arguments that the defendants made in this case in

12 opening, is everybody is very afraid we're somehow opening

13 the doors to the courthouse to a whole avalanche of cases.  I

14 don't think that's the case at all.  But I think that what we

15 are saying, Your Honor, is that procedures have to comply

16 with constitutional notions of due process.  That's all this

17 case is about.  While a state court --

18      THE COURT:  I don't think anyone disputes that, if

19 there's a property right and liberty interest.

20      MR. PAXTON: Right.

21      I think, Your Honor, when you look at the importance

22 of education today, not one of us that have children would

23 encourage them not to go to college or not to get a degree.

24      THE COURT:  Isn't it different, Mr. Paxton, than the

25 Goss case where you don't have post secondary education? It

1    is a right that Virginia has created with regard to everyone,

2    regardless of financial ability.

3          MR. PAXTON: Correct, and they have created an

4    incentive by giving discounted tuition.

5          THE COURT:  But they have not created that same right

6    in post secondary education.

7          MR. PAXTON: They have not formally said every person

8    in Virginia has the right to attend college, in part because

9    college requires an admissions standard, whereas public

10   education through 12th grade in the secondary education is

11   something that everybody needs.  Now, will that change over

12   time --

13         THE COURT:  And it's free.

14         MR. PAXTON: That's right, and it's free.

15         So here, we enter into a contract to buy your

16   services from different educational institutions.

17         THE COURT:  Is it an explicit contract or an implicit

18   contract?

19         MR. PAXTON: I think it is an explicit contract, Your

20   Honor, but it is implied in fact by the terms.

21         The Flores case that Mr. Gilboby cited involves a

22   quantum meruit implied at law concept, which is a very

23   different concept than implied.  In fact, in June of this

24   year, the Supreme Court of Virginia in a case, Spectra-4, LLP

25   vs. Uniwest Commercial Reality, Inc., clearly recognized the

1  difference between implied at law, which is a quantum meruit,

2  sort of an unjust enrichment kind of claim, which is not

3  permitted against a sovereign and implied in fact.

4      This case does not involve a government agency.  Let

5  me be real clear about that.  But it is talking about how the

6  law is analyzed.  Implied in fact is the recognition that if

7  you enter into services -- like in the Flores case.  What

8  happened there, Your Honor, was the third party was trying --

9  had provided services to the government, didn't comply with

10  the Procurement Act, refused to sign a signed agreement and

11  then tried to say, well, it's unfair that we gave all these

12  services and can't get paid for them.  That's not what we're

13  dealing with here.  We actually gave them money to get a

14  service.  They were to provide us something. We weren't

15  providing something to them.  It's a very different set of

16  circumstances where we're not looking, asking for equitable

17  relief.  We're asking to get the benefit of the bargain,

18  which is to attend school and not have us thrown out of

19  school unless we engage in misconduct that is established

20  through proper procedures.  So, from our perspective, Your

21  Honor, the Flores case does not stand for the bald

22  proposition that you can never have an implied contract

23  against a sovereign.

24      I would argue, too, here, this is not a contract

25  case.  We're not trying to enforce a contract.  We're looking

1   for the source of a property interest, which is a different

2   issue.  The Supreme Court in lots of cases, Perry vs.

3   Sinderman, all of those cases recognize that implied

4   contracts can give rise to a property interest.  In other

5   words, if you have to have a breach of contract claim in

6   order to bring a property interest case, then we would be

7   getting the same argument where you're trying to turn every

8   breach of contract into a constitutional tort.  That's not

9   the standard.  The question is, is there a property interest

10  and what's the source of it?  Virginia hasn't adopted a

11  statute that says John Doe or any other of our children have

12  the absolute right to go to JMU or UVA or any of those

13  schools.  That's not -- there's no statute to that effect.

14  But that's not the end of the inquiry and we recognize that

15  there is a lot of resistance from the Court and elsewhere,

16  but we believe it cannot be the case that there is no

17  contractual right here.  Certainly if our client had not paid

18  the tuition, they wouldn't have let him come to school.

19          THE COURT:  Can't JMU change its procedures and

20  policies at will?

21          MR. PAXTON: They can change them to a degree, Your

22  Honor, not in the way that you're talking.  And that's where

23  this third party beneficiary argument comes in.

