IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

JOHN DOE,                          )
                                   )
            Plaintiff,             )
                                   )        Civil Action No. 5:15-cv-00035
    v.                             )
                                   )        By:  Elizabeth K. Dillon
JONATHAN R. ALGER, *et al.*,       )               United States District Judge
                                   )
            Defendants.            )

**MEMORANDUM OPINION**

In August 2014, plaintiff "John Doe"[1] enrolled as a freshman at James Madison

University (JMU or University), a public institution, in Harrisonburg, Virginia.  During his first

week on campus, he met another freshman, "Jane Roe,"[2] and the two had sex.  A couple of

months later, Roe filed a charge of sexual misconduct against Doe with JMU officials, accusing

him of rape.  In December, a hearing board held an evidentiary hearing on the charge.  Roe and

Doe both attended and presented evidence, including witness testimony.  The hearing board

determined that Doe was not responsible for sexual misconduct.

Roe appealed the hearing board's decision.  In January 2015, a three-person appeal board

met and reversed the hearing board's decision, suspending Doe for five and a half years.  The

appeal board based its decision on the record of the evidentiary hearing and new evidence

submitted by Roe.  Doe was not permitted to appear before the appeal board, and his ability to

respond to the new evidence was limited.  JMU's vice president of student affairs, defendant

---

[1] Along with his original complaint, Doe filed a motion for leave to proceed under a pseudonym instead of
his real name.  (Pl.'s Mot. for Leave to Proceed Under Pseudonym 1–8, Dkt. No. 2.)  The court grants that motion
today in a separate memorandum opinion and order.

[2] The parties do not disclose Roe's real name in any of their submissions, and the court today orders that
they not do so for the remainder of the case.

Mark Warner, affirmed the appeal board's decision, and the University's president, defendant Jonathan Alger, refused to set it aside.

Seeking immediate readmission to JMU, Doe filed this suit against Alger and Warner in their official capacities under 42 U.S.C. § 1983. In his original complaint, Doe claimed that Alger and Warner deprived him of his property interest in his continued enrollment and of his liberty interest in his good name without procedural due process, in violation of the Fourteenth Amendment to the Constitution.

In response, Alger and Warner moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. The court granted that motion, but it also gave Doe leave to file an amended complaint, which he has done. The amended complaint makes the same procedural due process claims as the original complaint; however, it contains additional factual allegations.

Alger and Warner now move again to dismiss under Rule 12(b)(6).[3] They argue that, as before, Doe fails to plead a constitutionally protected property or liberty interest, much less that that they deprived him of such a right without procedural due process. Accordingly, they contend that he fails to state a procedural due process claim based on either a property or liberty interest and that his amended complaint must be dismissed.

For the reasons stated below, the court concludes that Doe states a procedural due process claim based on a property interest, but not on a liberty interest. It will thus grant Alger and Warner's motion in part and deny it in part, and dismiss with prejudice Doe's procedural due process claim based on a liberty interest.

---

[3] They also moved, in the alternative, for a more definite statement under Federal Rule of Civil Procedure 12(e). (Defs.' Mot. for More Definite Statement 1, Dkt. No. 31.) But they withdrew that motion after receiving Doe's brief in opposition. (Defs.' Reply Br. in Supp. of Mot. to Dismiss and Mot. for More Definite Statement 14, Dkt. No. 37.)

## I. BACKGROUND

The facts recited in this section and relied on below are taken from Doe's amended complaint and documents attached to it. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). For purposes of Alger and Warner's motion, the court accepts the complaint's well-pleaded factual allegations as true and construes them in the light most favorable to Doe. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010).

**A. Doe applies to and is accepted by JMU.**

In fall 2013, Doe, a Virginia resident, applied to JMU, a public university. (Am. Compl. ¶¶ 1, 5, 7, Dkt. No. 30.) The following spring, JMU notified him that he had been accepted for admission as a freshman beginning that August. (*Id.* ¶ 8.) Doe accepted the offer and paid the required deposit. (*Id.* ¶ 17.) He later paid the full tuition and fees ($9,270) for the fall 2014 semester. (*Id.* ¶ 18.)

Upon payment of his deposit for admission, Doe became a JMU student under the University's student rights policy. (*Id.* ¶ 13; Policy on Student Rights 2, Am. Compl. Ex. A, Dkt. No 30-1.) That policy, in relevant part, provides:

> Students' Rights and Responsibilities
>
> Students' rights and responsibilities as described here are not definitive; rather they are indicative of the direction of a growing and changing educational environment. . . .
>
> James Madison considers individuals as students upon receipt of deposit for admission until their official graduation date.
>
> . . . .
>
> Violation Procedure Rights
>
> All students have the right to fair and equitable procedures, which shall determine the validity of charges that they have violated university regulations. . . .

3

1.  Each student has a right to expect the procedures shall be structured to
    facilitate a reliable determination of the evidence for the charges, provide
    a fundamental fairness to the parties involved, and be effective as an
    instrument for the maintenance of the community.

2.  Each student has the right to know in advance the range of sanctions for
    university policies.  The definition of the adequate cause for separation
    from the university should be clearly formulated and made public.

    . . . .

5.  In case reviews, the technical rules of evidence in civil and criminal cases
    shall not apply.

    . . . .

