IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 5:15-cv-00035 |
| | ) | |
| JONATHAN R. ALGER, President of | ) | |
| James Madison University, sued in his | ) | |
| official capacity, and | ) | |
| | ) | |
| MARK J. WARNER, Ph.D., Senior | ) | |
| Vice President of Student Affairs and | ) | |
| University Planning for James Madison | ) | |
| University, sued in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
## MOTION FOR SUMMARY JUDGMENT

Plaintiff John Doe ("Plaintiff") submits this memorandum of law, as well as Attachments

and Deposition Exhibits, in support of his motion, pursuant to Rule 56 of the Federal Rules of

Civil Procedure, for summary judgment in his favor on the issue of liability on Count I of the

Amended Complaint.

### STATEMENT OF MATERIAL UNDISPUTED FACTS

As set forth below, Plaintiff was accused of sexual misconduct during his freshman year

at James Madison University ("JMU"). Since no one else was in the room when the sexual

encounter at issue took place, and the charge was not made until several months later, the

underlying case was of the he said/she said variety. There was a plenary hearing in which the

triers of fact saw, and heard from, live witnesses and asked them questions. After a long hearing

and careful deliberation, they concluded that Plaintiff was "not responsible."

Then came what JMU characterizes as "appeals." At least one of these was, in fact, a *de novo* review of the evidence by an anonymous panel, but without any live testimony and without Plaintiff being able to make his case in person. Worse, Plaintiff's accuser was permitted to submit new evidence and Plaintiff was given little time, and even less opportunity, to respond. Among other things, this new evidence went straight to the accuracy of the evidence that the initial, exonerating hearing panel had heard – a witness actually called by the accuser had testified that the accuser had not been drunk as she claimed (a key fact) on the night in question, and an "appeal witness" submitted a written statement claiming she had heard that hearing witness subsequently admit that she had intentionally lied at the hearing. After the first appeal resulted in a suspension of Plaintiff for 5 ½ years, a second appeal took place without Plaintiff's knowledge (much less participation).

None of this comported with due process. It resulted in a deprivation of Plaintiff's property in violation of the Fourteenth Amendment.

A.      Plaintiff's Enrollment at JMU

JMU is a state university. Defendants' Answer (Dkt. No. 110), <u>Answer</u>, ¶ 5; <u>Att. A</u> (Alger Dep. Tr. 6). As a state university, the Board of Visitors appointed by the Governor of Virginia is ultimately responsible for all matters. Va. Code §§ 23-9.2:3, 23-164.3, 164.6; <u>Answer</u>, ¶ 2; <u>Att. A</u> (Alger Dep. Tr. 26-27). The Board has delegated operations to the President. *Id.* In turn, Alger has delegated some authority to others, such as student disciplinary policies and decisions regarding suspension and expulsion to Warner, who is a Senior Vice President.[1] <u>Att. A</u> (Alger Dep. Tr. 29); <u>Att. B</u> (Warner Dep. Tr. 8).

---

[1] As Alger explained, allegations of academic integrity violations are handled by a separate system that are not part of Warner's jurisdiction. When those cases occur and involve an appeal, those matters go straight to the President. *See* <u>Att. A</u> (Alger Dep. Tr. 44-45).

2

Plaintiff applied to several Virginia universities in the fall of 2013 for admission as a freshman for the school year beginning in August 2014. He was accepted by JMU and two other state universities. Answer, ¶¶ 8-9; Att. C (JD Decl. ¶ 2). Plaintiff accepted JMU's offer of admission in April 2014, paying first an initial deposit, and then $9,270 (which was the tuition for an in-state student). Answer, ¶¶ 17-18; Att. C (JD Decl. ¶¶ 2-3). By accepting JMU's offer and paying the required tuition and fees, Plaintiff entered into a contractual relationship with JMU in which JMU agreed to provide educational services leading to an undergraduate degree in exchange for money. *See* Answer, ¶ 10; Att. A (Alger Dep. Tr. 32-37); Att. C (JD Decl. ¶ 10-11).

Once an undergraduate like Plaintiff is admitted in this manner, JMU has had a consistent policy and follows a well-established practice with respect to their continuing enrollment. It has never refused a student's continuing enrollment until graduation, unless that student (1) fails to meet JMU's academic standards, (2) fails to pay required fees, or (3) violates one of JMU's various rules of conduct. Answer, ¶ 17 (by accepting JMU's offer of admission and paying the required deposit, "Plaintiff was entitled to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course work needed to earn a degree, otherwise met the requirements for graduation, and complied with JMU's conduct rules."); Att. A (Alger Dep. Tr. 34-35); Att. B (Warner Dep. Tr. 35-40).

This course of conduct and established understanding was part of the money-for-educational-services agreement between Plaintiff and JMU and precluded JMU from suspending or dismissing Plaintiff without some good cause. Answer, ¶¶ 10, 17; Att. A (Alger Dep. Tr. 73-75); Att. B (Warner Dep. Tr. 36-37). *See also, e.g.*, Dep. Ex. 132 (JMU press release of June 19, 2014 in response to negative publicity regarding JMU's handling of the Sarah Butters' sexual

3

assault complaint stating that accused students have due process rights).[2] Plaintiff would not have accepted JMU's offer of admission had JMU apprised him that he could be dismissed arbitrarily and with no reason. Att. C (JD Decl. ¶ 7).

Moreover, JMU's student handbook specifically apprises students that they are entitled to a fair and impartial hearing if they are accused of misconduct that might affect their continuing education there. *See* Dep. Ex. 156 (Student Handbook) at 9; *see also* Att. B (Warner Dep. Tr. 37). While JMU reserves the right to change the specific procedures that are used to resolve allegations of misconduct – as, indeed, it was doing so with its rules for resolving complaints of Sexual Misconduct all around the time that the charges against Plaintiff were being resolved[3] -- they have never changed the basic right that a student must be given notice of the wrongdoing and a fair hearing before discipline is imposed. Att. B (Warner Dep. Tr. 37).[4]

JMU receives federal funds and is covered by Title IX. Att. E (RRTA 5). The Department of Education's Office for Civil Rights issued a "Dear Colleague" letter stating that those covered by Title IX must have fair and equitable procedures for resolving complaints of sexual harassment and sexual assault. *See* Att. P (Dear Colleague letter) at 6. Defendants assert that JMU has adopted such procedures. Att. E (RRTA 5).

---

[2] There is little doubt that JMU found itself the focus of a firestorm of negative publicity starting in mid-June 2014, as the public became aware of the Title IX investigation into Sarah Butters' allegations against JMU, and continuing into December 2014. *See* Dep. Exs. 131, 78, 80, 116, 52, 24, 138 (exhibits listed in chronological order); *see also* Answer, ¶¶ 23-26, 28-32.

[3] Just prior to the academic year 2014-15, JMU instituted a new and separate set of procedures to resolve complaints of Sexual Misconduct. Dep. Ex. 153 (announcing the substantive changes to the Student Handbook to the JMU Campus Community and noting that the changes include "[t]he creation of a separate and distinct Sexual Misconduct Accountability Process to address allegations of Sexual Misconduct."); Dep. Ex. 22. Moreover, the policy was changed even as the allegations against Plaintiff were being considered. *See* footnote 9, *infra*. Various significant distinctions between the Sexual Misconduct Accountability Process and the Accountability Process used for resolving reports of all other policy violations by students will be noted in the discussion of the process in Plaintiff's case as they are relevant.

[4] Defendant Warner is qualified to make this statement since he has served in his current role as Senior Vice President of Student Affairs and Vice President for 18 years (since 1998), and for the four years prior to 1998 he was Vice President of Student Affairs. Att. B (Warner Dep. Tr. 8-9).

4

21499/1/7522931v9

Case 5:15-cv-00035-EKD-JCH   Document 115   Filed 04/18/16   Page 4 of 40   Pageid#: 1050

JMU required Plaintiff to live on-campus as a freshman. Att. C (JD Decl. ¶ 5). He signed a contract with JMU that was "binding for the entire 2014-15 academic year." Dep. Ex. 144, at 3 (JMU001555). The contract could be cancelled by JMU only as a result of disciplinary action, administrative withdrawal, or a failure to meet academic or full-time registration requirements. Id. at 6 (JMU001558). Otherwise, it could remove the student from the residence halls if the student breached the housing contract or posed a threat to the welfare of others. Id. at 8-9 (JMU001560-61). Plaintiff was assigned a room in Wampler Hall, one of the on-campus residences at JMU. Att. C (JD Decl. ¶ 12).

B.    Jane Roe Charges Plaintiff With Sexual Misconduct

In November 2014, JMU apprised Plaintiff that he was being charged with a violation of JMU's rules regarding "Sexual Misconduct." Att. C (JD Decl. ¶ 15). Dep. Ex. 27 (November 6, 2014 email). This email did not provide any specifics at all, but told him that he should not have any contact with Jane Roe and, if he did, he could be charged with an additional policy violation. Id.

Prior to any hearings – indeed, just a few days after JMU notified Plaintiff that a charge had been made against him – JMU told Plaintiff that he must leave his dorm room in Wampler Hall and move to another place on campus. Att. C (JD Decl. ¶¶ 18-19, Ex. 1 (JMU000416-17)). Indeed, Plaintiff was precluded from even going into Wampler Hall. Id. ("Should you choose to enter Wampler Hall for any reason . . . , you may face disciplinary action through the JMU Police Department or the Office of Student Accountability.").

