IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

JOHN DOE,                    )

        )

      Plaintiff,           )

        )     Civil Action No. 5:15-cv-00035

 v.                   )

        )     By: Elizabeth K. Dillon

JONATHAN R. ALGER, *et al.*,     )         United States District Judge

        )

      Defendants.        )

## MEMORANDUM OPINION

Pending before the court are cross-motions for summary judgment. Plaintiff John Doe[1] seeks summary judgment in his favor as to liability on the sole remaining claim in his amended complaint: a claim that defendants deprived him of a property right—his right to continued enrollment at James Madison University (JMU)—without providing him adequate due process. Defendants Jonathan R. Alger, the president of JMU, and Mark Warner, its Senior Vice President of Student Affairs and University Planning, both of whom are named only in their official capacities, have also filed a motion for summary judgment seeking judgment in their favor as to Doe's claim. The motions are fully briefed and were argued before the court.

As discussed in more detail below, the court will grant Doe's motion for summary judgment as to liability, concluding that Doe had a protected property interest in his continued enrollment at JMU and that he was deprived of that interest without due process of law. The court will order additional briefing from the parties as to the proper remedy, an issue that the parties have not yet addressed. The defendants' motion for summary judgment will be denied.

---

[1] The court previously granted plaintiff's motion to proceed under a pseudonym. Likewise, his accuser (herein Jane Roe) and most of the students involved have been referred to in the unsealed materials in a way so as not to identify Doe or Roe.

# I. BACKGROUND

## A. Doe Enrolls at JMU

JMU is a public university. After being accepted at several state universities, Doe accepted JMU's offer of admission in April 2014, paying both an initial deposit and in-state tuition and fees. As defendants admitted in their answer, by accepting JMU's offer of admission and paying the required fees, Doe "was entitled to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course work needed to earn a degree, otherwise met the requirements for graduation, and complied with JMU's conduct rules." (Answer to Am. Compl. ¶ 17, Dkt. No. 110.) Consistent with this admission, both defendants testified that JMU allows a student's continuing enrollment until graduation, unless that student: (1) fails to meet JMU's academic standards, (2) fails to pay required fees, or (3) violates one of JMU's rules of conduct. (Alger Dep. 35–37, Pl. Att. A; Warner Dep. 35–40, Pl. Att. B.)[2] Warner further testified that the same basic provisions have been in place since at least 1998, including that a student is not "going to be kicked out for no reason" and that there "has to be a process that's followed." (Warner Dep. at 37, 39.)

JMU's Office of Student Accountability and Restorative Practices (OSARP) implements and administers many of the conduct policies applicable to JMU students. The office also publishes the student handbook, which contains many of JMU's rules governing student conduct. (Dep. Ex. 156; also at Handbook, Defs. Att. A.) The handbook provides that "[a]ll policies and procedures defined in these sections are subject to change . . . at any time" by JMU. (*Id.* at 4.)

---

[2] Both parties have submitted voluminous exhibits as part of the summary judgment briefing, many of which are under seal, and they appear at different docket entries on the court's ECF system. Rather than utilizing ECF numbers for these exhibits, this opinion will refer to all of the exhibits and attachments using three categories. First, "Dep. Ex. __" will refer to the joint deposition exhibits by number. Second, "Pl. Att. __" will refer to attachments to plaintiff's briefing, which are Attachments A through Q, and some additional exhibits that include both a letter and number, *e.g.*, K(1) or D(1). Third, "Defs. Att. __" will refer to attachments to defendants' briefing, which are Attachments A through Z, and AA through CC.

2

The handbook also states that "JMU reserves the right to develop and implement new rules, guidelines and student standards of conduct . . . ." (*Id.* at 22.) JMU in fact modified the handbook in August 2014, including the creation of a "separate and distinct Sexual Misconduct Accountability Process to address allegations of Sexual Misconduct." (August 29, 2014 email from OSARP, Defs. Att. C.) This revised policy was in force and was applied to the proceedings against Doe.[3]

## B. Doe Is Accused of Misconduct, and the First Hearing Results in a Finding of Not Responsible.

Doe met Jane Roe for the first time on JMU's campus. Like Doe, Roe was a first-semester freshman, and the two students lived in the same dorm, but on different floors. Late in the evening on August 22, 2014, or early the morning of August 23, 2014, Doe and Roe engaged in sexual intercourse in Doe's dorm room. Several months later, Jane Roe reported the encounter to a student resident assistant, claiming that she had not consented to intercourse on that occasion, that she had told Doe no, and that she was too intoxicated to consent. She came forward to speak with the resident assistant after learning that another student, Student A, also alleged that Doe had been physically aggressive with Student A on a separate occasion. The two students came forward together to speak to the resident assistant.

The resident assistant asked both Jane Roe and Student A if they would speak with the hall director, Nigel Word, and they both agreed to do so. With the two students' permission, Word prepared a report and submitted it to OSARP.[4]

---

[3] There is mention in the briefing of continuing revisions to some of the procedures of the sexual misconduct policy during the pendency of the proceedings against Doe. Any dispute over whether these revisions were applied or could be applied retroactively is not a material dispute that prevents the entry of summary judgment.

[4] To the court's knowledge, only Jane Roe decided to proceed with her claim against Doe at that time; Student A did not. There were passing references to Doe's conduct with regard to Student A at the initial hearing, but there is no written evidence in the file related to Student A, any misconduct toward her was not part of the

3

On November 6, 2014, Doe received an email notifying him that he was being charged with a violation of JMU's rules regarding "Sexual Misconduct." It provided no additional detail regarding the charge, except to advise him that he should not have any contact with Jane Roe and that, if he did, he could be charged with an additional policy violation. (Dep. Ex. 27.) The email also advised Doe to attend a meeting at OSARP on November 13, at which time the charge and review process would be explained. (*Id.*) Three days later, JMU moved Doe to another dormitory across campus over his objection, and he was told that he was not permitted to enter his old dorm "for any reason" and that doing so would risk disciplinary action. (Doe Decl. ¶¶ 18–21, Pl. Att. C.)

Doe went to OSARP as directed and met with assistant director, R.J. Ohgren. (Doe Decl. ¶ 22.) Ohgren talked with Doe about the procedure that would be used to decide the charge against him and about his rights as the accused. (*Id.*) Ohgren also advised Doe to review the charge file kept by OSARP. Although Doe was not permitted to make or receive copies of any file materials, he could take notes during his review. Ohgren later informed Doe via email that Doe would be told if additional materials were submitted. (Dep. Ex. 34.)