24          THE COURT:  Let's set that aside for now.

25          With regard to your client's direct alleged contract

```
1    with JMU, can't JMU change its policies, procedures, its

2    student --

3            MR. PAXTON: They can change details of it.  In fact,

4    the Dodge case, the Randolph Macon Williams College case,

5    that's a narrow decision and when you look at it, the Court

6    makes it very clear.  They can change the fact they're an all

7    women's college, but you still have to provide an education.

8    So, yeah, there are changes that can be made, but it can't be

9    changed in the context of changing the very nature of the

10   relationship.  That's a totally different thing and I think

11   that's where -- while they can certainly change their

12   policies -- they did change their policies, as we've alleged

13   in the complaint.  So I think what we have alleged is that

14   they have never discharged a student without having

15   established good cause for doing so, for a misconduct claim.

16   While it may not be exactly a third party beneficiary, they

17   have contractually obligated themselves not to change it in

18   this area with the federal government and we're the

19   beneficiary of that.  You can't have it both ways.

20           We know that there is another case pending before

21   this Court, filed by Sarah Butters, alleging a Title IX case.

22   Part of our case at the beginning of this was the very fact

23   of how the Department of Education and the investigation of

24   how JMU handles these cases, because they weren't sure they

25   were handling them properly and consistent with the Title IX
```

```
1    regulations and guidance that had been issued.  From our
2    perspective, Your Honor, the facts that we have alleged in
3    this case satisfy the existence of a property interest.
4    That's why we broke it into two claims because we want to get
5    that ruling very clear because we do believe that it is
6    possible for a state institution through its course of
7    conduct, through its dealings, through its affirmative
8    representations, to enter into a contract with students, the
9    essential terms of which are if you do the academic work
10   satisfactorily and pay our tuition, we will not kick you out
11   of school for misconduct unless we're able to prove you
12   actually did it.  Has to be a good reason to do it.  That's
13   the contract we've alleged.  They've never done anything
14   different.
15        In theory, is there some -- they could wake up
16   tomorrow and do that? They would never do that, Your Honor.
17   It's kind of one of those hypothetical things.  Why would
18   they ever agree to do something like that? They wouldn't do
19   that because no other college does that.
20        To your point, I don't think if this Court rules
21   there's a property interest in this case that every state
22   university in Virginia is going to change its rules and stop
23   providing process to people when they're accused of sexual
24   misconduct, because they can't.  The federal government won't
25   allow them to do that.  So, it is -- this is one of those
```

1    areas where the defendants seem to want to have it both ways.

2    We're required to do this, but then don't hold us accountable

3    to it.

4         So from our perspective, Your Honor, we believe we

5    have alleged a property interest and have done so in ways

6    that the other plaintiffs in the other cases in the eastern

7    district didn't, including John Doe in the George Mason case.

8    So we believe that that -- that there is a property interest.

9         We think the liberty interest is a pretty easy call.

10   I think defendant's counsel argued, well, why did Judge Ellis

11   do this? What was his motivation? He was trying to comply

12   with the Constitution.  The notion that somehow it's

13   different to lose your job as opposed to being kicked out of

14   college and branded as someone who has sexually assaulted

15   another student and you're not allowed to come back on campus

16   for five-and-a-half years, how that's not worse than just

17   losing your job is a little hard to understand, when what was

18   at issue in the Goss case was a ten-day suspension from

19   middle school.  I mean, to me, that's not even a real

20   argument that the Court should be giving consideration to.

21        The liberty interest, the impact on this young man is

22   significant.  We have, as has been pointed out, we have

23   alleged that JMU prior to the adoption of the new Virginia

24   statute that took effect in July, and this is in paragraph

25   135 of the amended complaint, that JMU has an established

```
 1    pattern of disclosing final disciplinary actions to other
 2    universities when students seek to transfer.  That's
 3    specifically permitted by FERPA.  Specifically.  They don't
 4    require consent of the student. Nothing.
 5             THE COURT:  Do you have the FERPA cite on that?
 6             MR. PAXTON: Yes, ma'am, I do.  It is FERPA cite 20
 7    U.S.C. Section 1232G(b)(6)(B).
 8             THE COURT:  Can you say that one more time?
 9             MR. PAXTON: 1232G(b)(6)(B).
10             THE COURT:  Thank you.
11             MR. PAXTON: Yes, ma'am.
12             It specifically says that they are permitted to
13    disclose the final results of any disciplinary proceeding
14    against a student alleged to have committed a crime of
15    violence or forcible sexual offense if there's a finding the
16    student violated the institution's rules.
17             We have been told directly that when students
18    transfer from one university in Virginia to another
19    university in Virginia, if the new university wants to get
20    that information, they're provided it.  I don't think -- and
21    certainly in light of the new statute that requires --
22             THE COURT:  Just so everyone knows, I'm looking at
23    what you've alleged, not what you're telling me you've been
24    told here.
25             MR. PAXTON: That's correct.  But I was dealing with
```

the Iqbal issue that we would have to somehow prove this. But I think you're right. We have alleged sufficiently that they do that and it's not prohibited by FERPA.

We think, and as the Court through its questions recognizes, that any application for transfer asks the question: "Have you left your former institution in good standing"? Or "have you been subject to disciplinary action?" And they have to answer that. If you want to transfer someplace, you've got to disclose the information.