Accused Student Rights
(Sexual Misconduct)

A student accused of [committing] Sexual Misconduct has the following rights:

1.  The right to a fair and impartial case review.

2.  The right to a presumption of being not responsible for a violation until
    proven responsible by a preponderance of the evidence presented at the
    case review.

    . . . .

4.  The right to be present during the entire case review . . . and to know and
    respond to all information used in the proceeding. . . .

6.  The right not to have his or her past sexual history discussed during the
    case review, except as it relates to the specific incident in question.

(Policy on Student Rights 2, 3, 5 (boldface type deleted).)

**B.  Doe enrolls at JMU and meets Roe.**

In August 2014, Doe enrolled at JMU and moved into an on-campus dorm.  (Am. Comp.

¶¶ 35, 36.)  He and Roe, who lived in the same dorm, met for the first time on August 22, when

they and their friends gathered and mingled at the dorm.  (*Id.* ¶¶ 36–37.)

4

Later that night, after the group had separated, Doe and Roe exchanged text messages and agreed to meet back at the dorm in the early morning hours of August 23. (*Id.* ¶ 38.) Eventually, the two ended up at Roe's room, where they had sex. (*Id.*) Over the next day or so, Doe and Roe continued to "exchange[] . . . friendly communications," and on the evening of August 24, they hung out at Roe's room, at her request. (*Id.* ¶ 39.) The following week, Roe visited Doe at his room, and the two had sex for the second time. (*Id.* ¶ 40.)

Several days later, Roe returned to Doe's room with a pillow and blanket. (*Id.* ¶ 41.) But she promptly left after seeing another woman sitting on his bed. (*Id.*) In the days and weeks that followed, Doe had only two more encounters with Roe, both of which she initiated. (*Id.* ¶ 42.)

**C. Roe accuses Doe of sexual misconduct.**

On November 6, 2014, Doe received an e-mail from JMU's Office of Student Accountability and Restorative Practices (OSARP), informing him that a charge of sexual misconduct had been brought against him. (*Id.* ¶¶ 3, 43.) The e-mail did not identify the accuser or describe the nature of the charge. (*Id.* ¶ 45.) It did, however, instruct Doe that he was to have no further contact with Roe and that, if he did not comply, then he would face another charge. (*Id.*) The e-mail also advised Doe to attend a meeting at OSARP on November 13, where the charge and review process would be explained. (*Id.*) Three days later, JMU moved Doe to another dorm across campus over his objection. (*Id.* ¶ 46.)

As directed, Doe went to OSARP on November 13 and met with its assistant director, R. J. Ohgren. (*Id.* ¶ 47.) Ohgren talked with Doe about the procedure that would be used to decide the charge against him and about his rights as the accused. (*Id.* ¶¶ 47–48.) As for the nature of the charge, Ohgren advised Doe to review the charge file kept by OSARP, but told him that he

could not make or receive copies of any file materials.  (*Id.* ¶ 49.)  Doe could make notes, though.  (*Id.*)

After his meeting with Ohgren, Doe reviewed the charge file.  (*Id.* ¶ 50.)  It consisted of two documents.  (*Id.*)  The first was a report dated October 24 from Roe's resident advisor and hall director, and the second was a report dated October 29 from JMU's Title IX officer.  (*Id.*)  Both reports said that Roe claimed that her sexual encounter with Doe on August 23 was not consensual.  (*Id.*)  The second also said that she claimed that she was drunk during that encounter.  (*Id.*)

On November 19, Doe received notice from an associate OSARP director, Wendy Lushbaugh, that the charge would be heard on December 5.  (*Id.* ¶ 52.)  On December 4, she sent him an e-mail reminding him about the hearing the next day and informing him that five witnesses would be called to present evidence on behalf of the University.  (*Id.* ¶ 53.)  She provided the names of the witnesses, but cautioned him that "discussing this case before the case review with any of the witnesses . . . may lead to an additional charge of interference with the Accountability Process."  (*Id.*)

Later that day, Doe went to OSARP to see if any new materials had been added to the charge file.  (*Id.* ¶ 54.)  He found one new document—a statement dated December 3 from a female student who claimed to have seen Roe drinking the night of August 22.  (*Id.* ¶ 54.)

**D.  Hearing board finds Doe not responsible for sexual misconduct.**

On December 5, a three-person board convened to hear the charge.  (*Id.* ¶ 55.)  The director of OSARP, Joshua Bacon, was the chair.  (*Id.* ¶ 56.)  The board was required to decide, by a preponderance of the evidence, whether Doe was responsible for sexual misconduct against Roe.  (*Id.*)

6

The board first considered evidence supporting the charge. (*Id.* ¶ 57.) It heard testimony from five witnesses: Roe and her roommate, suitemate, resident advisor, and hall director. (*Id.* ¶¶ 57–60.) Roe gave an oral "victim impact statement" in which she discussed sensitive matters from her past. (*Id.* ¶ 57.) The roommate testified that she did not believe that Roe was drunk or otherwise incapacitated when she saw her shortly after her sexual encounter with Doe on August 23. (*Id.* ¶ 58.) The suitemate testified that she had no personal knowledge about what happened on the night before that encounter. (*Id.* ¶ 60.) And the resident advisor and director both testified about their interview of Roe on October 24, which served as the basis for their report. (*Id.* ¶ 57.) That report was submitted to the board along with the other materials in the charge file. (*Id.*)