JMU's Sexual Misconduct policy provides that Sexual Misconduct includes "Sexual Assault," which is defined as "[e]ngaging or attempting to engage in any sexual intercourse . . . without consent." It further states:

5

> Consent means words or action that show a knowing and voluntary agreement to engage in mutually agreed-upon sexual activity. Consent cannot be gained by . . . taking advantage of the victim's incapacitation or physical helplessness *where the accused student knows or reasonably should have known of such incapacitation.*

Dep. Ex. 156 (Student Handbook) at 28 (JMU001635) (emphasis added).

The November 6, 2014 email also informed Plaintiff that he must come to the Office of Student Accountability and Restorative Practices ("OSARP") on November 13, 2014, to learn details of the charge. Att. C (JD Decl. ¶ 17); Dep. Ex. 27. When he did, Plaintiff was merely given a file folder that contained two documents. Att. C (JD Decl. ¶ 26-27). One was an "Incident Report" purportedly written by a Residence Hall Director for JMU, Nigel Word. *Id.*, ¶ 27. A copy of the document shown to Plaintiff was marked as Dep. Ex. 30, but is actually a substantially edited version of the original report submitted by Mr. Word. Att. F (Ohgren Dep. Tr. 144–145); *see* Dep. Ex. 33. This report describes two conversations Jane Roe had, first with her Resident Advisor and then with Mr. Word, on October 24, 2014. This report stated that Jane Roe said that:

> she is not an avid party-goer and that she rarely if ever consumes alcohol and because of this she does not have a high tolerance. . . While she does not remember some details, [she] was very aware that she had somehow gotten into [Plaintiff's] bedroom and into his bed. While there, [she] stated that although she had said 'No!' multiple times and physically pulled away from [Plaintiff], he still forced himself on her and raped her.

Dep. Ex. 30. The Incident Report stated that this alleged attack occurred on August 22, 2014. It also reported that Jane Roe said there was "a second occurrence with [Plaintiff] that involved him being very physically aggressive that came some time after the initial rape." *Id.* It also stated that Jane Roe "didn't want to seek medical treatment, police or counseling right away." *Id.*

6

The other document in the file folder was a typed statement by Amy Sirocky-Meck, the Title IX Officer for Students at JMU, dated October 29, 2014. Att. C (JD Decl. ¶ 27); Dep. Ex. 29. It described a conversation that Jane Roe had with Ms. Sirocky-Meck on October 28, 2014 about events that purportedly took place on August 22, 2014. *Id.* It stated:

> While [Jane Roe] and her friends were at [a] party they did have some drinks. She reports she doesn't really drink, she is on a prescription medication, and she became intoxicated quickly. . . [Jane Roe] reports that she was visibly intoxicated, that [Plaintiff] did not have anything to drink at that point and that he knew [Jane Roe] had been drinking. They went back to the same house party and [Jane Roe] remembers drinking and that [Plaintiff] was with her the whole time. She reports this is where she begins to not remember much of what happened . . .

> When she arrived at [Plaintiff's] room she sat down on a chair. She did not want to sit on his bed. He pulled her onto the bed and began kissing her. She remembers saying no and trying to pull away but he was holding her arms and it was hard for her to move. She remembers him fingering her and that it hurt and she kept saying no and trying to wiggle away. She reports that at some point she realized she physically couldn't get away from him because he was on top of her and she said "condom." She remembers him getting up and getting a condom and then she remembers him penetrating her with his penis. . . After that she does not remember much more.

> Jane Roe's roommate came to get her as soon as the roommate came back to the residence hall and realized that [Jane Roe] was not there. . . When she got there, [Jane Roe] had her clothes off and was out of it.

In stark contrast to the Incident Report (which reported a second encounter with Plaintiff), the second document stated that "Jane Roe has avoided [Plaintiff] and had no contact with him since the incident." *Id.*; *see also* Att. G (Sirocky-Meck Dep. Tr. 35-37).

OSARP did not give copies, nor would it allow Plaintiff to make photocopies of either of these documents. Att. C (JD Decl. ¶ 30). Prior to being left alone to review these documents, the assigned OSARP employee apprised Plaintiff of the process to be used and had him sign a

7

Statement of Rights (Dep. Ex. 28). The OSARP employee then sent a follow-up email in which he stated: "If additional materials are submitted, I will let you know and you will have the opportunity to review them." Dep. Ex. 34 at JMU000522. Plaintiff was notified on November 18, 2014, that the hearing on Jane Roe's charge against him was set for December 5, 2014 at 3:30 p.m. Att. C (JD Decl. ¶ 32, Ex. 3 (JMU000189)).

On December 4, 2014, Wendy Lushbaugh, OSARP's Associate Director, sent Plaintiff an email reminding him of the hearing the next day. Dep. Ex. 88. This email apprised Plaintiff for the first time of the names of all of the witnesses who were being called to support the charge of "sexual misconduct" – who would be witnesses "for the University" – and then sternly warned him that he was to have no contact with them. Id.; see Att. E (RRTA 23); Att. C (JD Decl. ¶ 38). It stated that any such contact would result in additional charges being brought against him. Id.; see Dep. Ex. 156 at 18 (JMU001625).

No one at OSARP (or anyone else at JMU) notified Plaintiff that he should come back to OSARP because new or additional evidence had come in that would be used against him. Att. C (JD Decl. ¶ 36). Nevertheless, Plaintiff chose to go back to OSARP's office on December 3, 2014, to speak to his advisor (see Att. C (JD Decl. ¶ 35); Dep. Ex. 39). He then went back to the office on December 4, 2014, to look in the file to see if anything had in fact come in. Att. C (JD Decl. ¶ 40); Att. E (RRTA 24). The only new item he found in the file at this visit was a short handwritten note dated December 3, 2014, asserting that, "on the night of this event," the author of the note had seen Jane Roe for "a while" and that Roe did not appear to be sober, and was "loopy and silly." Att. C (JD Decl. ¶ 20); Dep. Ex. 41.

8

C.    The December 5 Hearing

The hearing held on December 5, 2014, was before a three-person panel chaired by Dr. Joshua Bacon, OSARP's long-time Director. Att. D (Bacon Dep. Tr. 98, 100); Att. E (RRTA 28).

To put it kindly, the proceedings were not a model of decorum. (One of the Appeal Board members who later listened to the tape of the proceedings described them as "convoluted." Att. H (Parker Dep. Tr. 45-47)). *See also* Att. C (JD Decl. ¶¶ 47-50). For example, even though JMU's policies called for Plaintiff to be presumed not responsible, Mr. Bacon decided to ask Plaintiff to present his defense first, rather than following the rules that called for Jane Roe to put on her evidence to support the charge. Att. C (JD Decl. ¶ 47); *see* Dep. Ex. 74 at 3-5 (JMU000189-191). Moreover, Jane Roe, Plaintiff, and the various witnesses frequently interrupted and/or spoke over each other, and they disagreed on such basic questions as on what day the alleged attack occurred, what people were wearing, and which party/house the participants had been at. *See* Dep. Ex. 74. Indeed, Jane Roe began by insisting that she was assaulted on August 26, not August 22. *Id.* at 12-20. She then decided that it had taken place in September. *Id.* at 20. Only after Chairman Bacon called a "recess" did Ms. Roe adjust her testimony to reconcile with the documents that had been in the file, and assert that the alleged event took place on August 22. *Id.* at 22-23.

Jane Roe's Resident Advisor and Mr. Word testified for Jane Roe and recounted their conversations with her on October 24, 2014. Att. E (RRTA 29). Jane Roe, her roommate, and a suitemate of hers also testified. *Id.* Jane Roe's roommate ("Roe's Roommate") testified that she did not recall seeing Jane Roe drink and that Jane Roe was "completely fine" when they separated that evening. Dep. Ex. 74 at 37-38. This was contrary to what Jane Roe herself had

9

testified and what Sirocky-Meck's statement had reported of Jane Roe's conversation with Sirocky-Meck. Roe's Roommate further testified that Jane Roe was only "droopyish" and "tired" when she went to get Roe from Plaintiff's room, that Jane Roe did not seem drunk, and that she did not need any help walking upstairs or getting ready for bed. *Id.* at 39-40. The suitemate testified but acknowledged that she knew nothing about the event in question, and only learned of the accusation nearly a month later. *Id.* at 67, 73.

Plaintiff testified that Jane Roe was not drunk, did not appear at all drunk to him, and that she had consented to sexual relations in the early morning hours of August 23, 2014. *Id.* at 91-92, 98, 108. He also introduced friendly text messages that the two had exchanged subsequent to the night in question (Dep. Ex. 64), rebutting what Jane Roe had recited to Sirocky-Meck (Dep. Ex. 29) (*viz.*, that she had not had contact with Plaintiff subsequent to the encounter). Dep. Ex. 74 at 93-96.

Witness credibility was very important given the nature of the allegations, and the panel charged with resolving these allegations asked questions of both Plaintiff and Jane Roe, as well as Roe's Roommate and most of the other witnesses. Att. E (RRTA 34); *see* Dep. Ex. 74. After retiring to deliberate, the three-member panel concluded that Plaintiff was "not responsible" on the charge of sexual misconduct. Att. E (RRTA 35-36). When Chairman Bacon apprised Jane Roe of the result, he specifically told her that she might want to consider appealing and submitting new evidence. Att. I (Tobias Decl. ¶ 13, Ex. 1). Curiously, this part of the proceedings was omitted when JMU produced the written transcript of the proceedings in discovery. *Id.* ¶ 11.