Doe reviewed the charge file that same day; it contained only two documents. (Doe Decl. ¶¶ 26–27.) The first was an October 24 joint report from Roe's resident assistant and Word, and the second was a report dated October 29 from JMU's Title IX officer, Amy Sirocky-Meck. (Doe Decl. ¶ 27; Dep. Exs. 29, 30.) Sirocky-Meck had interviewed Roe in order to prepare her report.

---

charge against Doe, and the decision-makers were not to consider it. Although there is no evidence that Warner considered the other student's allegations in making his decision, Warner clearly knew about the other student at the time of his decision. (Dep. Ex. 93 (Bacon's email to Warner saying that Doe's case "relates to" Student A, who "accused [Doe] of sexual misconduct but decided not to press accountability charges").)

4

There were some inconsistencies or differences in detail between the statements, although both reports said that Roe claimed that her sexual encounter with Doe on August 23 was not consensual, and both referenced her drinking alcohol on that evening. The one written by Sirocky-Meck reported that Roe stated she was drunk during the encounter. (Dep. Ex. 29.) The first statement described the conversations that Roe had with both the resident assistant and Word, in which she reported that "she is not an avid party-goer and that she rarely if ever consumes alcohol and [so] does not have a high tolerance." (Dep. Ex. 30.) It claimed that she did not remember some details, but recalled being in Doe's bedroom and in his bed and that, although she had said, "No!" multiple times and physically pulled away from Doe, he still forced himself on her and raped her. It also referenced "a second occurrence" reported by Roe, in which Doe was "very physically aggressive." (*Id.*)

In the second statement, Sirocky-Meck mentioned Roe being on a medication. (Dep. Ex. 29 ("She reports she doesn't usually drink, she is on a prescription medication, and she became intoxicated quickly.").) It described the alleged assault in more detail and included Roe's statement that, when she "realized she physically couldn't get away from him because he was on top of her," she said "condom." (*Id.*) According to this statement, Doe then got up and got a condom and then "penetrat[ed] her with his penis." (*Id.*) This statement also included that Roe's roommate came to get Roe after the roommate returned to the dorm and that, when she arrived at Doe's room, Roe "had her clothes off and was out of it." (*Id.*) Unlike the first statement, the Sirocky-Meck report stated that Roe had "avoided Doe and had no contact with him since the incident." (*Id.*)[5]

---

[5] According to Doe, he and Roe had consensual intercourse a second time in his dorm room, within a few days after the first encounter, when they were both sober. (Doe Decl. ¶ 14; Hr'g Tr. 7–8.) At the hearing, Roe denied that they had intercourse a second time, and instead echoed her statement in Word's report that there was

Doe returned to review the file the day before the December 5 hearing. Although he was never advised that additional materials had been placed in the file, he found a third document had been added: a short, handwritten note by another student stating that "on the night of this event," the author had seen Jane Roe, that Roe did not appear to be sober, and that Roe was "loopy and silly." (Doe Decl. ¶ 41; Dep. Ex. 41.)

A hearing was held on the charge on December 5 before a three-person board (the accountability board or hearing board) chaired by Dr. Josh Bacon, the head of OSARP. (*See generally* Hr'g Tr., Dep. Ex. 74.) The purpose of the hearing was for the board to make a decision about whether Doe had violated JMU's Sexual Misconduct policy. That policy provides that Sexual Misconduct includes "Sexual Assault," defined as "[e]ngaging or attempting to engage in any sexual intercourse . . . without consent." (Handbook 28, Dep. Ex. 156.) It defines consent as "words or action that show a knowing and voluntary agreement to engage in mutually agreed-upon sexual activity. Consent cannot be gained by . . . taking advantage of the victim's incapacitation or physical helplessness where the accused student knows or reasonably should have known of such incapacitation." (*Id.*)

At the hearing, Doe and Roe were both given the opportunity to speak, to present witnesses, to question the other side's witnesses (posing the questions through Bacon), and both

_____

another time when Doe was physically aggressive with her. They did not have intercourse because she was able to dissuade him and get out of his room.

At the hearing, Doe also presented evidence of text messages (in the form of screen shots) that he and Roe had exchanged after the night in question. In general terms, the text exchange appears to be Roe either seeking to have more of a relationship with Doe, or being upset that he had "move[d] on like it was nothing." Doe responded that he is "not a relationship kind of guy," and the conversation ends with Roe suggesting that they "should just go with the flow." (Dep. Ex. 64.)

Later, at the appeal stage, Doe submitted the statement of another witness who verified Doe's account that, on another occasion prior to filing her charge of misconduct, Roe had come to Doe's room with her pillow and, upon seeing another woman in the room with him, had left "visibly angry and upset." (Dep. Ex. 72.)

The facts concerning whether or not these events happened are disputed, just as are the facts about what happened in the first encounter between Roe and Doe. But it is not disputed that these competing versions were made known to JMU at one point or another in the proceedings. In any event, the disputes are not material to the court's legal analysis of Doe's claims.

6

had a support person with them who was not permitted to testify. Doe's support person was an upper classman he knew from his fraternity; Roe's was one of her suitemates. The hearing officers asked questions of the witnesses and also reviewed the written materials and exhibits submitted by the parties.[6] (See generally Hr'g Tr.)

Doe denied that Roe was intoxicated or unable to give consent during the encounter, and he steadfastly maintained that she had never said "No" during it. He based his belief that she had consented on her conduct before and during the encounter, which included—according to him—her sitting on top of him after they began kissing, and their engaging in what he described as "mutual" fondling. (Hr'g Tr. 91–92, 98, 101, 109–10, 145.) Doe told the Board that, during the encounter, he asked Roe, "Condom?" and she responded, "Yes, condom." (*Id.* at 100.)

Roe presented a different account. She stated that she was so drunk that she could hardly move or speak, but that she did repeatedly tell him no. (*Id.* at 14, 112, 146.) She also said that when she realized he wasn't going to stop, she said, "Condom." (*Id.* at 14.)

During the hearing, Roe's roommate testified that she did not recall seeing Roe drink that evening and that Roe was "completely fine" when they separated earlier that evening. When Roe's roommate went to Doe's room to get Roe, she testified that Roe was "droopyish" and "tired," but stated that Roe did not seem drunk, and she did not need any help walking upstairs or getting ready for bed. (*Id.* at 33–40, 49–50, 55–56.)