I think the stigma-plus in this case is pretty clear and that's why Judge Ellis didn't have much problem with it. While it is true that FERPA imposes an extra layer of protection on student records, as the Court well knows, personnel records of state employees are not a matter of public disclosure either. They're exempt from FOIA. There are all kinds of issues that protect personnel issues.

THE COURT: FERPA is a little different than the Data Collection and Dissemination Act.

MR. PAXTON: It is, but to suggest personnel records are not protected is not, I'm sure, accurate. It's not like if I went to ask for Mr. Gilbody's records from the Attorney General, he would turn it over to me. Yet Sciolino and the other courts have said employers will eventually get that information and that's what's involved here. We think we have met the pleading standard established in Sciolino very

1    easily and the liberty interest is one that really shouldn't

2    cause the Court -- we believed at the beginning, when we were

3    here the last time, that we had pled the liberty interest

4    properly and I think Judge Ellis' decision as well.  And he's

5    not the only one.  There was a case that we cited in our

6    brief out of the Western District of North Carolina that

7    involved the Tonza case, I think it is.  I thought I brought

8    it with me, but I apparently left it on my desk.  There, too,

9    the Court found there was a liberty interest in very similar

10   circumstances.

11          We're dealing with probably the worst allegation that

12   could be brought against a student and that is one that, in

13   effect, they're a rapist.  They don't use those words

14   anymore.  They say "sexual misconduct" because it's more

15   politically correct.  But if you read the blogs, they accuse

16   him of being a rapist.  If you read what Jane Roe and her

17   friends said, they certainly call him a rapist.  We alleged

18   they disclosed the information to Jane Roe.

19          We think that from a motion to dismiss standpoint,

20   and we are prepared to prove our case, that we have pled a

21   proper case under Section 1983.  The question of relief is a

22   totally different issue.  I'm not sure where that was really

23   coming from.  I'm not sure the government is actually

24   suggesting due process has different variations to it.

25   Obviously, the context of due process has to be determined,

but what's happened here is the name-clearing hearing he got,
cleared his name.  We don't have a problem --

    THE COURT:  What they're alleging is if he has a
property right, the process that he was given was not due
process.

    MR. PAXTON: Correct.

    THE COURT:  So, do you agree that his remedy would be
to have a name-clearing hearing with due process?

    MR. PAXTON: The remedy would be to strike the
decision that was made, have it completely removed from his
record, have the original decision reinstated unless there is
to be an appeal at this point.  In other words, I don't think
it's a forgone conclusion that Jane Roe would want to go
through this again.  I don't think there is any reason to
think that -- we're in a little different situation here
because the only hearing that occurred where live testimony
was taken, he was found not responsible.  We are asking --
and the appeal process was the flawed part of this. There was
a lot about what happened before that's at issue, but not in
this case.

    THE COURT:  So is it your position that he received
due process until sometime after the original decision was
made?

    MR. PAXTON: We did not file a lawsuit challenging the
proceeding and the decision made on December 5th.  There were

things that occurred prior to December 5th that I'm not sure

comport with what should have happened.  We don't necessarily

agree that the standard that was used was appropriate, but it

didn't hurt him.  So it's a little hard for us to argue that

he was denied due process at that hearing.

THE COURT:  I'm just curious because your allegations

seem to indicate you challenge some of the process that

occurred before that.

MR. PAXTON: Yes, and we do because there was really

no investigation. There were a lot of things that happened,

but none of that worked to our client's ultimate

disadvantage, which is what happens with the outcome.  So,

even though we're not thrilled with some of the things that

happened and had issues with those, those are not part of

this case because he was exonerated.  So, it's like taking an

appeal or a challenge to something that -- where you win.  So

I don't know that he could bring a constitutional 1983 case

based on what happened.

THE COURT:  I'm just asking because the review then

is sometimes cumulative.  We're looking back at what someone

else did and what was developed earlier also.

MR. PAXTON: Right, that's correct.

So, I think a lot of what we don't know is we don't

know.  Until we get into discovery, we won't know. I just

didn't want to foreclose us from raising issues from below.

1          So, Your Honor, I don't know that it is accurate --

2     our position would be that the decision that was handed down

3     on January 9th, 2014, needs to be completely set aside and

4     what's left is a finding of no responsibility and he's

5     allowed to continue school unless and until there's an appeal

6     filed and adequate process that's consistent with motions of

7     due process, the right to be present if you're going to have

8     evidence entered, all those issues that we've raised, occurs.

9     That's really not up to us.  The university, the defendants

10    may decide not to do that.  Jane Roe may not even be a

11    student there.  She may not care.  We don't know.  We're not

12    in control of any of those things.

13         THE COURT:  Let me ask you this, Mr. Paxton.  Could

14    you address what you believe -- there was some question as to

15    what are the parameters of a name-clearing hearing.  Are you

16    prepared to address that or not?

17         MR. PAXTON: Well --

18         THE COURT:  Are the requirements coterminous with due

19    process?