Doe then put on his evidence opposing the charge, which consisted of testimony from him and two other witnesses and a document containing both a group photo taken with Roe's cell phone on the night of August 22 and a screen shot of text messages between him and Roe. (*Id.* ¶ 61.) Doe testified that Roe had consented to sex on August 23 and that she was not drunk or otherwise incapacitated. (*Id.*) He further testified about his interactions with her after that encounter, including that they had sex again the following week. (*Id.*)

Doe's roommate and a female friend also testified. (*Id.*) The roommate was not present during either of Doe's sexual encounters with Roe, but he testified about what he could recall from the night of August 22 and about Doe's interactions with Roe afterward. (*Id.*) And the friend testified about Doe's good character. (*Id.*)

The board was fully engaged during the hearing, asking questions of Doe and Roe and most of the other witnesses. (*Id.*) After all of the evidence had been presented, the board excused the witnesses and deliberated. (*Id.* ¶ 64.) At 8:30 p.m., five hours after the hearing had

7

started, Bacon told the parties that the board had determined that Doe was not responsible for sexual misconduct against Roe. (*Id.*)

**E. Appeal board reverses hearing board's decision and suspends Doe.**

Roe appealed the hearing board's decision on three grounds: (1) new evidence, (2) leniency of sanction, and (3) denial of due process. (*Id.* ¶ 72.) In support of her appeal, she submitted two statements. (*Id.* ¶ 73.) She wrote one and her support person from the evidentiary hearing wrote the other. (*Id.*) (Under JMU's student rights policy, both the accuser and the accused in a sexual misconduct case may elect to have a person help him or her at the hearing stage, but that person may not offer testimony or evidence as part of the review process. (*Id.* ¶ 74).) In her statement, the support person said that she had been with Roe on the evening of August 22 and that after the group photo, she and Roe went out drinking with Roe's roommate. (*Id.* ¶ 75.) The support person further said that when she and Roe's roommate left Roe alone at an off-campus party later that night, she thought that Roe was drunk. (*Id.*) The support person acknowledged, though, that Doe had not been present when Roe was drinking and that she did not know what happened after she and Roe's roommate left Roe at the party. (*Id.*) The support person offered no information about Doe or his sexual encounter with Roe on August 23. (*Id.*)

On December 11, Ohgren called Doe and informed him of Roe's appeal. (*Id.* ¶ 77.) Ohgren told Doe that a three-person appeal board would meet on December 18. (*Id.*) Later that day, Doe went to OSARP to meet with Ohgren and review the appeal file. (*Id.* ¶¶ 77–80.) Doe saw the statements from Roe and her support person. (*Id.* ¶ 78.) He was again not allowed to make or receive copies of any file materials. (*Id.*)

When Doe met with Ohgren, he told him that after finishing his exams the next day, he was going to take a trip out of state for winter break and that he would have little or no computer

8

access during that time.  (*Id.* ¶ 79.)  And Ohgren told Doe that he would not be allowed to appear before the appeal board.  (*Id.* ¶ 80.)

On December 12, Ohgren called Doe and informed him that Roe had been given an extension (until December 13) to submit any additional evidence in support of her appeal, and so the December 18 meeting of the appeal board had been postponed.  (*Id.* ¶ 82.)  Ohgren did not have a new date for the meeting, but told Doe that it would occur before the spring 2015 semester.  (*Id.*)  Later that day, JMU closed all dorms for winter break and did not reopen them until January 11, 2015.  (*Id.* ¶ 83.)  During that time, Doe travelled out of state and went on vacation with his family.  (*Id.*)

On or about December 13, 2014, OSARP gave Roe another extension (until December 15) to submit any additional evidence.  (*Id.* ¶ 84.)  On December 15, she submitted new materials.  (*Id.* ¶¶ 86–91.)  Among the materials were two documents from her suitemate.  (*Id.* ¶¶ 86–88.)  The first was a statement dated December 5 in which the suitemate reiterated that she did not know anything about what happened on the night of August 22 other than what she had learned "later in the semester."  (*Id.* ¶ 86.)  She nevertheless got involved because she believed that Doe "had been engaged in a similar experience with another girl."  (*Id.*)  The suitemate did not name the girl.  (*Id.*)  The second document was an undated e-mail from the suitemate to OSARP.  (*Id.* ¶ 88.)  In the e-mail, the suitemate claimed that Roe's roommate had lied to the hearing board and called Doe a rapist.  (*Id.*)  Roe's new materials also included a voice message that Roe left on a friend's cell phone and a screenshot from that phone, which showed that the message was left at 11:39 p.m. on August 21.  (*Id.* ¶ 90.)  The friend was not a JMU student.  (*Id.*)

On December 17, Roe sent an e-mail to OSARP with an additional statement. (*Id.* ¶ 92.) In the statement, she echoed her suitemate's allegation that her roommate had lied to the hearing board. (*Id.*) She also tried to connect the voice message to her ability to consent to sex with Doe. (*Id.*) She claimed that the message was evidence that she "was drunk and unable to give consent." (*Id.*) In conclusion, she said that "[i]t is very important to me that I feel safe and the other victim feels safe on this campus." (*Id.*)

The next day, OSARP forwarded some but not all of the new materials that Roe had submitted in support of her appeal to Doe; it left out Roe's December 17 statement. (*Id.* ¶ 94.) It gave Doe until December 22 to respond to the materials. (*Id.*) On that day, he submitted a statement reiterating his innocence. (*Id.* ¶ 95.) He also submitted a statement from a JMU student who was present when Roe left Doe's room quickly after seeing another woman sitting on his bed. (*Id.*)

After receiving Doe's response to Roe's new materials, Lushbaugh sent an e-mail to Doe that "'cut and pasted' information" from Roe's December 17 statement and gave him 24 hours to respond. (*Id.* ¶ 97.) The e-mail did not say anything about his right to request an extension to respond. (*Id.*) He did not see the e-mail until after the 24-hour deadline had passed. (*Id.* ¶ 98.)