The hearing panel put its decision in writing and gave it to both Plaintiff and Jane Roe. Dep. Ex. 61. If Jane Roe had not appealed, the December 5 determination of "not responsible"

21499/1/7522931v9

would have been the final resolution of Jane Roe's charge against Plaintiff. Att. E (RRTA 37). The panel's findings report told both Plaintiff and Jane Roe that there were only three business days, or until December 10, 2014 at 5:00 p.m., for an appeal to be filed. *See* Dep. Ex. 61 at 3 (JMU000041).

D.     The "Appeals"

On December 10, 2014, Jane Roe appealed the finding of "not responsible" on the grounds of new evidence, leniency of the sentence, and denial of due process. Att. E (RRTA 43 & D); Dep. Exs. 46-47.[5] This was the last day upon which Roe could appeal. Dep. Ex. 61; Dep. Ex. 156 (Student Handbook) at 18 (JMU001625). The semester ended two days later, on December 12, 2014. Att. E (RRTA 39). On that date, the dorms for undergraduate students closed, and they remained closed until January 11, 2015. Att. E (RRTA 56). Plaintiff, like others who lived in the dorms, left campus and went home. Att. C (JD Decl. ¶ 66). Plaintiff successfully completed his first semester in good standing and was pre-registered for five new classes to begin in January when the spring semester began. Answer, ¶ 71; Att. C (JD Decl. ¶¶ 33, 67).

JMU's procedures called for the appealing party to submit whatever papers she or he planned to use to support of the appeal when filing the appeal notice. Dep. Ex. 156 (Student Handbook) at 18 (JMU001625) ("Appeals will review the case file based on the points raised in the written appeal submission and a review of the audio recording of the [initial hearing]."). Despite this, and although Roe filed her appeal on the last day possible, JMU's OSARP

---

[5] In JMU's Accountability Process for resolving reports of violations of JMU's student conduct policies, other than the Sexual Misconduct policy, the accusing party is not permitted to appeal a hearing panel finding of "not responsible." Answer, ¶ 67.

21499/1/7522931v9

permitted Roe to submit additional evidence several times after her initial appeal deadline. Att. E (RRTA 55, 57); *see* Dep. Exs. 92, 187, 189, 190, 193.[6]

Although labeled an "appeal," JMU's post-hearing process was, in fact, a second trial in which the Appeal Board gave no deference to the initial finding of "not responsible" and could (and did) consider *de novo* evidence that had been presented at the hearing and any new evidence that the parties chose to submit. Att. J (Raab Dep. Tr. 43-46, 51-52); Att. K (Haraway Dep. Tr. 41-42); Att. H (Parker Dep. Tr. 46); Att. E (RRTA 44, 46, 59-61, 63-65). But unlike the December 5 hearing, there was in fact no hearing, no live witnesses, no questioning of new evidence submissions, and no appearance by Plaintiff before this anonymous panel. Answer, ¶ 115; Att. E (RRTA 95). OSARP repeatedly told Plaintiff that he could not appear before the Appeal Board. Answer, ¶ 108; Att. C (JD Decl. ¶¶ 39, 42); Dep. Ex. 176; Dep. Ex. 177 ("You will not be in attendance at this appeal."); Att. L (Lushbaugh Dep. Tr. 170, 176-77); Att. E (RRTA 54).[7] And while an appeal by Jane Roe could result in Plaintiff being found "responsible" for the very first time, and the Appeal Board would have access to the audio tape of the initial hearing, only the person appealing (in this case Jane Roe), and not the responding

---

[6] Plaintiff went to view the appeal file on December 11, 2014. Att. C (JD Decl. ¶¶ 58-59). The only documents in the appeal file given to him at that time were the Petition for Appeal (Dep. Ex. 46), Jane Roe's own statement (Dep. Ex. 47) and a typed statement from her "support person" (Dep. Ex. 69). (*See* discussion under "The 'New Evidence,'" *infra*.) Jane Roe submitted all of the other new evidence discussed in the next section on or after December 13. Most of the materials submitted were sent to Plaintiff by email for the first time on December 18. Att. C (JD Decl. ¶ 72); Dep. Ex. 108. One document not included with Plaintiff's December 18 email was Jane Roe's additional appeal statement (Dep. Ex. 71) that OSARP repeatedly urged her to submit. Answer, ¶ 94. This statement, as discussed in the text, was transmitted to OSARP on December 17 and relayed to Plaintiff on December 22, only after he had submitted his appeal response. Answer, ¶ 97. Of course, Dep. Exs. 62 and 68 were never sent to John Doe at any time until after January 9, 2015. Att. C (JD Decl. ¶ 51).

[7] JMU's procedures for Sexual Misconduct cases say that in "rare" or "extenuating" circumstances, OSARP may conclude that a "student should address the appeal board in person." Dep. Ex. 156 (Student Handbook) at 19 (JMU001626). Here, having told Plaintiff that he would not be able to appear in person, OSARP must have concluded that Jane Roe's appeal did not involve such "rare" or "extenuating" circumstances. The rule, again, contrasts with that applicable for the resolution of cases alleging a policy violation other than Sexual Misconduct. There, while a student does not typically appear before an appeal panel, it is permissible when his or her "presence is determined necessary for the case." Dep. Ex. 156 (Student Handbook) at 15 (JMU001626). No finding by OSARP of "rare" or "extenuating"

12

party (here, Plaintiff), was entitled to access to the audio tape of the initial hearing in connection with the appeal. Att. L (Lushbaugh Dep. Tr. 171).

This would have been troubling under any circumstances given the nature of the charges, the importance of witness credibility in resolving such "he said/she said" charges, and the submission of new evidence not considered by the initial Hearing Panel. However, the particular types of new evidence submitted and the post-hearing procedures employed by JMU in this case rendered this so-called "appeal" unambiguously unfair.

### 1.    The "New Evidence"

Several pieces of significant new evidence were submitted and considered for the first time on Appeal. First, Jane Roe claimed that her roommate "did not say the correct information" when she testified about Jane Roe's drinking (or not drinking) on December 5. Dep. Ex. 47. She also arranged to have her suitemate (the one who had testified at the December 5 hearing) submit two statements (Dep. Exs. 66 and 67), one of which asserted that there were "later events that are important to the case." Dep. Ex. 67; *see also* Dep. Exs. 191 and 192 (email exchange between OSARP and suitemate). Specifically, the suitemate claimed that Roe's Roommate "lied under oath about the events the night of the rape" and "admitted to doing so" after the December 5 hearing. *Id.* According to the suitemate, Roe's Roommate "lied, she was drunk, and she was out to cover her tracks." *Id.* Not only was the suitemate not subject to questioning by anyone about this rather bold allegation, but, because Roe's Roommate was one of Roe's witnesses, Plaintiff was prohibited by JMU's rules from contacting Roe's Roommate to ask her to submit a reaffirmation of her earlier testimony and a refutation of the allegation that she had intentionally lied. Answer, ¶ 89; Dep. Ex. 88; Att. D (Bacon Dep. Tr. 37) (parties are prohibited from

---

circumstances is required.

21499/1/7522931v9

discussing testimony with witnesses for the other party "as long as the charges are pending");
Att. L (Lushbaugh Dep. Tr. 46, 113). Of course, even if JMU's rule did not prohibit contact with
Roe's Roommate, it would have been difficult to contact her given the fact that the JMU dorms
had been closed for a week by the time Plaintiff received the suitemate's statement on December
18.

Worse still, JMU provided no opportunity for Plaintiff to access the audio tape of the
initial hearing (while permitting Jane Roe such access and providing it to the Appeal Board).
Att. L (Lushbaugh Dep. Tr. 171-172). Thus, not only could Plaintiff not get *additional* testimony
from Roe's Roommate to counter the new charges of intentional lying being made against her, he
could not even authoritatively refer to her *past* testimony.

Second, Roe presented a statement from the person who served as her support person at
the December 5 hearing. Att. E (RRTA 44); Dep. Ex. 69. This statement said that she, Roe's
Roommate, and Roe had been drinking during the evening of August 22, that Roe was "visibly
drunk" at one point in the evening (when all three were at a fraternity party), that she (the support
person) "started repeatedly taking drinks from [Roe] as she was already very intoxicated," but
that she and Roe's Roommate "left the house together so [she could not] account for what
happened the [rest of the] night as I did not see [Roe] again." Dep. Ex. 69. Thus, this evidence,
too, directly contradicted the testimony of Roe's Roommate at the hearing that she and Roe had
*not* been drinking during their time together and was not intoxicated.

It deserves mention that JMU's rules precluded the support person from testifying at the
December 5 hearing. Answer, ¶ 74; Att. E (RRTA 45). Thus, the support person was never
questioned by Plaintiff, the Hearing Panel, or the Appeal Board. Att. E (RRTA 48). If subject to

14

question, the support person might have been asked why she would have left a "visibly drunk" and "very intoxicated" friend alone at a fraternity party.