Doe's roommate testified that he returned to the room at the time Roe was leaving. When asked what Roe was like when he got to the room, he said "[t]hey were fine" and that it

---

[6] There was a lot of conflicting information at the hearing regarding the date of the alleged assault; who was together when during that evening; whether Doe had at any point observed Roe drinking; and when and where there was drinking and how much. Other testimony offered included information about Roe's subsequent reports of the assault and her demeanor during those reports, her general mental condition, and subsequent testimony about interactions between Roe and Doe. A female character witness who had known Doe during high school also testified favorably for Doe.

7

was "very…normal" and "expected." (*Id.* at 120, 121.) Aside from the testimony by Roe, Doe, and their respective roommates, there was no testimony from other individuals concerning Roe's condition that night.

At the conclusion of the hearing, the accountability board recessed to deliberate and then returned and announced that they had concluded Doe was "not responsible" on the charge of sexual misconduct. Bacon also told Roe that she "obviously…can appeal with new evidence and things like that." (Tobias Decl. ¶ 13, Ex.1, Pl. Att. I.) The board issued a written decision that was given to both Doe and Roe. (Dep. Ex. 61.) It also advised Roe that she could file an appeal by December 10, 2014. (*Id.*)

## C. Roe Appeals the Finding and Submits Additional Evidence

Roe filed her appeal on December 10, 2014, the final day for doing so. (Dep. Exs. 46–47.) The semester ended, and all of the dorms closed two days later on December 12, 2014. Doe went home for break and was pre-registered for five new classes for the spring semester. (Doe Decl. ¶¶ 33, 66.) The appeal review board (or appeal board) met while he was on break, and determined that he should be suspended, so he was not permitted to return to JMU or to take those classes.

Doe argues that the appeal process was effectively a second trial since the appeal board gave no deference to the hearing board's decision and reversed it in its entirety. He complains that it was a "trial" at which he was not permitted to appear,[7] and at which there were no live

---

[7] Defendants acknowledge that Doe was told he "would not appear," but argue that he was not told that he "could not" appear, suggesting that there is a difference between the two. (Defs.' Resp. to Mot. Summ. J. 7, Dkt. No. 123.) In particular, they point out that he could have asked for permission to do so because the policy permits OSARP to allow an appearance in "extraordinary circumstances." The court finds that argument meritless. The people tasked by JMU with advising Doe about the procedure told Doe repeatedly that he would not be present at any appeal board meeting. (Answer to Am. Compl. ¶ 108; Doe Decl. ¶¶ 62, 65; Dep. Exs. 176, 177, Lushbaugh Dep. 170, 176–77, Pl. Att. L.) No reasonable jury could conclude that meant he had the right to appear if only he had asked. So, although it is true that JMU's procedures say OSARP may conclude that a student should address the appeal board in person in "rare" or "extenuating" circumstances, here Doe effectively was barred from doing so.

8

witnesses and no questioning of certain new evidence. (Pl.'s Mem. Supp. Mot. Summ. J. 12, Dkt. No. 115.) He also complains that he had no access to the audio tape of the first hearing, but access was given to Jane Roe and the appeal board.[8]

The undisputed facts establish that there were several pieces of evidence that were presented to the appeal board. Doe describes much of it as "new evidence" to which he was not given an adequate opportunity to respond. Construing the facts in the light most favorable to defendants, some of the evidence may not have been entirely new, but some indisputably was. And while Doe was given an opportunity to respond, in writing, to some of this evidence, some was not even provided to him. The court discusses the evidence in detail, because it is important to the court's analysis.

The appeal procedures seem to suggest that anything Roe wanted considered by the appeal board should be submitted as part of her written appeal submission. (Handbook 18 ("Appeals will review the case file based on the points raised in the written appeal submission and a review of the audio recording of the [initial hearing].").) Nonetheless, OSARP allowed Roe to submit additional evidence several times after her initial appeal deadline. (Defs.' Resp. to Req. Admis. Nos. 55, 57, Pl. Att. E; Dep. Exs. 92, 187, 189, 190, 193.)

On December 11, prior to leaving for break, Doe reviewed the file. The only materials were the petition for appeal, Roe's own statement, and a typed statement from her "support

---

[8] For support of this proposition, Doe cites to Wendy Lushbaugh's deposition testimony. JMU denies that Lushbaugh accurately stated the policy and contends the written policy is different. It offers no other evidence to create a dispute of fact regarding her testimony. (Lushbaugh Dep. 170–71, Pl. Att. L.) Again, though, even if there were a dispute of fact regarding this, it is not material. There is no evidence that he wanted or sought to listen to the audio tape.

9

person," who was one of her suitemates.[9]  Subsequent to his review of the file, though, and prior to the appeal board meeting, additional materials were added, and he was provided most, but not all of these.

In her initial appeal statement, Roe alleged that her roommate had not been truthful when she testified at the December 5 hearing about Roe's drinking.  One of Roe's suitemates, who had also testified at the original hearing and was not her support person, submitted two statements as part of the appeal (both of which were emailed to Doe), one of which claimed that the roommate had "lied under oath about the events the night of the rape" and "admitted to doing so" after the December 5 hearing.  The statement claimed that the roommate was drunk and "was out to cover her tracks."  (Dep. Exs. 191, 192 (emails between OSARP and suitemate).)  Despite this allegation that a witness had lied, no member of the appeal board asked for testimony from either the suitemate or the roommate, nor could they direct a rehearing on that issue.  Further, Doe was prohibited under JMU's policy from contacting the roommate or any witness.  (Dep. Ex. 88 (email to Doe identifying witnesses and warning that any contact with them would result in additional charges); Doe Decl. ¶ 38.)  Thus, he could not obtain testimony from her that she had not lied or ask her to reaffirm her previous testimony.

Roe also submitted on appeal a statement from the person who served as her support person at the hearing.  This person claimed that she, along with Roe and Roe's roommate, had all been drinking during the evening in question, that Roe was "visibly drunk" at one point, and that she (the support person) "started repeatedly taking drinks from [Roe] as she was already very

---

[9] According to JMU's procedures, the accuser and accused are each entitled to have a "support person" with them at the hearing, but the support person is not permitted to offer testimony at the initial hearing.  (Answer to Am. Compl. ¶ 74.)  Neither student's support person offered any testimony at the initial hearing.  So neither Doe nor any decision-maker was ever permitted an opportunity to observe or challenge, in person, the support person's testimony or credibility.

intoxicated." (Dep. Ex. 69.) The support person's statement said that she and Roe's roommate "left the house together" and she could not account for anything else that happened that night because she did not see Roe again. (*Id.*)

Third, Roe submitted a statement and a voice-mail from a friend of hers at another college. According to both the screen shot and the statement, the voicemail was one that Roe had left her friend at "11:39 p.m. on August 21, 2014," which was approximately 24 hours before Roe alleged the assault occurred. According to the statement, the voice-mail showed that Roe had consumed alcohol. After her OSARP advisor asked her to explain to the appeal board "how you came across this new information and why you think it is important" (Dep. Ex. 193), Roe also submitted an additional statement of her own that claimed—incorrectly, according to the date Roe gave of the assault—that the voice-mail was left on her friend's phone on the date of the assault, minutes before leaving the fraternity house and heading back to Doe's dorm room. In that additional statement, Roe claimed that the voicemail "emphasizes that I was drunk and unable to give consent to sex." (Dep. Ex. 71.) The additional Roe statement was submitted to OSARP on December 17, 2014, but was not provided to Doe until after he filed a response on December 22. (*Id.*; Dep. Ex. 110 (showing dates and times on his response and later email from OSARP); Doe Decl. ¶ 86–87.)