20         MR. PAXTON: Yes, ma'am.

21         The whole notion of the name-clearing hearing,

22    obviously, and due process in the context in which it occurs,

23    is somewhat flexible.  But I think for all the reasons we've

24    alleged and briefed and argued and the Court seemed to agree

25    with us, those provisions, due process, there wouldn't be a

1  different standard for that.  It's not like there's a mini

2  different standard for a name-clearing hearing.

3      THE COURT:  I just wanted to know the party's

4  positions.

5      MR. PAXTON: Yes, ma'am.

6      It is very odd to us that the president of a

7  university who has been involved and as visible as he has

8  been in trying to address the sexual misconduct issue as

9  alleged in our complaint wants to run and hide behind his

10  vice president.

11      THE COURT:  That's really irrelevant to my analysis,

12  isn't it?

13      MR. PAXTON: Well, I mean, it is in the sense we think

14  we've alleged his involvement and the president of the

15  university has the responsibility for the policies that are

16  issued.  He was involved in this.  The complaint alleges that

17  he was directly involved, leading up to.  The complaint talks

18  about the task force he appointed to look into the policy

19  because of the OCR thing.  All this stuff was going on

20  parallel with this.  Our client and his parents made an

21  appeal to the university to undo the wrong that had been done

22  on January 9th and he was the one that made the decision

23  we're not going to do it.  That's why we're here.  If he

24  reached a different conclusion, we wouldn't be in this court.

25      THE COURT:  Would you agree, Mr. Paxton, that the

1    relief you seek is the same whether you have one defendant in

2    his official capacity or two defendants in their official

3    capacity?

4            MR. PAXTON: The relief is the same.

5            What we're not sure about is the extent of a vice

6    president's authority in their system.  The statute appoints

7    the Board of Visitors and then they delegate administrative

8    authority though the president.

9            THE COURT:  But who have you sued when you sue in the

10   official capacity?

11           MR. PAXTON: You're suing the office, the office of

12   the president, and we're suing the office of the vice

13   president for the administration and handling of the appeals

14   process.  So I think those two -- we don't know.  The worst

15   thing that can happen to us is have the president's office

16   dismissed from this and somehow, the university is not -- the

17   person that's left if not in a position left to provide the

18   relief that we deserve.  So if they want to dismiss Vice

19   President Warner, that's okay with us.  That would be more

20   logical than dismissing the top person, quite frankly,

21   because then there's no question about this authority.  But

22   they've not asked for that.

23           The argument that somehow the Court's decision on

24   this issue should be influenced on whether or not the case

25   proceeds under a pseudonym, I'm not sure what the logic of

1    that is.  There's really no -- there's not been much

2    publicity about this case, frankly.  They talk about it a lot

3    --

4            THE COURT:  I'm not considering that in my decision,

5    so I don't think we need to address that.

6            MR. PAXTON: Your Honor, we believe that as we left

7    here on June 26th, the question was could we amend the

8    complaint to allege a property interest and a liberty

9    interest.  We have done that.  We think we've done it

10   conclusively.  We're not asking -- we don't believe that

11   Judge Ellis created new law and the notion that somehow the

12   president of George Mason, the fact that he was granted

13   qualified immunity somehow suggests that that's new law, the

14   standard for qualified immunity is it has to be well

15   established.  Everybody here recognizes that this issue of

16   sexual misconduct and the government's response to it and the

17   college's efforts to comply with that has taken on a new

18   turn, from our perspective, a kind of sinister dark turn that

19   sort of ignores due process concepts, in the last five to

20   six years.  So the fact that Judge Ellis looked to employment

21   law as an analogous type of body of law, there's been lots of

22   cases, Your Honor, that we've cited that students have had

23   protected rights for a long time.  As Judge Ellis noted, a

24   lot of those cases didn't get into the fine details of is

25   there a property interest or liberty interest, but found

1   there had been violations. When you look at Jones vs. The
2   University of North Carolina and the cases cited and
3   discussed with Judge Ellis, but now there's kind of this,
4   frankly, fear from the university's perspective they're going
5   to get hauled into court a lot, these threshold issues are
6   becoming a lot more important issues.  So we think we pled
7   what we needed to and we would like to move on with the
8   discovery in the case and set this case for trial.
9           Thank you.
10          THE COURT:  Mr. Paxton, do you agree there's no cases
11  out there that I can -- to guide me with regard to this third
12  party beneficiary of a federal government contractual
13  relationship?
14          MR. PAXTON: Well, our brief cites certain situations
15  where -- not in this exact context.
16          THE COURT:  Not like this case.
17          MR. PAXTON:  But the reality is, Sarah Butters' case
18  is a Title IX case where she is claiming to be the
19  beneficiary of a regulatory system that the federal
20  government imposed on JMU.  That seems to me to be a third
21  party beneficiary argument. It's not couched in those terms,
22  but it's the same concept.  That's, frankly, how that idea
23  came to us.  If a female student can bring an action against
24  a university and state a claim because the university didn't
25  comply with those regulations, then a male student who is

guaranteed a certain due process before they're kicked out should also be allowed that same thing. It's not a Title IX issue because it may not be gender-based unless that's the way the Courts have analogized it, but in terms of trying to understand if there's a property interest involved, that's a pretty significant interest of not being discharged from school without receiving what most people would consider due process where evidence is introduced, you have a right to confront it and you know what the charges are going in. So, those are all things that I think that are important, Your Honor.