On January 8, 2015, the appeal board met and considered Roe's appeal. (*Id.* ¶ 115.) Based on the record of the evidentiary hearing and the materials submitted after that hearing, the appeal board decided to reverse the hearing board's decision and to suspend Doe through the spring 2020 semester so as "to allow [Roe] the opportunity to complete her chosen program of study, including any post graduate certificate or advanced degree in a safe environment." (*Id.* ¶¶ 120– 21; Appeal Action 1, Am. Compl. Ex. E, Dkt. No. 30-5.)

Doe was given no prior notice of the appeal board's meeting, nor was he told the names of the appeal board's members. (Am. Compl. ¶ 115.) He also was given no explanation for the appeal board's decision to reverse the hearing board's decision. (*Id.* ¶ 120.)

**F. Warner affirms the appeal board's decision.**

On January 9, Warner affirmed the appeal board's decision and Doe's suspension without any notice to or input from Doe. (*Id.* ¶ 124.) Later that day, Lushbaugh called Doe to inform him that the hearing board's decision had been reversed and that he was suspended immediately through the spring 2020 semester. (*Id.* ¶ 127.) She also advised him that he was no longer permitted on JMU's campus and that he would need a police escort when he retrieved his belongings from his dorm room. (*Id.*)

Over the next two days, Doe and his parents called several JMU employees, including Bacon, to determine what, if any, recourse they had to overturn Warner's decision. (*Id.* ¶ 129.) They were told that the decision was final and that there was no further appeal. (*Id.*) On January 15, JMU sent Doe an e-mail containing the "official" decision of the appeal board, copying 24 departments or administrators, including campus police, human resources, and dining services. (*Id.* ¶ 130.) The e-mail informed all recipients that Doe had been suspended through the spring 2020 semester for sexual misconduct. (*Id.*) The decision was also communicated to Roe and made a part of Doe's student record. (*Id.* ¶¶ 128, 134.)

Though Doe had no right to further review, Warner and Bacon agreed to meet with him and his parents on January 21. (*Id.* ¶ 131.) At that meeting, Doe contended that the appeal board's decision was based on false or misleading information and that his procedural due process rights had been violated. (*Id.*) He asked that the decision be set aside and that he be permitted to return to JMU. (*Id.*)

11

About ten days later, JMU informed Doe's counsel that there would be no change to its decision to suspend Doe for sexual misconduct and that it offered no further process.  (*Id.* ¶ 132.) Alger played a part in making this final decision.  (*Id.*)

### G.  JMU is investigated for its handling of another charge of sexual misconduct shortly before Doe's enrollment.

Doe suggests that JMU's handling of the charge against him was affected by public pressure placed on the University following the start of an investigation into its handling of another student's charge of sexual misconduct.  (*Id.* ¶ 34.)  The student alleged that she had been sexually assaulted by three male students during a spring break trip.  (*Id.*)  JMU took more than a year to determine that the male students were indeed responsible for sexual misconduct, and then it decided only to expel them following their graduation.  (*Id.*)  In June 2014, the U.S. Department of Education's Office of Civil Rights launched a Title IX investigation into JMU's handling of the student's charge.[4]  (*Id.* ¶¶ 23.)

JMU's disciplinary decision not only triggered a Title IX investigation, but it also provoked harsh criticism from local and national media outlets.  (*Id.* ¶ 24.)  In response, JMU issued a statement on June 19 that "included a pledge to review all of its policies and procedures 'to ensure that it is doing all it can to prevent and address issues of sexual harassment and assault.'"  (*Id.* ¶ 25.)  And later that month, Alger issued a statement on "Student Safety," reassuring incoming freshmen and their families that the University was "doing 'everything in its power to help keep our students safe.'"  (*Id.* ¶ 26.)

### H.  Doe sues Warner and Alger.

Roughly four months after his suspension, Doe brought this action against Alger and Warner in their official capacities under § 1983, alleging that they deprived him of his property

---

[4] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, prohibits certain educational institutions from discriminating "on the basis of sex," *id.* § 1681(a).

right in his continued enrollment and of his liberty interest in his good name without procedural due process, in violation of the Fourteenth Amendment. (Compl. ¶¶ 90–98, Dkt. No. 1.) Among other relief, he seeks a declaratory judgment that Alger and Warner violated his procedural due process rights, and a permanent injunction requiring JMU to readmit him as a full-time student and to expunge his student record of the charge of sexual misconduct. (*Id.* at 18–19.)

The court dismissed Doe's original complaint on Alger and Warner's motion to dismiss (Order, Dkt. No. 27), but granted Doe leave to file an amended complaint (*id.*), which he has done.