Third, Jane Roe had a friend of hers from another college submit a statement and a voicemail. The statement described the voicemail as one that Roe had left her "[a]t 11:39 pm on August 21st 2014," in which it was "evident that [Roe] had clearly consumed alcohol." Dep. Exs. 70 and 94. Neither this statement nor anything else that Roe submitted with it explained the relevance of a voicemail that Roe apparently had left more than 25 hours prior to her encounter with Plaintiff.

Then, on December 17, 2014, Roe submitted a new and complete statement of her appeal that also purported to explain this evidence. Dep. Ex. 71. In fact, her OSARP advisor had solicited this statement from her, seeking a paragraph about "how you came across this new information and why you think it is important." Dep. Ex. 193. In response, Roe claimed that the voicemail was left "minutes before leaving [the fraternity]" on the night of August 22nd, rather than "at 11:39 pm on August 21st 2014," as the friend's statement said and the screenshot showed. *Compare* Dep. Exs. 71 and 70. Roe added that "[t]his new information is very important because it emphasizes that I was drunk and unable to give consent to sex." Dep. Ex. 71.

However, Roe's new appeal statement dated December 17 was not sent to Plaintiff until *after* he already had submitted his response to Jane Roe's original appeal. Att. C (JD Decl. ¶ 86). In response to Plaintiff's appeal submission (Dep. Ex. 72), OSARP Associate Director Lushbaugh cut and pasted a version of Jane Roe's December 17 email into a new email and sent it to Plaintiff, explaining that she had "just received" it because of people being out of the office for the holidays. Dep. Ex. 110. However, Ms. Lushbaugh's December 22 email to Plaintiff was

15

never shown to the Appeal Board; rather, only Jane Roe's original additional statement (dated December 17) was placed in the case file and given to the members of the Appeal Board. Answer, ¶ 110 (admitting the details of the timing of Plaintiff's appeal submission was not shared with the Appeal Board members); Att. L (Lushbaugh Dep. Tr. 194-95); Att. J (Raab Dep. Tr. 89-91); Att. K (Haraway Dep. Tr. 80-84). Thus, since Plaintiff's responding statement Dep. Ex. 72) was submitted on December 22, the Appeal Board members were unaware that Plaintiff did not have Jane Roe's additional statement when he wrote his response,[8] and were surprised that Plaintiff made no effort to respond to this accusation or the accusation of lying made against Roe's Roommate. Att. J (Raab Dep. Tr. 89-91).

When Ms. Lushbaugh sent her email to Plaintiff on the afternoon of December 22, she gave him one day, or until Tuesday December 23 at 5:00 p.m., to file a response to that statement. Dep. Ex. 110; Att. E (RRA 76 and 77 & G, and RRTA 76 and 77). JMU has never explained why Plaintiff was only given one day, and neither the forwarding email nor any other communication from OSARP to Plaintiff advised him that he had any right to request more time to respond. Att. E (RRTA 78).[9] And, in fact, Plaintiff did not see the email until the 24-hour deadline already had passed. Att. C (JD Decl. ¶ 47).

---

[8] Similarly, Defendant Warner was never told that Plaintiff did not have Jane Roe's complete appeal statement of December 17, 2014 (Dep. Ex. 71) when he filed his response to the appeal on December 22, 2014. See Dep. Ex. 158 and Att. B (Warner Dep. Tr. 107-109) (identifying documents he reviewed).

[9] Ironically, JMU changed its policy regarding the amount of time permitted to respond on appeals just as Jane Roe's appeal was being processed. Dep. Ex. 81 (December 8 email exchange seeking approval of new language that would be relevant for current appeals); Att. M (Dfs' Supp. Resp. To Pl's First Interrogs. No. 15) (changes were for the purpose of "providing equitable time for a responding party to respond to an appeal"). See Att. B (Warner Dep. Tr. 95-98) (changes were designed to provide more time, not less than three business day used previously). These new rules were implemented on December 12, two days after Jane Roe filed her appeal, and applied to this appeal. Dep. Ex. 45. Previously, a responding party had three business days to respond to an appeal (the same time that an appealing party had to file an appeal). Under the changed rules, the responding party would receive "the same amount [sic] of days from receiving notification that an appeal has been submitted that the other party had to write the appeal." Dep. Ex. 44 at JMU000531. Poorly worded, to be sure, and the rule probably did not contemplate the piecemeal submissions that Roe was permitted. In any event, JMU's treatment of Plaintiff fell woefully short of its new "equitable time" rule.

16

Fourth, the file provided to the Appeal Board contained a three page statement (apparently created from an email sent on December 5 by Roe's mother) from a licensed clinical social worker describing the effects of Prozac when a user also consumes alcohol, as well as a prescription list from a CVS Pharmacy that identified medicines prescribed to Roe. Dep. Exs. 62, 90, 126. In her email dated December 5, Roe's mother asked Josh Bacon and Jane Roe's advisor to be sure that this information was presented to the Hearing Panel that afternoon. Dep. Exs. 90, 126. Jane Roe's OSARP advisor (who also got the December 5 email) communicated with Jane Roe that day and confirmed that she wanted it in the case file. Att. N (Ehrhart Dep. Tr. 134-138). This information was added to the case file at some point thereafter. *See* Answer, ¶ 102.

The procedures that JMU told Plaintiff applied required that any witness statements or documents he planned to use at the hearing be submitted 48 hours in advance. If the party offering that statement did "not submit [the] witness statement prior to the 48 hour deadline, it [was his or her] responsibility to bring 5 copies of the statement the night of the case review, and the [other party would] have the opportunity to review it before hand." Dep. Ex. 34 (JMU000521). *See also* Dep. Ex. 38 at JMU000158 ("I will be in touch if anything additional is submitted by the accusing student so that you'll have the opportunity to review that additional information.").

In any event, this evidence (Dep. Ex. 62) was not presented to Plaintiff prior to or during the December 5 hearing. No one at JMU ever apprised Plaintiff of its existence. He never saw this document until long after the final resolution of the charges against him. Att. C (JD Decl. ¶ 51). Indeed, during the appeal process, JMU specifically told him that he would *only* need to

17

respond to the evidence that *he had previously reviewed* and the "new evidence" that he was specifically going to be provided on December 18, 2014.  Dep. Ex. 48.

    2.    The Appeal Board's Selection, Deliberations, and Decision

The Appeal Board consisted of three faculty members: Ronald Raab, Dana Haraway, and David Parker.  They were selected by OSARP's Associated Director based upon availability, experience, and gender balancing.  Att. O (Resp. To Pl's First Interrogatories No. 8); *see also* Dep. Ex. 54.  However, JMU did not apprise Plaintiff of the names of the members of the Appeal Board.  Att. E (RRTA 82).  Thus, Plaintiff had no basis for objecting to the inclusion of any member.  (In contrast, at the initial hearing, a "student has the right to a fair and impartial case review, meaning that board members who feel they have bias must request they not serve, and the student can request that a board member cannot serve if they can prove bias."  Dep. Exs. 19, 28.

The members of the Appeal Board were provided a copy of the audio recording of the initial hearing and copies of the documents in the file (including each of the documents described in the last section) prior to January 8, 2015.  *See* Dep. Exs. 58 and 59; Att. H (Parker Dep. Tr. 43-44; Att. J (Raab Dep. Tr. 61-62; Att. K (Haraway Dep. Tr. 70-71).[10]  Despite the serious accusations of intentional lying laid against Roe's Roommate, when the Appeal Board met on January 8, it did not seek to contact her.  Att. E (RRTA 96); Att. J (Raab Dep. Tr. 111); Att. K (Haraway Dep. Tr. 89).

The "Executive Summary" of the Appeal Board's decision states its decision as "Sanction Increased."  Dep. Ex. 75.  The "Appeal Action" document embodying its decision simply

---

[10] A comparison of Dep. Ex. 173, which are the evidentiary documents identified by Dr. Haraway as the documents given to the Appeal Board (Att. K, Haraway Dep. Tr. 80-84) with the exhibits identified by Dr. Raab (Att. J, Raab Dep. Tr. 102-108) shows they are identical in all respects. Mr. Parker could not recall what documents he received, but agreed

21499/1/7522931v9

checked a box under "Increased." Att. E (RRTA 97-98 & Ex. H). It concluded that there should be a "new sanction" of immediate suspension from JMU through Spring 2020. It also required completion of an education/counseling program before readmission to JMU and banned Plaintiff from Greek involvement and functions. Dep. Ex. 75 at 2. No specific statement or finding was recorded that the Appeal Board found Plaintiff responsible for sexual misconduct, nor did the Appeal Board provide any reasoning or explanation for its decision. Dep. Ex. 75; Att. E (RRTA 98 & Ex. H, 100). See Att. K (Haraway Dep. Tr. 95); Att. L (Lushbaugh Dep. Tr. 54).

The "new evidence" presented on appeal was considered by the Appeal Board. See Att. J (Raab Dep. Tr. 102-108); Att. K (Haraway Dep. Tr. 80-84). According to an email to Defendant Warner sent by Joshua Bacon, the OSARP Director who chaired the December 5 Hearing Panel which found Plaintiff not responsible, "the appeal board had some new recorded evidence that really changed the case." Dep. Ex. 93; Att. O (Pl's Response to 1st Set of Interrogs. No. 14). This "recorded evidence" Bacon referred to was the voicemail that Jane Roe left with her friend at another college on August 21 (and as to which there were contradictory statements regarding timing). Id.; Dep. Exs. 70, 94.[11] One of the Appeal Board members testified that she found the voicemail significant in her deliberations because she was unaware, prior to this lawsuit, that the voicemail likely had been left on an earlier night. Att. K, (Haraway Dep. Tr. 92).