Documents were emailed to Doe on December 18, 2014, because he had been on a trip and without a computer from December 13 to December 17. He was permitted to respond to the emailed documents and the file documents, of which he was aware, by December 22, 2014, and he timely submitted his written response on that date. His statement, which was brief, responded to the allegation that Roe's roommate lied, and reasserted that he had received consent from Roe on the night in question. (Dep. Ex. 72.) The statement also referenced their subsequent

11

encounters. He also provided a statement from a witness who saw Roe leaving Doe's room upset after seeing him in the room with another girl. (*Id.*) As noted above, he did not respond to the additional Roe statement because it had not yet been provided to him. (Dep. Ex. 110 (showing dates and times on his response and later email from OSARP); Doe Decl. ¶ 86–87.) After Doe submitted his response, but within an hour, OSARP emailed Doe the additional Roe statement regarding why she thought the voice-mail was significant. (Dep. Ex. 110.) Lushbaugh gave Doe only one day—until Tuesday, December 23, at 5:00 p.m.—to file a response. (*Id.*) Doe has presented undisputed testimony that he did not see Lushbaugh's email until after that deadline had passed, because he did not check his email, and that he believed it was too late when he saw it to respond, so he did not ask for an extension. (Doe Dep. 126–27, Def. Att. E.) Throughout the process, though, both Roe and Doe had received previous extensions of time to file documents. Based on this, defendants argue that he knew he could have asked for an extension, and he simply failed to do so. Regardless, Doe did not respond to the specifics of Roe's new appeal statement at any point.

Because Roe's additional appeal statement had been submitted by her to OSARP on December 17, it appeared to the appeal board that Doe had that document on the date he filed his response, even though he did not yet have it. (Answer ¶ 110; Raab Dep. 89–91.)

Finally, the file given to the December 5 hearing board included a three-page statement from a licensed clinical social worker, describing the effects of alcohol consumption on a user of Prozac, and a statement from a pharmacy that showed medicines prescribed to Roe, including Prozac. (Dep. Ex. 62.) Doe has testified that the statement, although dated December 5, was not added to the case file until after the December 5 hearing, and that he did not see it prior to or during the December 5 hearing, or at any point during the appeal process. (Doe Decl. ¶ 51.)

12

Defendants admitted in their answer that it was not placed in the file until after the time permitted by its own procedures. (*See* Answer to Am. Compl. ¶ 102 (acknowledging it was received at some point on or after December 4, 2014); Dep. Ex. 34 (Ohgren's email explaining that either party introducing witness statements had to submit them 48 hours in advance of a hearing or to bring 5 copies to the initial hearing and give the other party the opportunity to review).) And they have not offered any evidence to show that it was ever provided to or made available to Doe.

**D.      The Appeal Board Issues a Decision of "Sanction Increased" With a Penalty of Suspension for Five-and-a-Half Years**

The appeal board consisted of three faculty members: Ronald Raab, Dana Haraway, and David Parker. All three testified that they gave no deference to the initial hearing board's decision, but reviewed all the evidence, including the audio recording of the initial hearing, to render a decision. (Parker Dep. 22–23, Pl. Att. H; Raab Dep. 45–46, 51–52; Haraway Dep. 41, 42.) The appeal board was provided a copy of the audio recording of the initial hearing and copies of the documents in the file (including all of the "new" information), prior to January 8, 2015. The board members did not attempt to speak with any of the witnesses, or with Doe or Roe, before rendering their decision. Instead, the members met on January 8 and reviewed the documentation in the file and discussed it.

The appeal board then issued a written document that simply described its decision as "Sanction Increased." (Dep. Ex. 75.) It imposed a "new sanction" on Doe of immediate suspension from JMU through Spring 2020 and would allow Doe's readmission only if he completed an education/counseling program and then reapplied. It also banned Doe from Greek involvement and functions. Nowhere did the statement expressly state that it found him

13

responsible for sexual misconduct, nor did it contain any reasoning or explanation for its decision. (*Id.*)

The appeal board's decision was conveyed to Warner that same day in an email from OSARP Director Bacon. Bacon's email told Warner that "the appeal board had some new recorded evidence that really changed the case," an apparent reference to the voice-mail left with Roe's friend. (Dep. Ex. 93.) But Bacon testified during his deposition that, later that same day—and after speaking with Raab—he called Warner and corrected that misimpression, telling Warner that it was not the voicemail that had influenced the appeal board and resulted in the opposite decision. (Bacon Dep. 161–62, Pl. Att. D.)

In their depositions, the three appeal board members were asked about what they discussed during their deliberations and what they found significant in reaching their decision. At least based on the deposition excerpts provided to the court, Parker had little memory of the proceeding, other than noting that the initial hearing was "convoluted" and "disorderly." (Parker Dep. 45–47.) Both Raab and Haraway referenced some of the new evidence presented only to the appeal board and not before the hearing board. For example, they said the board discussed and was influenced by the suitemate's statement that Roe's roommate had lied and the statement from the clinical social worker. (Raab Dep. 110, 126–27, Pl. Att. J; Haraway Dep. 88–89.) Additionally, the appeal board apparently was unaware that Doe had not been given Roe's additional statement prior to submitting his response. (Raab Dep. 89–91.) Also, Haraway referenced the voice-mail as being significant. (Haraway Dep. 92.) She did not realize until after the lawsuit had been filed that the voice-mail had been left on the prior evening, rather than the evening Roe alleged Doe assaulted her. (*Id.*)

### E.    Warner Affirms the Appeal Board

The appeal board's determination was sent to Warner for review and final action. Warner received a packet of documents from OSARP and a flash drive containing the audio recording of the initial hearing. (Warner Dep. 176–77, Pl. Att. B.) He reviewed the documents and listened to most of the hearing. (*Id*.) Warner had several options: he could affirm (with or without changing the sanction); find Doe "not responsible"; or determine that the case should be reheard at the original hearing level or by the appeal board. (Handbook 19.) Warner affirmed the decision, including its sanction, without any notice to or input from Doe. JMU then imposed a sanction of an immediate suspension to run through May 2020, which required Doe to reapply for admission in order to reenroll at JMU. (Answer to Am. Compl. ¶ 124.)