So I don't have a specific case, to answer your question.

THE COURT: Thank you. Thank you, Mr. Paxton.

Mr. Gilbody?

MR. GILBODY: Thank you, Your Honor.

I'm just going to address some of the points that Mr. Paxton just raised.

Just to go over the implied in fact and the distinction that he was making there, I think what is important to understand is one has to understand the nature of contracts that one can have with the Commonwealth. It's very important to understand that when you're contracting with the sovereign, apparent authority does not matter. The only thing that matters is actual authority. As the Virginia

```
1    state court cases, of which I'm very familiar, say, are that
2    you contract with the Commonwealth at your peril and --
3    because the person who provides it right -- if someone who
4    works for the Commonwealth enters into a contract with you,
5    they have to have the actual authority or it is ultra
6    vires -- and I think I'm saying that right, hopefully -- and
7    it's not enforceable.  In point of fact --
8            THE COURT:  There's cases that say no estoppel
9    against the Commonwealth.
10           MR. GILBODY:  Correct.
11           The point though is if you're going to make an
12   argument that the course of dealing creates some sort of
13   contract with the Commonwealth, then you're throwing all that
14   analysis out the door because what you're then doing is
15   you're giving to whatever state official with which they were
16   dealing the authority to contract with someone.  You would
17   have to show that that individual employee of the
18   Commonwealth had the actual authority to do that.  If you
19   can't show that, there is no enforceable contract.  And if
20   there is no enforceable contract, there is no property
21   interest.
22           Mr. Paxton sort of said, well, there might not be a
23   contract, but there's still a property interest.  Well, if
24   there's not a contract, there's not a contract. There is or
25   there's not.  And if there's not, there can't be a property
```

interest in something that isn't anything. That is the
nature of property, as I understand. And I think that's very
important to understand. I don't think that analysis is
appropriate. That's one of the reasons why we think the
property interest fails.

Another point that I want to make is that as counsel
just agreed, JMU has a right to change the contract, and I
think his exact words and what I have in my notes are, "to a
degree." They can change it to a degree? What degree? If
they can change it to a degree, there's no limiting measure.
That is not a contract. That is a set of general guidelines
and that's exactly what the student handbook purports to be.
That's what it says it is, that they're general guidelines.
That is not a contract.

Another thing that's important to understand as it
relates to this third party beneficiary/Title IX/dear
colleague letter, 2011, issue, and I think it's very
important, and as Mr. Paxton was talking, I was thinking
about it. Here's the issue, isn't it? In the Butters case,
she's bringing an action under Title IX. Let's just back up
and think for a second. What do the courts always say about
a property interest? It must be something created by state
law. Or something that the state did. Well, Title IX is not
something the state did. That's something the federal
government did. And what he's trying to argue now is that a

federally imposed right creates a state imposed right, which is not the method of analysis. What point of fact he's really saying, as I understand it -- and this is tricky, I admit -- it would seem to me what he's really -- their third party beneficiary claim is, in fact, really a misplaced way of saying a Title IX claim or something like that. Because they're saying we want the benefit of Title IX and we think we have a property interest in Title IX. Well, no, if you do, that's not something the state or in this case the Commonwealth of Virginia created. Therefore, it can't create a property interest. What you're really doing is seeking -- it's a Title IX claim in Section 1983 clothing, to borrow a metaphor. The tortured analysis there just doesn't get you there. It's not a property interest. It arises from a federal statute and a federal agency's interpretation of that statute. It's not something that was a benefit that was afforded to someone by the Commonwealth of Virginia. That's the alpha and the omega of the analysis, as far as I can tell, Your Honor.

          Now, as it relates to the liberty interest, we talked about that. I guess the only thing I can say is Mr. Paxton indicated, well, why did he do that? Well, because he was following the Constitution. That sounds great. That's a good sound bite. But what does it mean? We all know what it says: Life, liberty and property. I don't know if you're

1    talking about the Constitution or getting into a Lockheed

2    analysis or what have you, but the point is, liberty in this

3    context, the case law has developed in a very specific manner

4    and no federal court in the Fourth Circuit prior to Judge

5    Ellis found that liberty interest.  As I indicated, when he

6    goes through this qualified immunity analysis, he says, oh,

7    no, there's no way anybody could necessarily have known this

8    is the way the Court was going to go.