Doe's amended complaint contains two counts. In the first, he asserts a procedural due process claim based on a property interest. (Am. Compl. ¶¶ 142–52.) He alleges that he has "a constitutionally protected property interest in his continued enrollment at JMU and to be free from arbitrary dismissal," and that that interest "arises from the policies, courses of conduct, practices and understandings established by JMU which substantially limited JMU's discretion to sanction students for misconduct." (*Id.* ¶ 144.) He claims that, when Alger and Warner suspended him, they took away the property interest without procedural due process by (among other things) not granting him the same accommodations as Roe, not giving him notice of the appeal board's meeting, not allowing him to attend that meeting, and not permitting him to make a presentation to the appeal board. (*Id.* ¶¶ 142, 148.)

In the second count, Doe asserts a procedural due process claim based on a liberty interest. (*Id.* ¶¶ 153–67.) He alleges that he has a constitutionally protected liberty interest in his good name. (*Id.* ¶ 154.) He claims that Alger and Warner deprived him of that interest by affirming the appeal board's determination that he was responsible for sexual misconduct against Roe. (*Id.* ¶ 157.) He alleges that that determination was false and that it was reached "by means

13

of a constitutionally deficient and fundamentally unfair process that subjected him to a trial *de novo* in his absence under the guise of providing . . . Roe[] an appeal from the decision where he was found not responsible." (*Id.* ¶ 157.) He further asserts that the appeal board's false determination has been made a part of his student record and that, as a result, Alger and Warner have "placed a permanent stigma on his good name." (*Id.* ¶ 158.) He also claims that JMU has already published the false determination to Roe and 24 departments or administrators, and that it is reasonably likely that the University will publish that determination to other educational institutions as well as prospective employers, since it is "required by state law to place a prominent notation on the academic transcript of any student who has been suspended for . . . an offense involving sexual violence." (*Id.* ¶¶ 136, 153, 159–61.) This stigma, he alleges, "will substantially limit or foreclose both future educational and employment opportunities." (*Id.* ¶ 163.)

In response to Doe's amended complaint, Alger and Warner have moved to dismiss under Rule 12(b)(6). (Defs.' Mot. to Dismiss 1, Dkt. No. 32.) They argue that Doe again fails to state a constitutionally protected property or liberty interest and that, even if he has, he fails to state that they deprived him of that interest without procedural due process. (Defs.' Mem. in Supp. of Mot. to Dismiss 2–3, Dkt. No. 33.)

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint to determine whether the plaintiff has properly stated a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To avoid dismissal, the "complaint must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clatterbuck v. City of*

14

*Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In essence, the plaintiff must "nudge [his] claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding whether the plaintiff has met this plausibility standard, the reviewing court must take as true all well-pleaded facts in the complaint and in any documents attached or integral to it.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards*, 178 F.3d at 244, but it need not "accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  And if there is a conflict between the bare allegations of the complaint and any attached or incorporated document, then the document prevails.  *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

### III. DISCUSSION

Doe claims that Alger and Warner deprived him of property and liberty interests without procedural due process, in violation of the Fourteenth Amendment.  That Amendment, in relevant part, provides that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  On a motion to dismiss and where state action is not in question, the reviewing court must first determine if a property or liberty interest has been sufficiently alleged to determine whether constitutionally protected process is due.  If one or both has been sufficiently alleged, then the court must determine whether the plaintiff has sufficiently alleged that the process he received was constitutionally inadequate.  *Bd. of Regents v. Roth*, 408 U.S. 565, 569–71 (1972); *Shirvinski*

*v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citing *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011)).

Neither the Supreme Court nor the Fourth Circuit has explicitly recognized a property interest in a student's continued enrollment in a public college or university or a liberty interest in his good name, resulting from a constitutionally infirm disciplinary process. But these courts, at times, have assumed that one or both interests exist, and then gone on to find that the process at issue was constitutionally adequate.[5] As explained below, this court cannot take that approach because it finds that Doe has alleged sufficient facts to state that the process he received was inadequate. Thus, the court may not simply assume, but instead must decide, whether the amended complaint sufficiently alleges a property or liberty interest (or both). It concludes that Doe sufficiently alleges a property interest only.

**A. Doe states a constitutionally protected property interest.**

Though the Constitution protects property interests, it does not itself create them. "Rather, they are created and their dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Roth*, 408 U.S. at 577 (finding no property or liberty interest where public university refused to renew a teacher's expired, one-year contract). As *Roth* made clear, a property interest is not created by a mere "abstract need or desire for it." *Id*. Instead, there must be "a legitimate claim of entitlement to it." *Id*. This claim of entitlement may arise from state statutes, contracts, regulations, or policies. *Id*. at 576–78.

---

[5] *E.g.*, *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 223 (1985) (assuming a "constitutionally protectable property right . . . in continued enrollment"); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978) (assuming a liberty or property interest in continuing a medical education); *Butler v. Rector & Bd. of Visitors of Coll. of Wm. & Mary,* 121 F. App'x 515, 518 (4th Cir. 2005) (assuming "a property interest in continued enrollment"); *Tigrett v. Rector & Visitors of Univ. of Va.,* 290 F.3d 620, 627 (4th Cir. 2002) (assuming "some constitutionally protected interest in continued enrollment"); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 73 (4th Cir. 1983) (assuming "a protectable liberty or property interest in [disciplinary] proceeding").