The Appeal Board chair testified that the Board was influenced by the suitemate's statement that Roe's Roommate had lied (Dep. Ex. 67) and the statement (Dep. Ex. 62) from the clinical social worker that had been sent by Roe's mother. Att. J (Raab Dep. Tr. 110) (Appeal

---

with whatever documents Dr. Haraway identified. Att. H (Parker Dep. Tr. 49-52).

[11] This email (Dep. Ex. 93) was sent in the early afternoon of January 8, 2015 – just after the Appeal Board made its decision, but before Warner was to make his decision. Bacon testified that, after speaking with Raab, he concluded that he was mistaken about the reason for the reversal and called Warner to tell him that it was the witness statements, and not the voicemail, that had influenced the Appeal Board. Att. D (Bacon Dep. 161-62). Warner admits that he read this

19

Board's discussion revolved around witness's accusation of another witness lying), 126-27 (including "alcohol and the medication" as basis for conclusion that Roe could not make an "informed consent decision"). *See also* <u>Att. K</u> (Haraway Dep. Tr. 88-89). In short, the Appeal Board concluded that Roe was not capable of giving consent based on: (i) some of the evidence that JMU never told Plaintiff about (<u>Dep. Ex. 62</u>) (the social worker's statement and prescription list) and/or (ii) information that not only involved crucial questions of credibility (the accusations that Roe's Roommate had lied at the hearing), but where JMU's own rules prohibited Plaintiff from reaching out to the witness to obtain rebuttal information and from listening to the recording of the hearing.

As previously noted, the Appeal Board was also unaware that Plaintiff had not been provided with Jane Roe's additional statement of December 17 prior to submitting his own appeal response. Moreover, it apparently did not know that he was prohibited from contacting Roe's Roommate. They discussed Plaintiff's failure to address these issues. <u>Att. J</u> (Raab Dep. Tr. 89-91).

Finally, the Appeal Board applied a different definition of Sexual Misconduct and Sexual Assault than the one promulgated by JMU. According to the Appeal Board chair, John Doe's understanding of Roe's capacity to consent was "not relevant in finding responsibility." <u>Att. J</u> (Raab Dep. Tr. 37). This, of course, is directly contrary to JMU's published policy that Sexual Assault is sexual intercourse without consent, that consent can be obtained by words or action showing a knowing and voluntary agreement to the activity, and that such words or action is only invalidated by the victim's incapacitation or physical helplessness "where the accused student knows or reasonably should have known of such incapacitation." <u>Dep. Ex. 156</u> (Student

---

email on January 8 before rendering his decision. <u>Att. B</u> (Warner Dep. Tr. 117).

20

Handbook) at 28 (JMU001635). Thus, Plaintiff's testimony about what he perceived ought to have been vital to the Appeal Board's determination; instead, it was irrelevant. Moreover, the Appeal Board did not examine whether Jane Roe was "incapacitated" or "physically helpless," as the JMU standard required to vitiate consent, but rather whether she was "intoxicated" or "under the influence." Att. H (Parker Dep. Tr. 30-33) (intoxicated); Att. K (Haraway Dep. Tr. 48-51) (under the influence); both of these Appeals Board members acknowledged that these standards were lower standards than being incapacitated. *Id.*

   3. Defendant Warner Affirms the Appeal Board

   The Appeal Board's determination was sent to Defendant Warner for review and final action. Att. B (Warner Dep. Tr. 134-35). Again, at this stage, there were no live presentations, no live witnesses, and no questioning. Moreover, Plaintiff was provided no notice of the Appeal Board's January 8 decision and no right to contest this decision before Warner. Answer, ¶ 123; Att. E (RRTA 102). Indeed, Plaintiff was entirely unaware of the Appeal Board's decision on January 8, and Warner's review until after the latter's review was completed. Att. C (JD Decl. ¶ 88). Defendant Warner received a packet of documents from OSARP related to the appeal and a flash drive containing the audio recording for review. Att. B (Warner Dep. Tr. 105); Dep. Ex. 158.[12] Warner admitted that he did not listen to the entirety of the tape of the initial hearing, but "just enough for him to make his decision." Att. B (Warner Dep. Tr. 176-77).

   Under JMU's procedures, Warner's options were to affirm the Appeal Board's finding (with or without changing the sanction), find Plaintiff "not responsible," or determine that the case should be reheard at the original hearing level or at the appeal level. Dep. Ex. 156 (Student

---

[12] A comparison of Dep. Ex. 158 to Dep. Ex. 173 shows that the exact same documents were given to Defendant Warner and the Appeal Board, with one exception. In her deposition, Appeals Board member Haraway could not verify whether she saw Dep. Ex. 46, which was Jane Roe's Petition for Appeal. Att. K (Haraway Dep. Tr. 82-83).

21499/1/7522931v9

Handbook) at 19 (JMU001626). Oddly, the Appeal Board itself did not have the option of determining that the case should be reheard at the hearing level. *Id.* The Chair of the Appeal Board testified that he would have chosen that option had it been available. Att. J (Raab Dep. Tr. 133).

Warner summarily affirmed the decision of the Appeal Board on January 9, 2015, including its sanction, without any notice to or input from Plaintiff. Answer, ¶ 124; Att. E (RRTA 103). He discussed the decision with Alger on January 9, 2015, before anyone from JMU notified Plaintiff. Att. B (Warner Dep. Tr. 138-39, 181); Att. A (Alger Dep. Tr. 47-49, 156). JMU then imposed a sanction of an immediate suspension of Plaintiff to run through May 2020, which requires Plaintiff to reapply for admission if he wants to reenroll at JMU. Answer, ¶ 124; Att. E (RRTA 104).[13]

Ms. Lushbaugh called Plaintiff to advise him of the decision. Answer, ¶ 127; Att. L (Lushbaugh Dep. Tr. 212-16). She later sent Plaintiff several emails setting forth the sanction and its consequences. Answer, ¶ 130; Dep. Ex. 160; Att. E (RRTA 106 & Ex. I). Among other things, the emails apprised Plaintiff that he could not visit the campus of JMU without advance permission from OSARP and would "be subject to arrest for trespassing" if he violated this policy. *Id.* From this first call, JMU understood that there was a reasonable likelihood of litigation to challenge the decision. Att. B (Warner Dep. Tr. 183); Att. L (Lushbaugh Dep. Tr. 216-218; Dep. Exs. 139 and 160 (email exchange between Alger and Warner requesting that in-house counsel be kept informed). On January 10, 2015, Plaintiff's parents contacted JMU to contest the decision. Plaintiff's father sent Ms. Lushbaugh several emails regarding the adverse

---

[13] Shortly after his decision to suspend Plaintiff for 5.5 years, Defendant Warner made sure JMU took steps to withdraw him from all of the classes Plaintiff was registered to take beginning January 12, 2015. Answer, ¶ 133; *see* Dep. Exs. 164 and 166; Att. B (Warner Dep. Tr. 155-156).

22

decision (Dep. Exs. 95 and 96), and had two telephone conversations with OSARP Director

Bacon on January 10, 2015.  Answer, ¶ 129; Att. D (Bacon Dep. Tr. 168); Att. C (JD Decl. ¶ 97).

Drs. Warner and Bacon met with Plaintiff's parents later that month, but JMU took no action to

change the decision impacting Plaintiff.  Answer, ¶¶ 131-132; Att. E (RRTA 107).

ARGUMENT

This Court already has held that the allegations of the Amended Complaint state a claim for

relief for deprivation of Plaintiff's property interest without due process of law in violation of the

Fourteenth Amendment to the United States Constitution.  Memorandum Opinion dated March 31,

2016 (Dkt. No. 101) ("Op.").  As detailed both above and below, the pertinent allegations of the

Amended Complaint are indisputably true.  JMU does not dismiss its students for no reason at all,

and the contractual relationship that exists between it and its students has an implied term, based on

JMU's longstanding practices and procedures, requiring some good cause for a sanction.  JMU's

housing contract with Plaintiff was similarly limited.  Accordingly, Plaintiff had a property interest

in his continuing education at JMU that required Defendants to use procedures in accordance with

due process before depriving him of it.

The procedures that JMU used did not accord with due process.  The key allegations that

this Court identified on pages 25 and 26 of Op. on Defendants' motion to dismiss the Amended

Complaint are true, and indisputably so.  Indeed, Defendants concede that the appeal decision

was based on "new evidence," and that Plaintiff did not know the names of the Appeal Board's

members.  They cannot dispute that they specifically told him that he could not attend the Appeal

Board meeting and that they never told him when Defendant Warner's next-level review would

be.  Further, no one ever told him of the evidence that Roe's mother had sent in.  Finally, no one

23

disputes that additional arguments and factual claims were sent to him after he had submitted what he reasonably believed to be his final word on the appeal.

I. PLAINTIFF HAD A PROPERTY INTEREST IN HIS CONTINUING EDUCATION AT JMU

No genuine issue of material fact exists over whether Plaintiff had a property interest in his continuing education at JMU. Indeed, he had four different property interests.