Doe was not given notice of the appeal board decision or Warner's decision until afterward. Lushbaugh called Doe to advise him of the decision and later sent him several emails setting forth the sanction and its consequences. Doe's parents contacted JMU to contest the decision and had several conversations with OSARP Director Bacon on January 10, 2015. Additionally, Warner and Bacon met with Doe's parents, but under the policy, the decision was final, and there was no way to contest Warner's decision. The charge file was shredded shortly thereafter, per JMU Policy. (Lushbaugh Dep. 201–03, Pl. Att. L(1).)

### F.    Procedural History

Roughly four months after his suspension, Doe brought this action. He asserts two claims under 42 U.S.C. § 1983 in his amended complaint, naming Alger and Warner in their official capacities. The court previously dismissed Count 2 of his amended complaint, in which Doe claimed defendants had deprived him of a liberty interest without due process. (Mem. Op. & Order, Dkt. Nos. 101, 102.) The sole remaining count, therefore, is Doe's claim that

defendants deprived him of his property right in his continued enrollment without procedural due process in violation of the Fourteenth Amendment. (Am. Compl. ¶¶ 142–52, Dkt. No. 30.) In addition to seeking an award of attorneys' fees and costs, he seeks a declaratory judgment that Alger and Warner violated, and continue to violate, his procedural due process rights. He also seeks a permanent injunction requiring defendants, as officers and agents of JMU, to readmit him as a full-time student, to expunge his student record of the charge of sexual misconduct, and to otherwise prohibit the enforcement of any sanction against him, or disclosure to a third party that any adverse disciplinary action was taken against him as a result of the incidents described in the complaint. (*Id.* at 22.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment may be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits . . . [and] 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316, F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). The party opposing the motion, however, "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). Parties may point to such facts by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "If the

16

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

**B.     The Undisputed Facts Show That Doe Has A Protected Property Interest in Continued Enrollment at JMU.**

The Fourteenth Amendment, in relevant part, provides that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  To prove a procedural due process claim, a plaintiff must show that he has a "constitutionally cognizable . . . property interest," that the state deprived him of that interest, and that the procedures used were not constitutionally adequate. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).  As the court acknowledged in ruling on the defendants' motion to dismiss, "[n]either the Supreme Court nor the Fourth Circuit has explicitly recognized a property interest in a student's continued enrollment in a public college or university . . . ." (Mem. Op. 16, Dkt. No. 101.)  Thus, the court consults the more general guidance those courts have provided on the issue, albeit in the context of other property interests.

A property interest is "created and [its] dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Bd. of Regents v. Roth*, 408 U.S. 565, 577 (1972) (finding no property or liberty interest where public university refused to renew a teacher's expired, one-year contract).  As *Roth* made clear, a property interest is not created by a mere "abstract need or desire for it." *Id*.  Instead, there must be "a legitimate claim of entitlement to it." *Id*.  This claim of entitlement may arise from state statutes, contracts, regulations, or policies. *Id*. at 576–78.

In *Perry v. Sindermann*, 408 U.S. 593 (1972), the Court recognized that, even where there was no statute and no contract provision conferring a property interest, one might exist.

17

There, the Court addressed whether a public junior college professor had a property right in continued employment. *Id.* at 599. The professor argued that a de facto tenure policy existed based on rules and understandings officially promulgated and fostered by the college and that such a de facto tenure policy could be sufficient to state a property interest. *Id.* at 599–600. While emphasizing that "mere subjective 'expectancy'" is not protected by due process, the *Perry* Court nonetheless held that the professor "must be given an opportunity to prove the legitimacy of his claim of entitlement in light of the policies and practices of the institution." *Id.* at 603 (internal quotation marks and citation omitted); *see also Detweiler v. Commonwealth of Va. Dep't of Rehabilitative Servs.*, 705 F.2d 557, 559–60 (4th Cir. 1983) (concluding that related statutory provisions, regulations, and statements of policy, "when read together," established that nonprobationary employees had a property interest in continued employment).

This same rule has been applied outside of the employment context, too. In *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157–58 (4th Cir. 1991), for example, the court noted that "mutual expectations may create an entitlement in a license," especially where the license is renewable periodically simply on the payment of a fee and without additional action. Likewise, in *Ruttenberg v. Jones*, 283 F. App'x 121, 129 (4th Cir. 2008), the court reasoned that a billiard club had a property interest in its ABC license and its city permit allowing operation of a business on the premises. The court found it significant there that a state court had ruled the plaintiff had a property interest in the permit, and cited to *Roth* for the proposition that such interests "are created and their dimensions are defined by existing rules or understandings." *Id.* at 129 n.2.

Regardless of whether a property interest is created by statute, ordinance, or express or implied contract, "the sufficiency of the claim of entitlement must be decided by reference to

18

state law." *Bishop v. Wood*, 426 U.S. 341, 344 (1976), *overruled in part on other grounds by Cleveland Bd. or Educ. v. Loudermill*, 470 U.S. 532, 540–41 (1985); *see Perry*, 408 U.S. at 602 n.7 (noting that whether or not the professor had a legitimate claim of entitlement to job tenure would be determined by "the law of Texas"). Thus, the question here is whether Virginia law gives Doe an enforceable "entitlement" to continued enrollment at a public university.

Doe does not argue that there is a Virginia statute or regulation that confers on him a right to continued enrollment. Instead, Doe asserts four primary bases for his claimed property interest. First, he claims that he had an express contractual relationship with JMU: "money in exchange for an education." The terms of this contract include "those set by JMU's longstanding practices and policies, including those it set forth in its handbook." (Pl.'s Mem. Supp. Mot. Summ. J. 24.) He notes also that his contractual rights may arise from the conduct of the parties and be implied. (*Id.* at 25.) Second, Doe points to his housing contract with JMU as "further evidence of his protected property right." (*Id.* at 26.) Third, he alleges that he has a property interest because he is a third-party beneficiary of the contractual relationship JMU has with the federal government as a result of JMU receiving federal funds under Title IX. (*Id.* at 27.) Fourth, he contends that he has a common law right to fair and equitable procedures. The court agrees with Doe that the first of these grounds is sufficient and does establish a protected property interest.[10]

First of all, as noted *supra*, defendants admitted in their answer that Doe has a legitimate claim of entitlement to continued enrollment. *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (explaining the established rule that stipulations and assertions in an answer are binding on a party unless the court allows them to be withdrawn). Paragraphs 10 and

---

[10] In light of its ruling, the court does not address the remaining bases for Doe's claimed property interest.