9         THE COURT:  It wasn't clearly established, at least

10   with regard to the Fourth Circuit and Supreme Court.

11        MR. GILBODY:  Right.

12        And he says that because what he's doing is brand

13   new, and I think he's admitting as much, and that's what he

14   plainly was doing.  So again, I think that doesn't answer the

15   question of why.  Mr. Paxton indicated that perhaps that is

16   due to -- I think he indicated there was a sinister turn as

17   it relates to Title IX or sexual assaults or sexual

18   misconduct or these regulations that look at the behavior of

19   students in colleges are being adjudicated.  Well, let's be

20   clear.  The case law may have presumed.  In all the cases

21   where they said we presume without deciding, and the courts

22   did that for many years, but in all those cases where they

23   presumed without deciding, they found no due process

24   violation because what due process ultimately means is a

25   chance to be heard.  There's no question about whether or not

1    the plaintiff got that hearing.

2           Now, they've argued about some of the more technical

3    aspects of it, but they've never argued --

4           THE COURT:  The question is not whether a right

5    decision was made or not, either.  It's whether the process

6    was fair under the due process clause, if there's a property

7    right or liberty interest.

8           MR. GILBODY:  Well, but isn't that -- under the

9    stigma-plus liberty interest analysis though, the question

10   becomes not solely whether or not due process was allowed

11   because the question is, you have to show that it was wrong.

12   That is an element of that claim.  So --

13          THE COURT:  I stand corrected with regard to the

14   liberty interest.

15          MR. GILBODY:  I'm sorry.

16          THE COURT:  No, I appreciate that.

17          MR. GILBODY:  The point then becomes -- and that's

18   why I talked about it becoming a font of tort law.  Your

19   Honor is going to be hearing what in effect will be a

20   defamation lawsuit.  That's problematic because that's not

21   the role of the federal judiciary, in my view at least.  The

22   state remedy in a case like this would be a defamation

23   lawsuit.  Now, granted, he can't get the precise -- exactly

24   what he wants in terms of the equitable relief he's seeking

25   in a case brought at law, but he can certainly get, for

1    instance -- I mean, this young man has gone to school, as I
2    understand it, and he's at a different school out of state.
3    There would be a proper remedy that related to perhaps the
4    differences between, in a state law proceeding, the
5    difference between the price of an out-of-state tuition at
6    one university and the university where he had attended
7    previously, because there would be a measure of damages that
8    would be able to recompense a plaintiff in some fashion.
9    It's not clear to me there's an irreparable harm associated
10   with this because, frankly, if you've gone to a different
11   school and there's a piece of paper -- you're in the new
12   school.  There's a piece of paper somewhere in a college that
13   you're no longer attending that says something that's not
14   flattering about you, but if you're going to attend another
15   school, that's over.  Is anyone ever going to look at that
16   piece of paper? That's doubtful.  We just don't know.  As I
17   talked about earlier, it's not likely, as required by the
18   Fourth Circuit.  That's wholly speculative and, frankly, it's
19   a little far afield.
20          So as it relates to the liberty interest, I'm
21   concerned that the federal courts are going to become --
22   anytime a school takes an action, then we're going to have to
23   parse through exactly to make sure there wasn't any violation
24   of due process in which case you have to have courts almost
25   in every school that run very efficiently and are run very

strictly to provide due process to students.  I can tell you
--

     THE COURT:  We don't do that in the employment
context, really.

     MR. GILBODY:  You're talking about in terms of the
obligations of how they go about doing it?

     THE COURT:  There's not a court with the employer.

     MR. GILBODY:  Right.

     In fact, you raise a good point, Your Honor. What
you're really speaking to there, there's a heightened burden
upon JMU in this case and other public universities because
they typically do have some sort of quasi-judicial process
that's followed and it's going to be incredibly difficult to
not -- lawyers, got excellent lawyers over here and they are
very good at picking out what was done wrong in the process.
That's their job.  The people who are setting up these
processes are non-lawyers, lay people, and they're trying,
and I think doing an excellent job, but they're not to be
held to the same standards of federal or state courts in
terms of how they make decisions.  That's what the end result
of what they want to do in this case does.  It would require
every university to have essentially a -- they're going to
have to spend a lot of money and time that could otherwise be
directed at things like education, which is what we would all
prefer them to be doing, presumably, to satisfy these very

strict guidelines about not only picking through everything

that's occurred and making sure there can't be any complaint

that there was any due process violation, and that's going to

be problematic.  Your Honor has two cases like this that are

relating to this issue already.  I suspect they won't be the

last.

THE COURT:  But, Mr. Gilbody, it is your position

that your client gave due process in this case, isn't it?