16

Property rights to public education clearly exist when a state statute mandates a free education. *Goss v. Lopez*, 419 U.S. 565 (1975). In *Goss*, the suspended high school students "plainly had legitimate claims of entitlement to a public education" because the state, by statute, extended the right to education and that right could not be withdrawn without fair procedures. *Id.* at 573–74. In support of his alleged property interest here, Doe relies on *Goss*, and cases cited therein involving public colleges and universities. But he can cite no case in which the Supreme Court or Fourth Circuit has recognized a property right to continued enrollment in a public college or university—much less a case recognizing that the Commonwealth of Virginia has created such a right. Doe cites only cases where the parties did not address the issue or where the court assumed that a property right existed in order to reach the issue of whether the process given complied with the constitution. Further, Doe is not alleging that a state statute creates his property right, so *Goss* does not help him.

Instead of relying on a state statute, Doe alleges that JMU "substantially limited its ability to suspend, expel or dismiss" through its adoption of certain policies and practices. (Am. Compl. ¶ 9.) He claims that by "regularly and routinely" dismissing, suspending, or expelling students only with cause, JMU created a property interest. (*Id.* ¶ 146; *see also id.* ¶ 11 ("JMU has never dismissed, suspended, expelled or separated an undergraduate student for alleged misconduct without proving cause through a fair and impartial process . . . .").) Alger and Warner agree that property interests "may arise from … regulations, municipal ordinances, or from an express or implied contract, such as 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" (Defs.' Mem. in Supp. of Mot. to Dismiss 8 (quoting *Covell v. Menkis*, 595 F.3d 673, 675-76 (7th Cir. 2010).) But they argue that Doe's allegations

17

are insufficient to establish a property interest because, even if it has been JMU's practice to suspend a student only for cause, Doe has no right to enforce any such "entitlement." (*Id.*)

The Supreme Court's decision in *Perry v. Sindermann*, 408 U.S. 593 (1972), is instructive on this issue, since rules and understandings were asserted as the basis for a property interest there. In *Perry*, decided the same day as *Roth*, the Court addressed whether a public junior college professor had a property right in continued employment where no state statute existed to provide that right and his contract did not contain such a right. *Id.* at 599. The Court held that the lack of a statute and a contract provision did not necessarily mean there was no property right. There, the professor's allegation that a de facto tenure policy existed arising from rules and understandings officially promulgated and fostered by the college could be sufficient to state a property interest. *Id.* at 599–600. While noting that "mere subjective 'expectancy'" is not protected by due process, the Court nonetheless held that the professor "must be given an opportunity to prove the legitimacy of his claim of entitlement in light of the policies and practices of the institution." *Id.* at 603 (internal quotation marks and citation omitted). This same rule has been applied in other contexts as well. *See, e.g.*, *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157–58 (4th Cir. 1991) (noting that "mutual expectations may create an entitlement in a license," especially where the license is renewable periodically simply on the payment of a fee and without additional action).

On a motion to dismiss, this court must take as true all well-pleaded facts in the amended complaint. Here, Doe alleges that, through its policies and practices, JMU has a system of expelling, suspending, or dismissing students only after a finding of cause and that his continued enrollment is therefore a protected property interest. He also relies on the student rights policy. And though it may not itself create enforceable contract rights, it may nevertheless bear on

whether he had an entitlement to continued enrollment. Following *Perry*, while the court is "not now hold[ing] that [Doe] has any legitimate claim of entitlement to [continued enrollment], 408 U.S. at 602 n.7, it will give him the opportunity to prove the legitimacy of his claim to a property right "in light of the policies and practices of the institution," *id.* at 603.

### B. Doe does not state a constitutionally protected liberty interest.

Due process must also be provided before one is deprived of a liberty interest. Under certain circumstances, courts have recognized a liberty interest in a person's good name. Doe alleges that he had "a protected liberty interest in his good name, reputation, honor and integrity," which was taken from him without procedural due process when he was wrongly found responsible for sexual misconduct. (Am. Compl. ¶¶ 154, 161, 163 167.) He contends that this stigmatizing information will be part of his permanent record and will be shared with other colleges or universities. Make no mistake, if Doe needed to allege only that his reputation had suffered because JMU found him responsible for sexual misconduct without constitutionally adequate process, this would be an easy decision for the court. Doe has certainly alleged as much. As the law has developed, however, those allegations are insufficient to rise to the level of a constitutionally protected liberty interest.

If the court looked only to *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), *Roth*, 408 U.S. 565, and *Goss*, 419 U.S. 565, for guidance here, then it may have concluded that Doe has sufficiently alleged a constitutionally protected liberty interest. In *Constantineau*, a state statute authorized the posting of names of persons to whom alcohol sales were forbidden because of problems caused by a person's excessive drinking. 400 U.S. at 435–36. The plaintiff's name was posted, and she had no opportunity to challenge the determination. *Id.* at 435. The Supreme Court stated, in admittedly sweeping terms, that a liberty interest exists "[w]here a person's good

19

name, reputation, honor, or integrity is at stake because of what the government is doing to him . . . ." *Id.* at 437. Thus, due process was required. *Id.* Likewise, in *Goss*, the suspended high school students had a liberty interest because the "charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." 419 U.S. at 575.