First, Defendants concede that in-state tuition was paid on his behalf and that he enrolled as an undergraduate student at JMU. <u>Answer</u>, ¶ 18; <u>Att. E</u> (RRTA 7-9). Thus, JMU and Plaintiff had an express contractual relationship: money in exchange for an education. Answer, ¶ 10. The terms of this contract also included those set by JMU's longstanding practices and policies, including those it set forth in its handbook. <u>Answer</u>, ¶¶ 9-10. Those practices and policies make clear that students accused of misconduct have rights to fair and equitable procedures before any discipline can be imposed. *See* Op. at 3-4 (quoting policy on student rights). Defendants' testimony also establishes that JMU's continuing practice over many years has been to permit its enrolled students to remain at JMU until they receive an undergraduate degree, provided that they continue to pay the necessary tuition and fees, make satisfactory academic progress, and comply with JMU's policies. <u>Answer</u>, ¶ 17; <u>Att. A</u> (Alger Dep. Tr. 34-38); <u>Att. B</u> (Warner Dep. Tr. 35-40); <u>Dep. Ex. 132</u>. In short, there is no genuine issue that the allegations summarized in this Court's opinion – that "JMU has a system of expelling, suspending, or dismissing students only after a finding of cause" (Op. at 18) – are true.

"'[P]roperty interests subject to procedural due process are not limited by a few rigid, technical forms." *Perry v. Sinderman*, 408 U.S. 593, 601 (1972). As this Court noted, citing *Perry*, *de facto* rights can exist based upon policies and practices between parties even though

21499/1/7522931v9

they "may not . . . create enforceable contract rights." Op. at 18. *Cf. Zwick v. Regents of the University of Michigan*, 2008 WL 1902031, *5 (E.D. Mich. April 28, 2008) (describing and following Michigan law that students at a university have an "'implied contractual right' [that] amounted to 'the right to continued enrollment free from arbitrary dismissal'" even though Michigan courts do not create an explicit contractual relationship between students and universities).

Here, though, there are explicit contractual relationships. Further, under Virginia law, terms of an express contract may arise from the conduct of the parties. *See Westmoreland-LG & E Partners v. Virginia Electric & Power*, 486 S.E.2d 289, 293 (Va. 1997) (customs and usage of trade can be used to establish a point upon which a contract is silent or unclear); *Galloway Corp. v. Ballard Construction Co.*, 464 S.E.2d 349, 355 (Va. 1995) (considering, *inter alia*, prior dealings in order to construe terms of a construction contract). Implied terms of a contract are no different from express contracts under Virginia law. *Spectra-4 LLP v. Uniwest Commercial Realty*, 290 Va. 36, 44, 772 S.E.2d 290, 293-94 (2015) (contrasting implied-in-fact from implied-in-law contracts and stating that the former are no different from express contracts except that some terms are implied by the conduct of the parties). *Cf. Perry v. Sinderman*, 408 U.S. at 601-02 (noting that "the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.'").

Accordingly, JMU's policies and longstanding practice created a property interest entitled to protection under the Fourteenth Amendment. *E.g., Barnes v. Zaccari*, 669 F.3d 1295, 1303-04 (11th Cir. 2012) (affirming denial of qualified immunity defense on procedural due process claim; plaintiff's property interest demonstrated by policy manual and code of conduct authorizing the school to punish students who violate rules, which "permit [university] to impose

25

disciplinary sanctions only 'for cause.' The cause at issue here is a violation of the Code. Until a

student violates it, that student has a legitimate claim of entitlement to continued enrollment at

[the university] under Georgia law."); *Gaspar v. Bruton*, 513 F.2d 843, 845, 850 (10th Cir.

1975) (holding that, where student at a vocational-technical school pursuing courses in practical

nursing "paid the requisite enrollment fees to the School and maintained adequate academic

grade points in the objective or classroom portion of the course," that "a [property] right must be

recognized to have vested with [plaintiff], and the more prominently so in that she paid a

specific, separate fee for enrollment and attendance at the [school]."); *Lewin v. Medical College

of Hampton*, 901 F. Supp. 1161, 1164 (E.D. Va. 1996) ("For the purpose of disposing of the

instant motion, the Court finds that Plaintiff had a protectible property interest in continued

enrollment, free from arbitrary state action, at the Medical College."), *aff'd*, 131 F.3d 135 (4th

Cir. 1997); *Krasnow v. Virginia Polytechnic Institute*, 414 F. Supp. 55, 56 (W.D. Va. 1976)

("[S]tudents enrolled in state supported institutions acquire a contractual right for the period of

enrollment to attend, subject to compliance with scholastic and behavioral rules of the institution,

and to dismissal for violations thereof, provided the dismissal was not arbitrary or capricious."),

*aff'd*, 551 F.2d 591 (4th Cir. 1977); *Ashokkuman v. Elbaum*, 932 F. Supp. 2d 996, 1008 (D. Neb.

2013) ("Also relevant is the contractual relationship between the plaintiff and the University; the

terms of that contract may be implied from a student handbook or other statements of academic

policy. . . . In this case, the plaintiff has alleged the existence of a University misconduct policy

that could be held to create a cognizable property interest in nonarbitrary decisions . . .").

Second, as further evidence of his protected property right, Plaintiff and JMU had a

housing contract – indeed, one that JMU obligated Plaintiff to enter into as a condition of his

attending JMU. This contract had a specific term: the entire academic year 2014-15. Further, as

26

discussed previously (*see* discussion *supra* at 5), it could be terminated or cancelled by JMU only for specific reasons (including misconduct).

Third, JMU receives federal funds and is thus obligated to comply with Title IX as a condition of that receipt. As the Supreme Court has long noted, this, too, is in the nature of a contractual relationship. *Davis v. Monroe Cty. Bd. Of Educ.*, 529 U.S. 626, 640 (1999). The Office of Civil Rights in the Department of Education has required fund recipients to promulgate fair and equitable rules for the resolution of allegations of sexual assault and sexual harassment. JMU adopted its current set of rules in direct response to those requirements. Lushbaugh Dep. Tr. 25-28; <u>Dep. Ex. 150.</u> (proposing changes to JMU's rules for resolving complaints of sexual misconduct and referring to both Title IX and OCR requirements). Plaintiff is a third-party beneficiary of that contractual relationship and thus has a property interest in those fair and equitable procedures.

Fourth, Plaintiff had a property interest from the common law right to fair and equitable procedures from institutions of higher education. *E.g.*, *Tedeschi v. Wagner College*, 49 N.Y. 652, 658-60 (1980) (concluding that colleges must follow their own rules although not resolving whether that obligation derives from contract law or something else); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443, 444 (Iowa Ct. App. 1984) ("a private college may not expel a student arbitrarily, unreasonably, or in bad faith"); *Abbariao v. Hamline School of Law*, 258 N.W.2d 108, 113 (Minn. 1977) (common law imposed "due process" duties on private universities similar to those imposed by the U.S. Constitution on public universities). Although neither the 4th Circuit nor the Virginia Supreme Court has yet addressed the existence of this common law right, the reasoning of these authorities strongly suggests that it would recognize it.

27

(Obviously, this Court need not reach this issue if it agrees with Plaintiff on any of the other three property interests.).

## II.   JMU'S PROCEDURES FAILED TO MEET THE REQUIREMENTS OF DUE PROCESS

Even limiting the discussion to undisputed facts, the "process" JMU provided Plaintiff violated the Fourteenth Amendment in a number of different ways. First, it failed to apprise him of the names of the members of the Appeal Board who would reconsider the evidence *de novo*. Second, the Appeal Board failed to provide any reasoning or rationale for its actions. Third, because credibility was so important, JMU's failure to permit Plaintiff the opportunity to appear in person before the Appeal Board, which was considering new evidence and assessing credibility, also violated due process. Fourth, JMU used "gender balancing" – *i.e.*, the conscious use of sex - in selecting members of the panel. Fifth, the Appeal Board assessed Plaintiff's conduct under a standard different from the one stated in its policy. And, finally, JMU failed to give him a reasonable, meaningful opportunity to respond to the evidence against him. Each of these defects, alone, would be sufficient to grant Plaintiff's motion for summary judgment.

### A.   JMU Denied Plaintiff An Opportunity To Challenge For Bias

No one disputes that JMU did not apprise Plaintiff of the names of the individuals who were serving on the Appeal Board. One of the hallmarks of due process is an unbiased decisionmaker. *Professional Massage Training Center, Inc. v. Accreditation Alliance Of Career Schools and Colleges*, 781 F.3d 161, 177 (4th Cir. 2015) ("This court has made clear that an impartial decisionmaker is an essential element of due process.") (internal quotation marks and citations omitted); Op. 25 (finding that the allegations here, including the allegation that JMU

21499/1/7522931v9

"did not tell [Plaintiff] the names of the appeal board's members" were sufficient to allege a failure to provide due process) (citing paragraph 107 of the Amended Complaint).

One of the prerequisites to ensuring an unbiased decisionmaker is knowledge of the *identity* of the decisionmaker. Defendants have admitted (<u>Answer</u>, ¶¶ 107, 115) that Plaintiff was never informed of the three persons appointed to serve on the Appeal Board, but they were anonymous to him at all relevant times. Defendants have also admitted (<u>Answer</u>, ¶ 111) that since JMU denied Plaintiff any right to appear before the Appeal Board and failed to notify him of who would serve on the Appeal Board. Plaintiff had no way to assess its members or challenge their participation for bias. Without that, a student in disciplinary proceedings simply cannot know whether his decisionmaker is impartial, and has no basis to challenge it. *See* <u>Att. C</u> (JD Decl. ¶ 70).