17 of the amended complaint and defendants' responses to those two paragraphs make this clear.

In Paragraph 10, Doe alleged:

> 10. In return for Plaintiff paying the required tuition and fees in a timely manner, JMU agreed to provide an undergraduate educational program which required the earning of a minimum of 120 credit hours to be earned over several years in order to be eligible for a degree. During this period of enrollment, JMU placed substantive limits on its ability to suspend or dismiss Plaintiff by adopting policies and by continuing to follow a longstanding and consistent practice of requiring a finding of cause, as determined by a fair and impartial process which included notice of the charge, a meaningful opportunity to appear, and confront the evidence to be considered.

(Am. Compl. ¶ 10, Dkt. No. 30.)

Defendants' response was:

> 10. *Defendants admit that in return for Plaintiff paying the required tuition and fees in a timely manner, JMU agreed to provide an undergraduate educational program which required the earning of a minimum of 120 credit hours to be earned over several years in order to be eligible for a degree.* Paragraph 10 also contains legal conclusions to which no response is required. Defendants deny the remaining allegations contained in Paragraph 10 of the Amended Complaint.

(Answer to Am. Compl. ¶ 10, Dkt. No. 110 (emphasis added).)

Paragraph 17 and defendants' answer to it are as follows:

> 17.     On or about April 6, 2014, in reliance on these policies, practices and understandings regarding Student Rights, Plaintiff accepted JMU's offer and paid the required deposit. By doing so, Plaintiff entered into a relationship with JMU that entitled him to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course work needed to earn a degree, otherwise met the requirements for graduation, and complied with JMU's conduct rules.

> 17. Paragraph 17 states legal conclusions to which no response is required. To the extent a response is required, *Defendants admit only that Plaintiff accepted JMU's offer of admission and paid the required deposit, and that by doing do, Plaintiff was entitled to be enrolled thereafter so long as he paid the required fees, remained in good standing academically as he pursued the academic course*

> *work needed to earn a degree, otherwise met the requirements for graduation, and complied with JMU's conduct rules.* Defendants deny that Plaintiff entered into a relationship with JMU in reliance on policies, practices, and understandings regarding Student Rights.

(Am. Compl. ¶ 17; Answer to Am. Compl. ¶ 17 (emphasis added).)   In defendants' own words, then, once Doe accepted the offer of admission and paid his deposit, he "was entitled to be enrolled thereafter" so long as he met certain requirements, including paying fees, meeting academic standards, and "compl[ying] with JMU's conduct rules." (*Id.* ¶ 17.)  In other words, it is undisputed that he was entitled to continued enrollment absent cause for suspension or dismissal.  Defendants' admissions here show that there is no dispute that Doe had a legitimate entitlement to enrollment, one that was part of a contractual agreement (whether expressed or implied in fact), although not all of the terms of the contract were in writing.

Defendants contend, though, that Doe's theory is one of implied contract or quasi-contract, and that, because "[i]mplied contracts are not enforceable against the sovereign in Virginia," Doe's property interest cannot be grounded in an implied contract theory.  (Defs.' Mem. Supp. Mot. Summ. J. 19, Dkt. No. 117.)  On this basis, they argue that *Perry*—to the extent it allows a property right to be based on anything other than a statute or contract—is simply inapplicable in Virginia.  Their argument ignores the important distinction, however, between implied-in-fact and implied-in-law contracts.

As the Fourth Circuit has explained:

> Virginia distinguishes between two types of implied contracts: contracts that are implied-in-fact and contracts that are implied-in-law. An implied-in-fact contract is an actual contract that was not reduced to writing, but the court infers the existence of the contract from the conduct of the parties. . . .  By contrast, the concept of an implied-in-law contract, or quasi contract, applies only when there is not an actual contract or meeting of the minds.

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165–66 (4th Cir. 2012) (internal citations omitted). The main case on which defendants rely, *Dr. William E.S. Flory Small Bus. Dev. Ctr. v. Commonwealth*, 541 S.E.2d 915 (Va. 2001) dealt only with an implied-in-law, quasi-contractual theory. The *Flory* court held that such a theory could not be enforced as against a sovereign, because of principles of sovereign immunity. *Id.* at 918. Specifically, it noted that, although a sovereign was not shielded from liability for its valid contracts under common law, it had immunity, unless it had waived it, from "quasi-contractual doctrines" which "are premised on the absence of a valid contract." *Id.*

Here, by contrast, to the extent Doe is relying on an implied contract theory at all, he relies on an "implied-in-fact" contract. Such a contract "differs from an actual contract in that the parties have not reduced it to a writing or to an oral agreement; rather, the court infers the implied-in-fact agreement from the course of conduct of the parties." *Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990). But such a contract is still a contract and thus can be enforced against a sovereign. *Id.* The court's conclusion that a property right may be based upon an implied-in-fact contract, even in Virginia, is also consistent with Fourth Circuit authority holding that "[a] claim of entitlement based on an understanding is enforceable in Virginia . . . only if the understanding is mutual, *i.e.*, both parties have assented to it." *Sabet v. E. Va. Med. Auth.*, 775 F.2d 1266, 1270 (4th Cir. 1985).

Here, as already shown, the admissions of defendants show a clear and mutual assent to an entitlement based on a mutual understanding. Both defendants (as well as Doe) have stated their understanding that, as long as Doe maintained sufficient academic progress, paid tuition and applicable fees, and did not commit a conduct violation, he had an "entitlement" to continued enrollment at JMU, and thus a protectable property interest. The court's conclusion is

22

also supported by JMU's long-standing practice of not suspending or expelling students except for cause, as both defendants acknowledged in their depositions.