MR. GILBODY:  That they did it?  Oh, absolutely, and

I think the evidence is going to show -- we've laid out, I

think in response to the original complaint that, really, the

evidence is going to show there was one single document --

there were no new allegations.  I'm not trying to argue the

case, but I think the evidence is going to show quite clearly

there was no new evidence of which the plaintiff was not

aware when the -- when there was this second hearing where

there was no live testimony taken, but rather, the appeal

panel listened to the testimony that was given at the

hearing.  They listened to that and then made their new

decision, which is a good segue, by the way, into the next

point, Your Honor, which is getting into the question of what

relief is available to the plaintiff in this case and whether

or not they're entitled to just what I heard Mr. Paxton

saying is, he believes the Court should come in and say,

okay, there was this due process.  Now, the plaintiff wants

1   it stopped right here where he won.  Stop right there and

2   we're happy with that.  That's what they want.  Of course,

3   they do.  They want to stop at the point in which they

4   prevailed.  But that's not what ultimately happened.  So the

5   question is, there was a process in place at JMU that

6   plaintiff in this action, to be clear, is asking a federal

7   court to say the process you followed, not only was it not --

8   and they also admitted they have problems with the due

9   process even up to that point, but because our client won, we

10  want you to stop right there.  He got off.  He won.  Let's

11  just forget everything and stop right there.  Let him back in

12  school.  The case is over.  No, that's not the way that

13  works.  That does not comport with Title IX or the

14  requirements of JMU.

15          In point of fact, if this Court is going to grant

16  relief, we believe the only proper relief would be the

17  name-clearing hearing the party is entitled to under the

18  liberty interest analysis and that's assuming -- and I'm

19  assuming without conceding that we prevail on the property

20  interest question and don't prevail on the liberty interest

21  question.  That is -- under the liberty interest analysis,

22  only if the Court finds that that is the only relief that's

23  proper is that name-clearing hearing and we would ask that

24  the Court grant the motion to dismiss to the extent that they

25  seek a remedy beyond that narrow focus because at least then,

1   the parties would know what it is we're actually fighting

2   over.  Why are we here and what is in play? I think that

3   would be very important for an ultimate disposition in this

4   matter.

5        Now, finally, just to address the question of

6   President Alger, counsel for JMU, Susan Wheeler, is here.  I

7   am, at least for the next three days, an employee of the

8   Office of the Commonwealth of Virginia and I'm representing

9   to this Court that explains why she's coming in, although I'd

10  be happy to have her in any case, Your Honor, as a colleague,

11  but we are representing to the Court, and Ms. Wheeler will

12  correct me if I'm wrong, that going forward in this suit

13  solely against Vice President Warner will not change the

14  panoply of remedies that could be afforded the plaintiff.

15  We're making that representation on the record to this Court

16  and I'm happy to do so.

17       I'll tell you, I looked back at Ms. Wheeler at one

18  point and thought to myself, when Mr. Paxton said, well, we'd

19  be happy to dismiss Warner, but not Alger, I thought to

20  myself, well, I should accept that deal because lawyers, we

21  all have a penchant for wanting to be cute at times, because

22  quite frankly, Alger's involvement in this, the facts are

23  going to show, was nothing.  Nothing.  That's what the facts

24  are going to end up showing.  When that's the case, then we

25  can say, well, he had no involvement in any of this, so it

doesn't matter if you're right or wrong.  Because he wasn't
involved, you have to show some involvement and because there
was no involvement, you lose.  That's not showing the proper
respect to this proceeding I think that it deserves.

There's a question before this Court that should be
answered.  The proper party is Mr., not Dr., Warner, as he
likes to point out.

Thank you.

THE COURT:  Thank you.

Counsel, would you like to speak to whether or not
you want the opportunity to provide me any other information
with regard to the Doe vs. George Mason case?

MR. GILBODY:  Is that directed to me?

THE COURT:  Either side, both sides?

MR. GILBODY:  As Your Honor can well imagine, my
question would be --

THE COURT:  In your three days.  Would you like to
spend your three days working on that?

MR. GILBODY:  Unfortunately, looks like my dance card
is booked. Getting my files transferred is going to take
those three days.

THE COURT:  I understand.  I'm sure there will be a
smooth transition.

MR. GILBODY:  Your Honor, I think that given the
gravity of Judge Ellis' decision that I think this has, it's

an issue that deserves a great deal of consideration because it's going to likely have effects throughout the Commonwealth for the years going forward, that in the interest of getting it right the first time, it would be appropriate. Mr. Paxton raised a section of FERPA that I wasn't aware of and I think that it would be appropriate, and frankly, if it says what he says -- if it says what he says it says, and I have no reason to believe that it doesn't, that could be problematic for us, perhaps. But I think the Court wants to get this issue quite right and I think it would be proper and appropriate to allow the Commonwealth to more fully brief this issue because it is a rather 11th-hour change in the field of what's going on in this area of juris prudence, which is, quite frankly, an area that is rather active.