While no liberty interest was found to exist in *Roth*, 408 U.S. at 577, the Supreme Court there provided guidance as to when a liberty interest *might* be implicated when a state refused to rehire one of its employees. Specifically, the Court explained that if a state, while in the process of determining not to rehire the employee, made some charge against the employee that would have imposed on him a stigma "that foreclosed his freedom to take advantage of other employment opportunities," that action could implicate a liberty interest. *Id.* at 573. For example, if the state had "invoke[d] . . . regulations to bar the respondent from all other public employment in state universities," *id.*, or otherwise impaired the employee's ability to seek other jobs, then a liberty interest might arise. *Id.* at 575 (citing *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895–96 (1961)).

At first blush, then, these decisions seem to support Doe's position. The Supreme Court, however, has since explained and clarified these earlier rulings, seemingly narrowing the circumstances in which the government's damage to a person's name gives rise to a protected liberty interest. *See Paul v. Davis*, 424 U.S. 693 (1976). In *Paul*, local police provided merchants with the names and photographs of possible shoplifters by way of a flyer. *Id.* at 694–95. The plaintiff's name and photograph were included in the flyer because of a prior shoplifting arrest—a charge of which he had never been convicted. *Id.* at 695–96. The charge was not dismissed until after publication and distribution of the flyer. *Id.* at 696. The plaintiff alleged

20

that he had been deprived of a liberty interest without due process and that he would be harmed in business relationships and future employment opportunities. *Id.* He claimed that he would not be welcome in business establishments any more. *Id.* at 697. Certainly, the stigma attached to being labeled a shoplifter by the government, and the consequences that would follow, was no less than the stigma and consequences suffered by the plaintiff in *Constantineau* when she was labeled an excessive drinker. But the Court held in *Paul* that the government's act of defamation alone, even if stigmatizing, did not result in a deprivation of the plaintiff's liberty interest. *Id.* at 702.

In explaining its holding, the Court first cautioned that the Constitution is not a "font of tort law," *id.* at 701, and expressed concern that if the plaintiff were to prevail on a constitutional claim for damage to his reputation by the government, then it would be "hard to perceive any logical stopping place to such a line of reasoning," *id.* at 698–99.[6] Next, the Court distinguished its previous cases on the issue by noting that they all involved an "alteration of legal status" as a matter of state law, combined with an injury from the defamation. *Id.* at 708–09. In *Constantineau*, the government's action "deprived the individual of a right [to buy liquor] previously held under state law." *Id.* at 708. In *Roth*, "the defamation would have to occur in the course of the termination of employment" to implicate a liberty interest. *Id.* at 710. Finally, in *Goss*, while the Court noted possible damage to reputation from the students' suspension, "it also took care to point out that Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or

---

[6] *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 155 (5th Cir.), *cert. denied*, 368 U.S. 930 (1961), relied on by Doe and some courts to support a public college student's right to due process, was decided before *Paul* and some of its reasoning is no longer good law. Most notably, the *Paul* Court rejected the proposition stated in *Dixon* that "[w]henever a governmental body acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law." *Id.* at 155.

deprivation of that right."[7]  *Id.*  The *Paul* Court then concluded that "[i]n each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished."  *Id.* at 711.

The standard established in *Paul*, which has come to be known as "stigma plus," requires a reputation injury (the stigma), accompanied by a state action that distinctly altered or extinguished a legal status or right (the plus).  *Shirvinski*, 673 F.3d at 315; *Doe v. Rector & Visitors of Geo. Mason Univ.*, No. 1:15-cv-209, 2015 U.S. Dist. LEXIS 125230, at *17–19  (E.D. Va. Sept. 16, 2015).  Thus, the test after *Paul* is not one of the level of sting to the stigma or the severity of the consequences; rather, if there is stigma, then the court must also determine whether there is also the "plus"—a legal right or status that was altered or extinguished.  Further, outside of the employment context, *Paul* instructs that there must be a statutory right that was altered or extinguished, as was the case in both *Constantineau* and *Goss*.  *Paul*, 424 U.S. at 708–11; *see also Vitek v. Jones*, 445 U.S. 480, 487–88 (1980) (recognizing a prisoner's liberty interest in not being involuntarily transferred to a mental hospital, based on a state statute permitting such transfer only on a finding that the prisoner was "suffering from a mental illness for which he could not secure adequate treatment in the correctional facility").

Applying *Paul* here to determine whether the plus portion of the stigma-plus test is met, the court concludes that Doe has not alleged sufficient facts to show that he had a legal right or status that was altered or extinguished by JMU's actions.  First of all, there is no statutory right to be a public college or university student.  Moreover, this case does not involve public employment, a context where the Supreme Court and the Fourth Circuit have recognized that an

_____

[7] Courts that have recognized a public college student's liberty interest often cite *Goss* without mentioning the apparent narrowing of the decision in *Paul*.  *See, e.g.*, *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (deciding on appeal whether student received adequate process).

"'effect on the legal status of . . . a person' includes 'the loss of government employment.'"[8] *Shirvinski*, 673 F.3d at 315 (citing *Paul*, 424 U.S. at 705); *see also Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (citing *Paul* and noting that a liberty interest in reputation is only sufficient to invoke procedural due process protections if combined with some more tangible interest such as employment). This fact is significant because the Fourth Circuit has stated that government employment cases are "not germane" to cases that do not involve the loss of a government job. *Shirvinski*, 673 F.3d at 315.