B.    <u>The Appeal Board Provided No Reasoning For Its Decision</u>

Another fundamental element of due process is to provide some kind of reasoning for any actions taken against a student. *E.g.*, *Jones v. Bd. of Governors of the University of North Carolina*, 704 F.2d 713, 716 (4th Cir. 1983) (affirming grant of preliminary injunction for a student where initial determination had been reversed "without any expression of reasons for the reviewing officer's rejection of the [first] tribunal's determination"); *Dixon v. Alabama State Bd. Of Educ.*, 294 F.2d 150, 159 (5th Cir. 1961) ("If the hearing is not before the Board [of Education] directly, the results and findings of the hearing should be presented in a report open to the student's inspection."); *Doe v. The Rector and Visitors of George Mason University*, 2016 WL 775776, *12 (E.D. Va. Feb. 25, 2016) (finding a violation of due process where, *inter alia*, after plaintiff's acquittal on sexual misconduct charges, "an administrator then found plaintiff liable and imposed sanctions upon him without providing a basis for the decision."); Op. 26

29

(finding that the allegations here, including the allegation that "the appeal panel gave no explanation for its decision to overturn the hearing panel, which had the benefit of both oral presentations and live testimony," were sufficient to allege a failure to provide due process) (citing paragraphs 51, 56-57, and 120 of the Amended Complaint).

Here, once again, there is no dispute of fact. The Appeal Board which acted as a second trial court, gave no deference to the plenary hearing decision and provided no written explanation or reasoning for its actions. <u>Answer</u>, ¶ 120; <u>Att. E</u> (RRTA 100). Indeed, the papers completed by the Appeal Board did not even state that Plaintiff had been found "responsible," only that the sanction for him had been "increased." <u>Answer</u>, ¶ 120; <u>Dep. Ex. 75</u>.

C.    <u>JMU Denied Plaintiff An Opportunity To Be Heard At The Appeal Board</u>

Similarly, it is undisputed that JMU expressly told Plaintiff that he could not appear before the Appeal Board and that he was entirely unaware of Warner's subsequent review. See Dep. Exs. 176, 177; <u>Answer</u>, ¶ 108; <u>Att. B</u> (Warner Dep. Tr. 44-45, 123-24) (appeal was designed to be a paper process without participation by accused). Because credibility was so important to the charges that were made against Plaintiff, and because the Appeal Board's review of the evidence was *de novo*, this also violated the Fourteenth Amendment.

Once again, the Fourth Circuit's decision in *Jones v. Bd. of Governors of the University of North Carolina*, 704 F.2d 713 (4th Cir. 1983) is on point. There, a university alleged that a student had cheated on a final examination. A hearing panel found that the student had not cheated "after a full evidentiary hearing," but that finding was "either 'reversed' as a finding or 'disregarded' as advice" by a university officer, a decision "made solely upon review of the written record of the hearing tribunal's evidentiary hearing and without any expression of reasons for the reviewing officer's rejection of the tribunal's determination . . . ." *Jones*, 704 F.2d at 716.

21499/1/7522931v9

*See also* Op. 25-26 (finding that the allegations here, including the allegations that JMU "did not permit [Plaintiff] to attend the appeal board's meeting," that "even though the appeal board was presented with new allegations and evidence, it decided to reverse the hearing panel's decision without any oral presentations or live testimony – not even from Roe's roommate whose credibility had come under attack by Roe and her suitemate," and that "without prior notice to or input from [Plaintiff], Warner summarily affirmed the appeal board's decision," were sufficient to allege a failure to provide due process) (citing paragraphs 108, 118-19, and 123 of Plaintiff's Amended Complaint). The Fourth Circuit found the procedures in *Jones* sufficiently questionable that it concluded that the plaintiff had "presented 'grave or serious questions' of procedural due process violations," *Jones*, 704 F.2d at 716, and affirmed a preliminary injunction requiring plaintiff's reinstatement.

Here, as in *Jones*, a so-called "appeals" panel (and, subsequently, Defendant Warner) reversed the initial panel's determination favorable to Plaintiff without any explanation at all. (The initial December 5 determination in this case was not a "recommendation," but a final decision that would have ended the process if Jane Roe had not appealed.) Att. E (RRTA 37). Thus, the Appeal Board members were left with listening to an audio recording of the initial hearing and to review written submissions. Answer, ¶ 115. Accordingly, the Appeal Board could not make crucial credibility determinations by observing the witnesses.[14] It gave no deference to the decision of the Hearing Panel, which had been able to observe witnesses. *See* Att. H (Parker Dep. Tr. 22-23); Att. J (Raab Dep. Tr. 45-46); Att. K (Haraway Dep. Tr. 41-42). Indeed, JMU purposefully created a "paper appeal" process. *See* Att. B (Warner Dep. Tr. 123-

---

[14] The Appeal Board had no transcript that might have assisted in reviewing the recording, and the more-than-two-hour recording itself involved frequent interruptions and substantial changes in volume. Att. I (Tobias Decl. ¶ 10). One of the Appeal Board members found it difficult to hear. Att. K (Haraway Dep. Tr. 71-72). Defendant Warner conceded

21499/1/7522931v9

24, 129-32). JMU's paper appeal process ensured that *more* weight would inevitably be given to the conclusions of the appeal panel that did *not* observe live testimony than it did to the panel that conducted a plenary hearing where witnesses appeared, were questioned by the panel and cross-examined by the accused, and where the accused had a right to appear in person and have his credibility judged. JMU's "appeal" process is particularly problematic here where (1) the nature of the case made credibility issues of utmost importance, and (2) the standard under which Plaintiff was *supposed* to be judged required an assessment of what he knew (or reasonably should have known) of Roe's alleged incapacity. Accordingly, Plaintiff's own recitation of events, and his credibility in telling them, should have been particularly important.

The Second Circuit's decision in *Hagopian v. Knowlton*, 470 F.2d 201 (2d Cir. 1972) also supports Plaintiff. There, a cadet at the Military Academy had accumulated sufficient demerits to warrant expulsion. The board tasked with considering whether the cadet should be expelled could vote against it if the cadet's potential warranted retention. The Second Circuit held that due process required the cadet an opportunity to appear before that board because "especially with respect to the subjective evaluation of the cadet's potential, the opportunity to personally appear and present his case may affect considerably the credibility which the members of the [board] attach to the cadet's appeal." *Id.* at 211. It further held:

> The opportunity to bring witnesses to appear in his behalf may also strengthen the impact of his case above the frail impression which a written submission would make. "Particularly where credibility and veracity are at issue, … written submissions are a wholly unsatisfactory basis for decision." *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S. Ct. 1011, 1021, 25 L. Ed. 2d 287 (1970).

---

that he did not even listen to all of it before rendering his decision. <u>Att. B</u> (Warner Dep. Tr. 176-77).

32

Case 5:15-cv-00035-EKD-JCH   Document 115   Filed 04/18/16   Page 32 of 40   Pageid#: 1078

*Id. See also Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997) (denying summary judgment to university officials accused of procedural due process by student expelled for alleged rape because officials failed to permit cross-examination of witnesses; "if a case is essentially one of credibility, the 'cross-examination of witnesses might [be] essential to a fair hearing.' . . . In the instant case, the disciplinary hearing became a test of the credibility of plaintiff's testimony versus the testimony of [his accuser]. . . . [T]he plaintiff here faced expulsion. . . . At the very least, in light of the disputed nature of the facts and the importance of witness credibility in this case, due process required that the panel permit the plaintiff to hear all evidence against him and to direct questions to his accuser through the panel.") (quoting *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972)). *Cf. Henry A. Knott Co. v. Chesapeake and Potomac Telephone Co. Of West Virginia*, 772 F.2d 78, 85 (4th Cir. 1985) (reversing district court that had rendered a verdict in a civil trial where the evidence had been heard by a special master who had withdrawn before issuing findings; "a successor judge simply cannot make credibility determinations based upon the record" and, thus, a "hearing *de novo* before a new successor master or before the district court must be conducted if the case requires the trier of fact to make credibility determinations concerning the testimony of witnesses; otherwise the parties right to a full due process hearing would be severely undercut. . . . [T]he notion that the person who hears the testimony should be the person who decides the case is part of our conception of a fair trial."); *Appalachian Power v. Fed'l Power Comm'n* , 328 F.2d 237, 240 (4th Cir. 1964) ("Where the original trial examiner hears testimony and the demeanor of witnesses is an important factor, the substitution of a new trial examiner might be improper.").

21499/1/7522931v9

D.    JMU Discriminated On The Basis of Sex In Selecting Members of The Appeal Board

Unbeknown to Plaintiff until discovery in this case, JMU also used "gender balancing" to select members of the Appeal Board that heard Roe's appeal. Att. O (Dfs' Resp. To Pl's First Interrogs. No. 8). That is, they intentionally considered potential Board members' sex in determining who would sit on the Appeal Board.

The intentional consideration of sex is sex discrimination. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989) (plurality op.) (interpreting Title VII to mean that "a person's gender may not be considered in making decisions that affect her"). Consideration of a panel member's sex is thus sex discrimination that can be raised by an affected party. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994) (holding that putative father was harmed by state's use of peremptory challenges in a sex-discriminatory fashion, and that such use violated the Fourteenth Amendment). Sex discrimination can only be justified by means that are substantially related to an important state interest, and Defendants have offered none here. *Cf. United States v. Allen-Brown*, 243 F.3d 1293, 1298-99 (11th Cir. 2001) (holding that defense attorney's effort to obtain more diversity on a predominantly-white jury by using peremptory challenges against white jurors was not in pursuit of a sufficiently compelling reason, and thus unconstitutional).

Again, no facts are in dispute here. Defendants enforce an order that JMU obtained through a discriminatory process that violates the Fourteenth Amendment.[15]

---

[15] While sex discrimination claims are usually brought under the Equal Protection Clause of the Fourteenth Amendment, it is well-established that due process also incorporates principles of non-discrimination. *E.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("[T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive . . . [A]s this Court has recognized, discrimination may be so unjustifiable as to be violative of due process."). If this Court would prefer that this issue be addressed under the Equal Protection provision, Plaintiff respectfully requests that he be permitted to amend his complaint. Given that he first learned of JMU's practice when Defendants disclosed it during discovery, and notified Defendants that he believed it

34

E.    JMU Did Not Assess Plaintiff's Conduct Under The Standard It Had Announced

Another requirement of due process is ensuring that those accused know what they are charged with and what rules they have violated. *E.g.*, *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1089 (8th Cir. 1969) (holding that due process requires, *inter alia*, a "definite charge"). A "definite charge" is not an undefined label, but a charge whose contours are spelled out with reasonable clarity.

JMU charged Plaintiff with a violation of its Sexual Misconduct policy. Under the standard for that offense published in its Handbook, sexual conduct "with consent" was not a violation of the Sexual Misconduct policy. "Consent," in turn, was defined as knowing and voluntary agreement by the parties to mutually-agreed upon activity. Under that policy, consent could not be obtained by taking advantage of another's "incapacitation" or "physical helplessness" where "the accused student knows or reasonably should have known of such incapacitation." Dep. Ex. 156 (Student Handbook) at 28. Thus, when the voluntariness of the accusing party's consent is an issue in a Sexual Misconduct case because of the person's alleged capacity (or incapacity) to make a decision, the standard that JMU promulgated focuses on the reasonableness of the accused's behavior at the time, not a post-hoc examination of the accusing party's tolerance for alcohol or drugs.

But the Appeal Board members did not examine the reasonableness of Plaintiff's behavior. Rather, they focused on whether Jane Roe was "intoxicated" or "under the influence" – two phrases, it deserves mention, that are not in JMU's definition of "consent." *See* discussion *supra* at 18-19. Indeed, the Chair of the Appeal Board testified to his understanding that the

---

violated due process in his discovery answers, Plaintiff would have good cause for doing so and Defendants could not possibly be prejudiced by such an amendment.

21499/1/7522931v9

reasonableness of Plaintiff's perceptions was irrelevant to whether he was responsible for Sexual Misconduct.

F.    JMU Failed To Give Plaintiff A Reasonable Opportunity To Respond To The Evidence Against Him

The Appeal Board sanctioned Plaintiff after JMU permitted Jane Roe to supply new evidence, including several statements that disputed the hearing testimony of Roe's own roommate (whom Plaintiff could not contact) – and one of these (Dep. Ex. 67) purported to relay a conversation in which the roommate admitted to intentional lying. The Appeal Board also considered evidence that JMU never notified Plaintiff of (the statement from the clinical social worker and the list of Roe's prescription medicines, Dep. Ex. 62). *E.g.*, *Dixon*, 294 F.2d at 159 ("[T]he student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies."). And (unbeknownst to the Appeal Board), JMU gave Plaintiff, for all practical purposes, no opportunity to rebut Roe's final statement, which contradicted her friend's written statement as to when Roe's "drunken voicemail" had been left. Defendants have no evidence to contradict these material facts.

It is a fundamental of due process that the state entity threatening to deprive someone of liberty or property provide that person with reasonable notice of the evidence that will be used against him or her, and with a reasonable opportunity to respond. The nature of the hearing will depend upon the nature of the charges and the possible consequences. *Goss v. Lopez*, 419 U.S. 565, 579 (1975) ("'[T]here can be no doubt that at a minimum, [due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313 (1950)); Op. 25 (finding that the allegations here, including the allegations

36

Case 5:15-cv-00035-EKD-JCH   Document 115   Filed 04/18/16   Page 36 of 40   Pageid#: 1082

that JMU "did not give [Plaintiff] notice of, or time to respond to, Roe's new evidence" and "did not allow him to contact Roe's roommate, whom Roe and her suitemate accused of lying before the hearing panel," were sufficient to allege a failure to provide due process) (citing paragraphs 88, 92, 94, 96, and 101 of the Amended Complaint).

The nature of the case in this instance was extraordinarily serious, and Defendants failed to provide Plaintiff with a true opportunity to respond to evidence. Notably, Defendants admit a number of key facts in their Answer that support this conclusion: (a) Defendants admit that the appeal hearing occurred while school was out of session and dorms were closed (Answer, ¶¶ 83, 112); (b) Defendants admit that Plaintiff was prohibited by JMU from contacting Jane Roe's witnesses directly (Answer, ¶ 89); (c) Defendants admit that when "new evidence" was sent to Plaintiff on December 18, 2014, that Jane Roe's appeal statement of December 17 was not included (Answer, ¶ 94); and (d) Defendants admit that when Jane Roe's appeal statement (Dep. Ex. 71) was sent to Plaintiff on December 22, he was only given 24 hours to respond, and he was not told that he could get more time if needed (Answer, ¶ 97).

JMU could have shown Plaintiff all of the evidence in the file (like the statement from the clinical social worker), allowed him to contact Roe's Roommate, made full disclosure to the Appeal Board about what information was given to Plaintiff and when, given Plaintiff more time to respond since the panel was not meeting until January 8, and/or precluded the use of "new evidence" on appeal. Not only would these options not have been onerous for JMU, precluding "new evidence" on an appeal would have been *less* burdensome. *Goss*, 419 U.S. at 580 ("The risk of error is not at all trivial and it should be guarded against if that may be done without prohibitive cost or interference with the educational process."). *See also Doe v. The Rector and Visitors of George Mason University*, 2016 WL 775776, *13 (E.D. Va. Feb. 25, 2016)

37

(concluding that procedures to resolve claim of sexual misconduct violated due process; "But where the accused has this much at stake, as in the context of university discipline of this magnitude, the compounding of errors that could easily and cheaply have been avoided renders the risk of unfairness 'intolerably high.'") (quoting *Withrow v. Larkin*, 421 U.S. 35, 58 (1975)); *id.* at *12 (concluding that deprivation was caused by, *inter alia*, "conduct[ing] a *de novo* administrative review of the charges without affording an adequate opportunity to mount an effective defense"); *Doe v. University of Southern California*, 2016 WL 1321509, *15 (Cal. Ct. App. April 5, 2016) (concluding that student accused of sexual misconduct had not been given a fair hearing; "[R]equiring [accused student] to request access to the evidence against him does not comply with the requirements of a fair hearing") (citing *Goss* and *Dixon*); *id.* at *16 ("Even where constitutional due process protections do not apply, common law requirements for a fair hearing . . . do not allow an administrative board to rely on evidence that has never been revealed to the accused.").

JMU failed to provide procedures concomitant to the risk of error on a serious charge, and, accordingly, denied Plaintiff of property without due process.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted.

Respectfully submitted,

/s/ W. David Paxton
W. David Paxton (VSB No. 19798)
Bradley C. Tobias (VSB No. 88046)
GENTRY LOCKE
P.O. Box 40018
Roanoke, VA 24022-0013
(540) 983-9300
paxton@gentrylocke.com
tobias@gentrylocke.com

38

Michael E. Rosman
Michelle A. Scott
CENTER FOR INDIVIDUAL RIGHTS
1233 20th Street, N.W.
Suite 300
Washington, DC 20036
(202) 833-8400
rosman@cir-usa.org
scott@cir-usa.org

39

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing Memorandum on April 18, 2016, using the Court's ECF/CM filing system, which will send an electronic notification of same to counsel of record for Defendants, Nerissa Rouzer, John Butler and Nicholas Simopoulos of the Office of the Virginia Attorney General. I further certify that the deposition exhibits and attachments, which are cited to in the foregoing Memorandum, are made accessible to counsel via a file transfer protocol ("FTP") website, per the parties' agreement.

Nerissa N. Rouzer
John G. Butler, III
Nicholas F. Simopoulos
Assistant Attorney General
Office of the Attorney General of Virginia
900 East Main Street
Richmond, VA 23219
NRouzer@oag.state.va.us
JGButler@oag.state.va.us
NSimopoulos@oag.state.va.us


/s/ W. David Paxton
W. David Paxton (VSB No. 19798)
Bradley C. Tobias (VSB No. 88046)
GENTRY LOCKE
P.O. Box 40018
Roanoke, VA 24022-0013
(540) 983-9300
paxton@gentrylocke.com
tobias@gentrylocke.com

40