Defendants also argue that any contract is an "illusory" one, because the policies or procedures could be changed at any time. (Defs.' Mem. Supp. Mot. Summ. J. 19 (citing, *e.g.* *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 337 (E.D. Va. 2005) ("[T]he [George Mason University] Catalog amounts to an unenforceable illusory contract because it purports to promise specified performance, but the performance by GMU, the promissor, is entirely optional.")).) With regard to policies, as already discussed, defendants have admitted an entitlement to continued enrollment in their Answer, and they testified about this mutual understanding. JMU's practice—since at least 1998—was to expel students only for cause.[11] Doe's legitimate entitlement to continued enrollment has been acknowledged by JMU. Defendants cannot now retract their admissions or testimony by arguing that the entitlement was not legitimate, but was illusory.

With regard to procedures, JMU is correct. It may change its procedures at will. However, once the property right exists, any internal procedures are irrelevant if they grant more rights than required by the constitution. *See Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990). There is no property right that exists in procedures themselves. *Loudermill*, 470 U.S. at 541 (property is not defined "by the procedures provided for its deprivation"). But, by virtue of the Fourteenth Amendment, JMU cannot deprive Doe of his property right without satisfying the minimal constitutional requirements of procedural due process.

Based on the undisputed evidence, then, the court concludes that there was a mutual understanding and assent, as well as a practice, and therefore an enforceable entitlement under

---

[11] While the delineation of what constitutes cause may change over the years, defendants admit that cause is required and thus that Doe legitimately expected not to be dismissed from school without cause and at the whim of JMU.

Virginia law.[12]  Thus, the court concludes that Doe had not just a subjective sense of entitlement, but a "legitimate entitlement" to due process before being effectively expelled.  The court therefore concludes, as a matter of law, that Doe had a protected property interest in his continued enrollment.

## C.    The Undisputed Facts Show That Doe Did Not Receive Due Process

Having concluded that Doe had a protected property interest in his continued enrollment, and there being no dispute regarding deprivation of that interest when JMU suspended him, the court turns next to the issue of whether the undisputed facts show he was deprived of that interest without procedural due process.  The court concludes that the undisputed facts establish a violation of Doe's due process rights.

The basic requirements of due process are notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  But the process due in any particular case is governed by what "the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  The Fourth Circuit has explained that where a student faces expulsion,[13] the procedural protections he must be afforded are as follows:

> The notice should contain a statement of the specific charges and grounds
> which, if proven, would justify expulsion under the regulations of the

---

[12]  Taking defendants' position to its logical conclusion would allow a public institution to take a student's tuition and housing money and then expel him on the second day of classes for no reason whatsoever, and the student would not have any "enforceable" right to recourse.

[13]  Defendants argue that Doe was not expelled and that he was merely suspended.  (Defs.' Mem. Supp. Mot. Summ. J. 21, Dkt. No. 117.)  But the court concludes that, under the circumstances here, that is a distinction without a difference.  *See Medlock v. Trustees of Ind. Univ.*, 738 F.3d 867, 870 (7th Cir. 2013) ("Although called a 'suspension,' this [one-year suspension] was more like an expulsion, because if he wanted to be reinstated he had to apply, after the year was up, and there was no guarantee that the application would be accepted.").  OSARP's director has acknowledged as much here.  (Bacon Dep. 198, Pl. Att. D(1)  ( "Q. And would you agree that [a suspension of five and a half years is] almost like an expulsion?  A. Yes.").  Doe was suspended for a period of five and a half years, a longer time than the typical college student takes to graduate.  He was not permitted to return from break to the campus and was barred from returning for the entirety of that period.  He also had to reapply for admission if he wanted to reenroll at JMU.  (Defs.' Resp. to Req. Admis. No. 104, Pl. Att. E.)  Thus, the court concludes that Doe was entitled to the same process a student should receive prior to being expelled.

24

[University].  The nature of the hearing should vary depending upon the
circumstances of the particular case.  The case before us requires something more
than an informal interview with an administrative authority of the college.  By its
nature, a charge of misconduct, as opposed to a failure to meet the scholastic
standards of the college, depends upon a collection of the facts concerning the
charged misconduct, easily colored by the point of view of the witnesses.  In such
circumstances, a hearing which gives the . . . administrative authorities of the
college an opportunity to hear both sides in considerable detail is best suited to
protect the rights of all involved.  This is not to imply that a full-dress judicial
hearing, with the right to cross-examine witnesses, is required. Such a hearing,
with the attending publicity and disturbance of college activities might be
detrimental to the college's educational atmosphere and impracticable to carry
out.  Nevertheless, the rudiments of an adversary proceeding may be preserved
without encroaching upon the interests of the college.

*Cobb v. Rector & Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 828–29 (W.D. Va. 1999).

(alteration and omissions in original) (quoting *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150,

159–59 (5th Cir. 1961)); *see also Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th

Cir. 1983) ("Although *Dixon* was decided more than twenty years ago, its summary of minimum

due process requirements for disciplinary hearings in an academic setting is still accurate

today.").

Applying this standard here, the court concludes that the undisputed facts establish that

Doe was not afforded due process.  Although Doe notes numerous aspects of the disciplinary

process that he contends violated his due process rights, the court focuses on several key aspects

that, particularly considered together, were fundamentally unfair to Doe.[14]

### 1.  The Appeal Board Provided No Reasons For Its Decision

Due process requires some kind of reasoning for the disciplinary action taken, as a

number of courts have recognized.  *See, e.g.*, *Jones v. Bd. of Governors of the Univ. of N.C.*, 704

---

[14]  Doe also challenges that JMU failed to apprise him of the names of the members of the appeal board
ahead of time and thus deprived him of any opportunity to challenge their independence and that it used "gender
balancing" in selecting members of the panel.  (Pl.'s Mem. Supp. Mot. Summ. J. 28.)  In light of the other
deficiencies the court discusses herein, it is not necessary to address these additional grounds.

25

F.2d 713, 716 (4th Cir. 1983) (affirming district court's grant of preliminary injunction for student where university's initial determination had been reversed "without any expression of reasons for the . . . rejection of the [first] tribunal's determination"); *Doe v. The Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 612–13, 621–22 (E.D. Va. 2016) (finding a violation of due process where plaintiff was acquitted, but then a different administrator found him liable and imposed sanctions, without an explanation). Here, just like in *Jones* and *Doe*, the appeal board effectively reversed the decision of the hearing board without any explanation whatsoever and without ever expressing a finding that Doe was responsible for sexual misconduct. It did so without hearing any live testimony, even though a new issue of credibility had arisen, and after considering additional evidence submitted by Roe, some of which was not even provided to Doe until after a final decision was made. Furthermore, Doe was not permitted to be present at the appeal hearing. Since the initial decision was favorable to Doe and because there were additional concerns regarding the fairness of the second hearing or appeal (as discussed next), the lack of any explanation is particularly problematic.

Relatedly, the lack of explanation makes it impossible to tell whether the appeal board applied the wrong standard for gauging consent, as it appears may have been the case.[15] In particular, the appeal board chair testified that Doe's understanding of Roe's capacity to consent was "not relevant in finding responsibility." (Raab Dep. 37.) That is clearly incorrect under the policy, which allows incapacitation to invalidate consent only "where the accused student knows or reasonably should have known of such incapacitation." (Handbook at 28.) If Raab's understanding was applied, then the appeal board effectively misapplied JMU's policy. While a misapplication of internal policies may not be a denial of constitutional due process in every

---

[15] While this court's decision is not based on a possible misapplication of the standard because the record is not clear, it is mentioned for any due process implications in any subsequent appeal board meeting regarding Doe.

26

case, it could, in this case, affect whether the notice to Doe was adequate. He believed he was charged with committing sexual misconduct, which was defined a certain way, but his conduct may have been evaluated under a different definition of sexual misconduct.

### 2. Doe Was Deprived of a Meaningful Opportunity to Be Heard Before the Appeal Board

As set forth in the factual background above, there were significant anomalies in the appeal process that show, especially when viewed collectively, that Doe was denied a meaningful opportunity to be heard during the appeal. *See Doe*, 149 F. Supp. 3d at 621 (concluding that although certain procedural irregularities or failures to follow the university's own procedure would not, standing alone, rise to the level of a constitutional violation, the "accumulation of mistakes" "resulted in a violation of procedural due process") (citation omitted).

Perhaps most problematic here is the issue of the suitemate's testimony that Roe's roommate had lied—and admitted to lying—which the appeal board members said they had discussed in their deliberations and which Bacon conveyed to Warner made a difference in the outcome. This credibility determination by the appeal board differs fundamentally from the "he said/she said" aspects of the accounts of their sexual encounter that Roe and Doe gave, because the appeal board could at least listen to those accounts as part of the hearing recording. But as to this issue, there was no opportunity for Doe (or Roe's roommate, for that matter) to counter the attack on her credibility. For the appeal board to credit the suitemate's testimony that Roe's roommate had lied, without ever hearing from Roe's roommate on the subject (or even questioning the suitemate about it), is fundamentally unfair. The unfairness was compounded by the fact that Doe was not permitted to contact the roommate under JMU's policies and

procedures, a prohibition about which he was repeatedly advised and threatened with severe consequences for violating.

Another procedural deficiency arises from the fact that a three-page statement by the social worker regarding the effects of mixing Prozac and alcohol was not given to Doe at all until after his suspension. Doe may have been on notice about the issue generally, based on passing references in the original charge and in Roe's testimony before the hearing board, and thus had notice that Roe was claiming the Prozac affected her levels of intoxication. But no reasonable jury could conclude that Roe's statement that she recently learned being on Prozac made her more susceptible to getting drunk was the equivalent of a three-page report by a licensed professional, with educational background and training on the subject, explaining the effects of alcohol on individuals who are on Prozac. At the very least, had Doe known there was a licensed clinical social worker offering written testimony before the appeal board, he might have tried to submit additional materials of his own in response.

Lastly, the lack of any meaningful opportunity for Doe to contest the additional statement of Roe saying that the voice-mail showed she was intoxicated that evening also deprived him of due process. Although he had knowledge of the voicemail and statement from the friend prior to filing his response, he did not have timely access to Roe's new appeal statement about its significance. The appeal board, however, was left with the impression that he did have the statement before he filed his response. One of the appeal board members said that she had found it significant and did not even realize, until her deposition in this case, that the voice-mail was from at least 24 hours before the alleged assault. A fair process would have given Doe an opportunity to raise and emphasize this point.

In short, Doe was given no opportunity to respond to some of the evidence (*e.g.*, the social worker's statement), was hampered by the rules prohibiting contact with witnesses or limited by time constraints in responding to others (*e.g.*, the allegations that Roe's roommate lied, and the new appeal statement, including the explanation of the voice-mail), and was not permitted to appear before the appeal board.[16]  Additionally, because the appeal board made no finding of responsibility by Doe and provided no reasons for its "Increased Sanction" decision, the appeal board decision and its review by Warner were unfair to Doe.  Taking all of these deficiencies together, the court concludes that no reasonable jury could find Doe was given fundamentally fair process.[17]  Instead, the undisputed facts show that JMU denied Doe a "meaningful hearing," *Jones*, 290 F.3d at 627.

For these reasons, the court concludes that Doe is entitled to judgment in his favor on his due process claim as to liability.

**D.    President Alger Is A Proper Defendant**

The court addresses briefly defendants' contention that Alger is not a proper defendant in this case and that he should be dismissed.  They argue that Alger was not involved in any deprivation and that he is not a necessary party for implementing any injunctive relief the court might order.  (Defs.' Mem. Supp. Mot. for Summ. J. 27–29.)  The court disagrees and concludes that Alger should not be dismissed.

---

[16]    The court is not suggesting that due process requires an appearance before an appeal board, but, given the other deficiencies in process here, the opportunity to appear may have lessened the effect of the deficiencies.

[17]    Doe also complains that Roe was given additional extensions and accommodations he was not provided. For example, he points out that JMU allowed her to file an amended appeal statement late, a statement from her support person, and asked her to explain her new evidence, effectively giving her advice throughout the process. Doe claims he was not given the same level of support or accommodation.  The court's decision does not rest on these alleged differences in treatment.

29

Although it is true that he played no role in the disciplinary proceedings against Doe, he is the president of the University and is being sued only in his official capacity. Under *Ex Parte Young*, 209 U.S. 123 (1908), a defendant can be sued in his official capacity if that defendant has responsibility for enforcing an unconstitutional law or order, or is necessary to effectuate injunctive relief that is requested by the plaintiff. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (explaining that, where a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective[,]" the Eleventh Amendment does not bar a suit against a state official). As noted, Doe requests injunctive relief in the form of his sanctions being changed, his being readmitted, and JMU's records being expunged. The court is satisfied that Alger, who is the president of the university, possesses sufficient "*proximity to* and *responsibility for* the challenged state action" to render him a proper defendant. *See McBurney v. Cuccinelli*, 616 F.3d 393, 399 (2010) (emphasis in original).

## III. CONCLUSION

For the reasons stated above, the court will grant plaintiff's motion for summary judgment and deny defendants' motion. An appropriate order will be entered, which will also direct the parties to brief the issue of the appropriate remedy in light of the court's ruling.

Entered: December 23, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

30