      THE COURT: Thank you.

      Mr. Paxton?

      MR. PAXTON: If they're going to file something, we'd like the opportunity to respond to it. I don't want to prolong this. Judge Ellis' view on this was known.

      THE COURT: But they didn't have the benefit of the written opinion.

      MR. PAXTON: That's true.

      I brought an extra copy of the Spectra 4 case that I mentioned. I gave a copy earlier to Mr. Gilbody.

      If it's the Court's pleasure, we'll be glad to submit

1    whatever additional analysis --

2         THE COURT:  I'm certainly going to allow it.  This is

3    an important issue.  I think it's a legally fascinating issue

4    also.  For many years, Courts have assumed, without deciding.

5    I will tell you that I don't plan to assume without deciding.

6    But I would welcome any additional information you would like

7    to provide.

8         Is it pronounced Rouzer?

9         MS. ROUZER:  Yes, Your Honor.

10        THE COURT:  Ms. Rouzer, I'll let you speak to this

11   since Mr. Gilbody will not be there to do the work, so we'll

12   look at your schedule.  When would you be able to get

13   something filed?

14        MS. ROUZER:  Your Honor, after next Thursday, I'll be

15   out of the country for two weeks, so either one week or

16   four weeks would be my preference.

17        THE COURT:  Mr. Paxton, in the interest of being kind

18   to another professional, would you allow four weeks so that

19   she can perhaps enjoy her vacation a little more?

20        MR. PAXTON: Your Honor, we certainly would be more

21   than accommodating.

22        One of the concerns that we have is kind of the delay

23   factor here.  Given the unusual sort of flow of this case, no

24   trial date has been set.  We haven't started discovery. I'd

25   like to at least get the opportunity to serve some discovery.

1   Typically when a motion to dismiss is pending, discovery is
2   not stayed.  I don't want to find ourselves -- four weeks
3   from now is the end of October, and we respond a couple weeks
4   after that and we're into December probably before the Court
5   has a chance --
6           THE COURT:  I can tell you that this Court has a
7   tremendous desire to bring this portion of it to a decision
8   quickly.  The Court has not been idle awaiting your arguments
9   and not looking at this case in doing so.
10          MR. PAXTON: I was not trying to imply any of this was
11  on the Court.
12          THE COURT:  I didn't think you were. But I wanted you
13  to know that I've been working on this case and I plan to
14  continue working on this while I await your further briefing.
15  So it is not going to be set aside with nothing happening
16  until that point in time.
17          To the extent the parties desire to go ahead with
18  some discovery, it's at your client's risk that that might be
19  a wasted effort on your part.  But do you have an objection
20  to that?
21          MS. ROUZER:  No, Your Honor, we don't.  If the Court
22  prefers that we go ahead and set a trial date just to have it
23  on the calendar, we don't object to that.
24          THE COURT:  If you would like, you may contact
25  chambers and look at your calendars with regard to a trial

date.

You may proceed with discovery, understanding that's at your risk.

Then what date can you have the brief to the Court?

MS. ROUZER:  I need to look at the calendar, but by October 28th.

MR. PAXTON: If it's okay, I'll refer to my device here.

MS. ROUZER:  I believe the 28th is four weeks.

MR. PAXTON: The 28th is a Wednesday.  If we could have two weeks from that, the 11th.

THE CLERK:  That's a holiday.

MR. PAXTON: We can do the 10th.  That's fine.

THE COURT:  Do you need a reply?

MS. ROUZER:  No, Your Honor.

THE COURT:  You'll just rest.

MS. ROUZER:  Yes.

THE COURT:  Then the briefing will be completed November 10th and I'm not going to give you a date because I have learned that court time is sometimes longer than regular time.  But I do tell you that I have a great interest in making a thoughtful considered decision as quickly as possible.

MR. PAXTON: Yes.

THE COURT:  Anything else we need to address today,

1  counsel?

2       MR. GILBODY:  Other than, Your Honor, because I'm

3  going to be leaving, I'd like to thank you for your kind

4  consideration and wish you well.  I'll be going to the

5  Henrico County's attorney's office so I probably won't be

6  finding my way back out to western Virginia anymore.

7       THE COURT:  I wish you the best of luck in your next

8  endeavor and I'm sure it will be a very interesting position

9  also.  Good luck to you.

10       I thank all of the parties for your briefing, for

11  your argument of these issues.  I think these are fascinating

12  legal issues, but they are not, as we well know in this case,

13  not arguments in the abstract.  There are people on each side

14  of this case that have an interest in having this decided

15  with due speed and that will be done.  Thank you, counsel.

16       With that, we will adjourn court for the day, please.

17

18

19  "I certify that the foregoing is a correct transcript from

20  the record of proceedings in the above-entitled matter.

21

22

23  /s/ Sonia Ferris                    October 20, 2015"

24

25