The plaintiff in *Shirvinski* alleged that he was deprived of his liberty interest in his reputation without due process when the Coast Guard requested his removal from a project while defaming him. *Id.* at 314. But he was not a Coast Guard employee; he was a sub-subcontractor. *Id.* at 315. The court noted that, although the action may have affected his private employment prospects and could impair his future employment opportunities, there was no change in his legal status. *Id.* His status under law was not altered or extinguished; he was not "foreclosed from reentering the field"; and he was "not formally excluded from government contracts." *Id.* at 315–16. Thus, as in *Paul*, those damages alone were not sufficient to state a constitutional claim. *Id.* at 315–17.

Similarly here, Doe cannot rely on the government employment cases, and nowhere does he allege that any statutorily granted legal status has been altered or extinguished, as required by *Paul*. The court thus holds that he fails to allege sufficient facts to satisfy both elements of the stigma-plus test and that, as a result, he does not state a constitutionally protected liberty interest.

---

[8] This court is aware of the decision in *Doe v. The Rector and Visitors of George Mason University*, No. 1:15-cv-209, 2015 U.S. Dist. LEXIS 125230 (E.D. Va. Sept. 16, 2015), but it does not agree with that court that *Goss* and *Constantineau* support the finding of a liberty interest in these circumstances after *Paul*'s clarification of those cases. While there may be binding precedent in the future that borrows from public employment cases to find a liberty interest in cases of suspension or expulsion from public colleges and universities, there is none now.

**C. Doe states a procedural due process violation.**

Having determined that Doe sufficiently alleges a property interest, the court must decide whether he states a deprivation of that right without procedural due process. *Ingrham v. Wright*, 430 U.S. 651, 672 (1977). At its core, due process requires fair notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Beyond those threshold requirements, though, due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Where a student faces expulsion, this court has applied, and the Fourth Circuit has embraced, the following due process standard:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the [University]. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the . . . administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities might be detrimental to the college's educational atmosphere and impracticable to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.

*Cobb v. Rector & Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 828–29 (W.D. Va. 1999). (alteration and omissions in original) (quoting *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 159–59 (5th Cir. 1961)); *see also Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983) ("Although *Dixon* was decided more than twenty years ago, its summary of minimum

24

due process requirements for disciplinary hearings in an academic setting is still accurate today.").

Applying this standard here, the court concludes that Doe alleges sufficient facts to state a procedural due process violation against Alger and Warner. To be sure, JMU provided Doe with adequate process at the hearing stage of the disciplinary proceedings. Under the facts alleged, however, it did not afford him such process at the appeal stage. There, JMU subjected him to a second fact-finding trial but severely limited his ability to defend himself:

- It did not give him sufficient notice of, or time to respond to, Roe's new evidence. (Am. Compl. ¶¶ 94, 101.)

- It did not provide him with details about the unnamed girl whom Roe's suitemate accused him of sexually assaulting—an accusation not raised before the hearing board but presented to the appeal board. (*Id.* ¶¶ 86, 100.)

- It did not allow him to contact Roe's roommate, whom Roe and her suitemate accused of lying before the hearing panel. (*Id.* ¶¶ 88, 92, 96.)

- It did not tell him the names of the appeal board's members. (*Id.* ¶ 107.)

- It did not give him prior notice of the appeal board's meeting. (*Id.* ¶ 115.)

- It did not permit him to attend the appeal board's meeting. (*Id.* ¶ 108.)

By contrast, JMU gave Roe many accommodations at the appeal stage. For instance, it twice continued her deadline to submit new evidence and allowed her to file a new appeal statement more than a day after her second extended deadline had passed. (*Id.* ¶¶ 82, 84, 92, 103.) It also permitted her to submit a new statement from her support person, even though its student rights policy prohibits support persons from offering testimony or evidence as a part of the review process. (*Id.* ¶¶ 74, 86, 103.)

Moreover, even though the appeal board was presented with new allegations and evidence, it decided to reverse the hearing panel's decision without any oral presentations or live

25

testimony—not even from Roe's roommate whose credibility had come under attack by Roe and her suitemate. (*Id.* ¶¶ 118–19.) The appeal panel gave no explanation for its decision to overturn the hearing panel, which had the benefit of both oral presentations and live testimony. (*Id.* ¶¶ 51, 56–57, 120.)

And then, without prior notice to or input from Doe, Warner summarily affirmed the appeal board's decision. (*Id.* ¶ 123.) Roughly ten days later, after Doe had demonstrated that the decision was based on "false and misleading information," Warner, with Alger's input, refused to set aside the decision. (*Id.* ¶¶ 126, 131–32.)

Taken together, these allegations show that JMU denied Doe a "meaningful hearing," *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002), and thus distinguish this case from those where the process given to the student was found to be constitutionally adequate. *E.g.*, *Butler v. Rector & Bd. of Visitors of Coll. of Wm. & Mary*, 121 F. App'x 515, 520 (4th Cir. 2005); *Cobb*, 69 F. Supp. 2d at 829–30. The court accordingly holds that Doe alleges sufficient facts to state a procedural due process claim based on a property interest against Warner and Alger, the ultimate decisionmakers in the review process.

IV. CONCLUSION

For the reasons stated above, the court will grant Alger and Warner's motion to dismiss as to Doe's procedural due process claim based on a liberty interest (Count II) and dismiss that claim with prejudice. The motion as to Doe's procedural due process claim based on a property interest (Count I) will be denied.

An appropriate order will follow.

Entered: March 31, 2016.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge